FILED
2021 May-28  PM 08:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 1

William A. Lemons, Jr., M.D. v. Principal Life Insurance Company

February 27, 2020

Debra A. Conner, JD
300 Buck Island Road
West Yarmouth, MA 02673

**Lemons 7661**

**Table of Contents**                                                                    Page

Education and Experience                                                                  3 - 4

Documents List                                                                           5 - 6

The Policy Language                                                                      7 – 13

Background & Time-line                                                                   13 - 18

Alabama Insurance Law & Model Unfair Claims Settlement Practices Act                     18 - 20

Opinion Regarding Claim Handling by Principal in Rebuttal of Expert Witnesses            20 - 25
Laura B. Parker and Elliott Flood

     Initial Claim Handling                                     20 - 21

     The Date of Disability                                     21

     Determination of Regular Occupation                        21 - 23

     Use of Marketing Materials in Adjudicating Disability Claims   23 - 24

     Decision to Pay Benefits by Doug Hanselman                 24

     Reconsideration Process                                    25

Regulatory Findings                                                                     25 - 26

Miscellaneous Comments                                                                  26 - 27

Summary                                                                                 27

Publications & Testimony                                                                28

**Lemons 7662**

**Introduction, Education and Experience**

I have been asked by Maynard, Cooper & Gale, P.C., to review documents as noted in the section entitled "Documents List" and provide my opinion as to the file management and decision made on the disability claim for William Lemons, MD, by Principal Life Insurance Company, hereinafter referred to as "Principal Life". As part of my review, I have also been asked to comment on the expert reports submitted by Laura B. Parker and Elliott Flood.

By way of background, I have a Bachelor of Arts degree from the University of Massachusetts, Amherst and a Juris Doctor from Western New England University in Springfield, MA. I am a member of the Connecticut Bar.

I have worked in the insurance industry for the past 40 years in various product lines as part of claim departments, contracts and compliance departments (state and federal) and as in-house counsel. Since September of 2018 I have provided life and disability claim/product consulting services. There may be times within this report where I refer to the "industry". This term is meant to encompass the experience I have gained by working with multiple group and individual life and disability insurance carriers as well as reinsurers and third-party claim administrators. It includes holding a number of positions in claims departments including my most recent position as Vice President of Life and Disability claims at Sun Life Financial. In this position I was responsible for life and accidental death insurance claims, short term disability claims and the oversight of 20,000 open long-term disability claims with an average of 800 new long-term disability notices received each month. I was responsible for working with the Internal Audit Department to assure that proper controls were in place in the claim department to ensure that procedures were being followed, authority levels were appropriate for level of experience, training programs were in place and claim determinations were timely and accurate. If deficiencies were noted I had oversight of the Department's response and action plan to remedy them. Over the years I was involved in the interview and reporting process with Canadian and US regulatory agencies involving market conduct exams.

For eight years as in-house counsel for Allmerica Financial and Massachusetts Casualty Insurance Company I managed the litigation associated with individual disability policies. For my remaining year and a half at Massachusetts Casualty I was the Vice President of the individual disability claim department. Thus, my experience encompasses group policies governed by ERISA as well as those governed by state law including individual policies and non-ERISA group policies.

For six years of my career I worked in the contract and compliance department where my responsibilities included writing insurance contract language for existing group product contracts and drafting new group products including disability, interpreting state laws, submitting contract language to state insurance departments and working with them to obtain approval of the forms. I also worked as a federal compliance analyst with the responsibility of interpreting federal laws that impacted policyholders. I provided guidance to the group division

3

as to the impact of those laws. Examples include, COBRA, OBRA, ADA, etc. As in-house counsel I have provided support to the contracts and compliance department in similar matters.

I have worked with life and accidental death insurance products, short term disability, long term disability, cancer and critical illness, a voluntary hybrid disability product and medical claims and stop loss products. These include the traditional insurance products as well as voluntary/worksite products. Throughout the years I have attended (and/or spoken at) industry meetings (including Society of Group Contract Analysts, International Claim Association, the New England Claims Association and The Definitive Disability Conference).  I am a past president of the New England Claims Association. I have interacted with reinsurers and my peers at other companies both in the United States as well as Canada and Australia. I have been involved in the sale of an individual disability business (Massachusetts Casualty) and have conducted due diligence on a number of other carriers' claim blocks for potential acquisitions and integrated claim best practices from two acquisitions by Sun Life.

4

## Documents List

| Document | | Bates No. |
|---|---|---|
| Court Documents: | | |
| Second Amended Complaint | | |
| Principal Life's Answer to Plaintiff's Second Amended Complaint | | |
| Principal Life's Supplemental Responses to Plaintiff's Interrogatories | | |
| Verification to Second Interrogatory Responses | | |
| | | |
| Principal v. MetLife | | Lemons 3852 – 3855 |
| Principal's Portfolio Summary | | Lemons 3858 – 3867 |
| Third Party Production from Covenant | | Lemons-Covenant 1 – 148 |
| Small Business Owner Election-2015-Tax Document | | Lemons 2812 – 2817 |
| Individual Disability Income in the U.S. | | Lemons 4694 – 4743 |
| Principal Claims Manual | Principal-Lemons-CONFIDENTIAL | 6360 – 6400 |
| Principal Claims Manual | Principal-Lemons-CONFIDENTIAL | 6404 – 6415 |
| Principal Claims Manual | Principal-Lemons-CONFIDENTIAL | 7094 – 7135 |
| IDI Menu | Principal-Lemons-CONFIDENTIAL | 5940 – 5942 |
| Principal Claim Manual | Principal-Lemons-CONFIDENTIAL | 5945 – 6023 |
| Principal Performance Goals | Principal-Lemons-CONFIDENTIAL | 6356 – 6359 |
| Claim Check List | Principal-Lemons-CONFIDENTIAL | 5943 – 5944 |
| Job Descriptions | Principal-Lemons-CONFIDENTIAL | 6024 – 6051 |
| Organizational Chart | Principal-Lemons-CONFIDENTIAL | 6401 - 6403 |
| Claim File | Principal-Lemons-CONFIDENTIAL | 0001 – 3585 |
| Policy | Principal-Lemons-CONFIDENTIAL | 0001 – 0042 |
| Alabama DOI Complaints | Lemons | 1649 – 2105 |
| State of CA Market Conduct Exam | Lemons | 1493 – 1505 |
| What if You Couldn't Be an Attorney Lemons | Lemons | 3856 – 3857 |
| Iowa Financial Exam | Lemons | 1621 – 1646 |
| Additional Line of Credit | Lemons | 2810 – 2811 |
| Business Taxes for Covenant | Lemons | 2808 – 2809 |
| Check Book for Covenant | Lemons | 3049 – 3053 |
| Compass Transaction receipts | Lemons | 3054 – 3057 |
| Documents from Compass | Lemons | 2818 – 2831 |
| Fritz Independent Physician Contract | Lemons | 1333 |
| HH750 Product Portfolio | Lemons | 3876 – 3879 |
| IRS S-Corp Letter for Covenant | Lemons | 2833 – 2835 |
| Lemons Capstone | Principal/Lemons Capstone Financial Subpoena | 001 – 168 |
| Lemons CV | Lemons | 1246 – 1248 |

## Documents List Continued

| Document | Bates No. |
|---|---|

Occupational Underwriting                                    Lemons    3868 – 3875
Principal IDI Powerpoint                                     Lemons    4216 – 4305
Principal Life Step by Step Guide to Disability Ins.         Lemons    4597 – 4670
Trinity Termination letter                                   Lemons    1293 – 1332
Product Description and Underwriting Guide                   Lemons    3933 - 4194

Expert Reports:
Laura B. Parker
Elliott Flood
W. Pearce, CPA

Deposition Transcripts:
A. Ralston
D. Hanselman
J. Hendricks
M. Curry
M. Wallace
N. Johnson
S. Thorpe
Dr. Lemons

**Lemons 7666**

**The Policy Language**

**Principal Life Individual Disability Policy**
Insured: William A. Lemons, Jr.
Issue Age 30
Policy Number: 7471393
Policy (Effective) Date: November 15, 1995
Policy: Disability Income
Elimination Period: 90 Days
Maximum Monthly Benefit: $10,000

Social Security Substitute Benefit not included

Maximum Benefit Period—to Age 65 Policy Anniversary. If this policy is renewed between the Age 65 and Age 74 Policy Anniversaries, the Maximum Benefit Period is 2 years. Beyond the Age 74 Policy Anniversary, the Maximum Benefit Period is one year.

Riders

| | |
|---|---|
| HH677 | Benefit Update |
| HH674 | Return to Work Benefit |
| HH649 | Regular Occupation Benefit |
| HH661 | Business Earnings Benefit |

**Definitions in this Policy**

Continuous Disability-- means your Disability that continues with no interruption. You will be considered Continuously Disabled even if an Interrupted Elimination Period or Recurring Disability Occurs.

Current Earnings—means your Earnings for each month while you are Disabled.

Disability—means:

1. Solely due to Injury or Sickness:
    a. i. Your ability to work is restricted, resulting in the Loss of Earnings; or
       ii. You are unable to perform the substantial and material duties of your regular occupation in which you were engaged just prior to the Disability; and
    b. Your Loss of Earnings is 20% or more of your Prior Earnings; and
2. You are receiving care from a Doctor which is appropriate for the condition causing your Disability. We will waive this requirement when continued care would be of no benefit to you.

**Lemons 7667**

If a Disability is caused by more than one Injury or Sickness, we will pay benefits as if the Disability were caused by only one Injury or Sickness.

Earnings—means income you earn for labor or services performed. This includes salary, wages, fees, draw, commissions, and other compensation you receive. If you are self-employed, this is net income after deducting your normal and customary business expenses. These expenses must be reasonable and must not exceed expenses before Disability began. They must be deductible for Federal Income Tax purposes. *(this definition is replaced by the Business Earnings Rider)*

Identifiable contributions for you to any tax qualified retirement, annuity, salary reduction, or deferred compensation plan, whether employer sponsored or individually owned, or to any non-qualified deferred compensation plan are considered Earnings if they are:

1. Made either by you or on your behalf; and
2. Not waived by contract during your Disability;

During any period, Earnings:

1. Will include all income for services performed during that period, whether or not received; but
2. Will not include income for services performed prior to that period, regardless of when received.

Elimination Period—means the number of days of Disability from the start of a Continuous Disability for which no benefits will be paid. The Data Page shows the Elimination Period for each of the Disability Benefit and Social Security Substitute Benefit sections.

Extended Disability—means we will continue to consider you Disabled even if your Loss of Earnings is less than 20% of your Prior Earnings if:

1. You have been receiving benefits for the same Continuous Disability under this policy for at least 90 days;
2. You meet all the other requirements for Disability; and
3. The total of the benefits payable under this policy would be at least $300 per month.

Interrupted Elimination Period—means if your Disability is not continuous the Elimination Period will be met if the required number of days of Disability occurs in a period that is:

1. Twice as long as the Elimination Period; but
2. Less than one year.

Loss of Earnings—means Prior Earnings minus Current Earnings.

Prior Earnings—means your highest monthly average Earnings for any consecutive 12 months in the last 24 months before a Continuous Disability began. However, we will use any consecutive

8

**Lemons 7668**

24 months out of the last 60 months if that amount is higher. On each Change Date we will adjust the Prior Earnings to a new level by multiplying the Prior Earnings, as of the start of the Continuous Disability, times the Index Factor. If a new Elimination Period is required because of a new Disability, your Prior Earnings will again be determined for the new Disability without regard to any previous indexing.

**Disability Benefit Section**

We will pay all or a proportion of this section's maximum monthly benefit shown on the Data Page for your Disability. Benefits start to accrue at the end of this section's Elimination Period. Benefits will continue during your Disability but not beyond the Maximum Benefit Period.

The proportion of the maximum monthly benefit payable will be your Loss of Earnings divided by your Prior Earnings. For a time when this proportion exceeds 75% we will pay all of the maximum monthly benefit. For the first six months of a Continuous Disability for which benefits are payable and during which you have earnings, the proportion will not be less than 50%. This 50% minimum does not apply during Extended Disability.

We will continue to pay benefits for up to four months, but not beyond the remaining portion of the Maximum Benefit Period if:

1. You return to work full-time after a Continuous Disability for which benefits are payable; and
2. Your Loss of Earnings continues to be at least 20%.

Proof of Loss

Completion and return of the claim form or, if needed, the letter described above will serve as proper filing of proof of loss. This filing must be received in our home office no later than 90 days after the end of a period for which benefits are claimed. Benefits will not be reduced due to delay in filing proof of loss if it was filed as soon as reasonably possible. In no event, however, will we accept a filing of proof of loss more than a year after it is due. An exception will be made only if the Owner was not competent to make claim.

As part of proof of your loss, we must be furnished with satisfactory proof of your Prior and Current Earnings so that we can determine the proportion of the monthly benefit payable. If this proof is not furnished, no benefit will be payable. Proof of Earnings may consist of copies of your Federal Income Tax returns, a statement from a Certified Public Accountant, or such other records we may require. Proof of Current Earnings must be furnished as often as we may reasonably require.

**Lemons 7669**

**The Contract**

| | |
|---|---|
| Entire Contract | The policy, the attached applications, and any attached riders or endorsements make up the entire contract. |
| Alterations | Only our corporate officers may modify or waive anything in, or approve adjustments to, the policy. The change must be attached to the policy. No one else, including the agent, may change the policy or waive any provision. |

### Return to Work Rider

This rider is part of your policy. It is issued in consideration of the application and payment of its premiums shown on the current Data Page. All definitions, provisions and exceptions of the policy apply to this rider unless changed by this rider. Its issue date is the same as the policy date unless another date is shown on the current Data Page.

| | |
|---|---|
| Definitions | FULL-TIME—means at least as many hours as you were working before your Disability began.<br><br>REGULAR OCCUPATION—means your occupation in which you were engaged just prior to your Disability.<br><br>LOSS OF EARNINGS—means your Prior Earnings minus your Current Earnings for the months after you return to work.<br><br>CURRENT EARNINGS—means your monthly earnings after you have returned to work Full-Time. |
| BENEFIT | We will provide a benefit if: |

1. You have returned to work Full-Time in your Regular Occupation after a Disability for which benefits were paid;
2. Your Loss of Earnings continues to be at least 20%; and
3. Your Loss of Earnings is solely due to the prior Injury or Sickness which caused the Disability.

Benefits under this rider will be payable up to the Maximum Benefit Period but not to exceed your Age 65 Policy Anniversary.

The amount of benefit payable will be based on your Loss of Earnings. No benefit will be paid under this rider while benefits are payable under the Disability Benefit section of your policy.

10

**Lemons 7670**

If the Cost of living Adjustment Rider is a part of your policy, then the Return to Work Benefit will be calculated based on the adjusted Maximum Monthly Benefit being paid when you recovered from your Disability. There will be no additional increases under the Cost of Living Adjustment Rider while benefits are payable under this rider.

The Waiver of Premium benefit in the policy will be provided while benefits are payable under this rider. Other benefits provided by your policy will not be payable.

| TERMINATION | This rider ends on the first of: |
|---|---|

1. Your Age 65 Policy Anniversary;
2. The Owner's written request to terminate the rider; or
3. Termination of the policy of which it is a part.

## Regular Occupation Rider

This rider is part of the policy. It is issued in consideration of the application and payment of its premiums as shown on the Data Page. All definitions, provisions, and exceptions of the policy apply to this rider unless changed by this rider. Its issue date is the same as the Policy Date unless another date is shown on the Data Page.

This rider provides benefits under this policy for Disabilities when you are unable to perform the substantial and material duties of your regular occupation but are working in another occupation. This rider does not provide benefits when you are able to work full or part time in your regular occupation. This rider does not pay benefits in addition to those of the Disability Benefit section. Instead this rider states the benefit payable if you are Totally Disabled from your Regular Occupation.

| Definition | Total Disability from your Regular Occupation—means: |
|---|---|

1. Solely due to Injury or Sickness you are unable to perform the substantial and material duties of your regular occupation in which you were engaged just prior to Disability.
2. You are receiving care from a Doctor which is appropriate for the condition causing your Disability. We will waive this requirement when continued care would be of no benefit to you; and
3. You are engaged in another occupation.

| Benefits | Benefits payable under this policy if you are Totally Disabled from your Regular Occupation will be the maximum monthly benefit from the |
|---|---|

11

Disability Benefit section and the Social Security Substitute Benefit Section, if included.

Termination          This rider ends on the first of:

1. Your Age 65 Policy Anniversary;
2. The Owner's written request to terminate it; or
3. Termination of the policy of which it is a part.

**Business Earnings Rider**

This rider is part of the policy. It is issued in consideration of the application and payment of premiums for the policy to which it is attached. All definitions, provisions, and exceptions of the policy apply to this rider unless changed by this rider. Its issue date is the same as the Policy Date unless another date is shown on the Data Page.

The policy to which this rider is attached is amended by changing the Earnings definition as follows:
Earnings:

Income you earn for labor or services performed. This includes salary, wages, fees.

If you are self-employed or a shareholder performing labor or services for any business, Earnings means:

1. Your share of the earned income;
   LESS
2. Your share of normal and customary business expenses which do not exceed expenses before disability began and which are deductible for Federal Income Tax purposes;
   PLUS
3. Any salary and any contributions to a tax qualified pension, profit sharing or deferred compensation plan made on your behalf.

Earnings include but are not limited to salary, wages, fees, commission, dividends, bonuses, undistributed net income or addition to retained earnings.

Earnings Do Not Include:

1. Capital gains whether from short or long-term investment;
2. Income from deferred compensation plans;
3. Income not derived from your vocational activities.

**Lemons 7672**

We will allow either the cash or accrual accounting method, whichever you are using immediately prior to the Disability. However, we will not consider any change in accounting method during a Disability.

**Background & Time-Line**

November 15, 1995:     Principal Life issues policy number 7471393 (as described above) to William A. Lemons, Jr. with a date of birth of 11/16/1964.

August 15, 2015:       Dr. Lemons is terminated from his employment at Trinity OB/Gyn services where he worked from 6:30 AM to 5:30 PM and was on call 1 night per week and 1 weekend every 5 weeks as an OB/GYN physician. He reported receiving a 90-day severance package.

October 2015           Dr. Lemons starts working at BCBS of Alabama as a consultant performing reviews for an average of 15 hours per week.

4th Quarter 2015:      Dr. Lemons starts to prepare to open his own business as an OB/Gyn physician including applying for an employer ID number, searching for medical practice office space, entering into an agreement to rent/purchase equipment, determining amounts of supplies and instruments and finding a third party vendor to perform medical coding (assigning CPT codes) and billing support.

February 2016          Dr. Lemons starts to work at Birmingham Metro Clinic as an addiction treatment counselor averaging 12 to 18 hours per week.

March 2016             Dr. Lemons begins working at Fritz Clinic as an addiction treatment counselor for an average of 4 hours a week. He started seeing patients in April 2016.

March 11, 2016         Dr. Lemons consults for the first and last time with Paul Atchison, MD, Neurologist, and is diagnosed with essential tremor. Dr. Atchison's attending physician statement is dated 10/17/16 and indicates that Dr. Lemons restrictions began on July 15, 2016 and are permanent.

April 4, 2016          Dr. Lemons reports that he has opened Covenant Gynecology and Wellness as an S-Corporation. He reported he practiced limited duties with respect to gynecological treatment and wellness, patient care and managed a medical assistant.

13

**Lemons 7673**

| | |
|---|---|
| June 16, 2016 | Dr. Lemons first visit with Christina Smith, MD, psychiatry. She reports his diagnosis as anxiety and depression. She indicated his restrictions began 6/16/16 and recovery would typically take place within 6 to 12 months. |
| June 27, 2016 | Dr. Lemons consults with Al Saunders, Psy.D., psychologist, referred to by Christina Smith, MD. Dr. Saunders reports a diagnosis of severe major depressive disorder with generalized anxiety. Dr. Saunders indicated restrictions beginning 6/16/16 working no more than 20 hours per day. He also reported an approximate recovery time of 12 months. |
| July 13, 2016 (W) | Dr. Lemons reported that he saw his last patient at Covenant. |
| July 15, 2016 (Fr) | Dr. Lemons closed his Covenant business. |
| July 15, 2016 (Fr) | Dr. Lemons reports this as his date of disability. |
| September 19, 2016 | Dr. Lemons sees his primary care physician, David Black, MD. Dr. Black reports diagnoses of anxiety, tremor and depression. Dr. Black did not note a date for any restrictions but indicated that "his tremor inhibits fine motor skill required of surgery, his tremor is worsened by anxiety [and] his anxiety interferes with sleep which worsens his anxiety/depression" |
| October 18, 2016 | Principal Life receives an attending physician's statement from Dr. Lemons' physician. |
| October 19, 2016 | Principal Life (Ralston) acknowledges receipt of Dr. Lemons' claim by letter.  In this letter policy provisions were set forth and additional information was requested: completed disability claim notice, copies of CPT billing codes for 2015 and year to date through June of 2016, 2014 and 2015 business and personal tax returns, year to date earnings through June 2016, and any ongoing monthly paystubs. |
| November 11, 2016 | Dr. Lemons meets the 90-day elimination period. |
| November 18, 2016 | Principal Life (Ralston) completes a personal telephone interview with Dr. Lemons. During that call Principal Life indicated they would be looking at his occupation just prior to his date of disability. He was asked to provide CPT codes in order to verify his occupation. He responded that he could not obtain CPT codes |

14

from his practice because he is no longer paying the third party vendor that had been doing that for him.

November 22, 2016    Principal Life (Ralston) sends a follow-up letter to Dr. Lemons outlining what information they had received and letting him know they still needed: medical records from his physicians which they had requested, a medical review would be done once the records were received and ongoing monthly paystubs from him.

December 16, 2016    Principal Life (Ralston) sends a follow-up letter describing outstanding proof of loss: medical records from his physicians, a medical review, ongoing monthly paystubs and monthly business expenses.

December 16, 2016    Financial review completed – prior earnings calculated as $22,747.68 using calendar year of 2015 as the highest earnings of 12 of 24 months.

December 19, 2016    A representative from CoventBridge meets with Dr. Lemons on behalf of Principal Life to discuss various aspects of his claim including his employment history, medical information, activities and general information.

January 5, 2016    Principal Life (Ralston) sends another follow-up letter detailing the status of Dr. Lemons' claim and outlining the information that is still outstanding: Atchison's and Black's medical records, ongoing monthly paystubs and ongoing business expenses.

January 10, 2017    Medical review completed by Dr. Gallagher supporting restrictions and limitations due to depression.

January 11, 2017    Amy Ralston details her decision regarding determination of Dr. Lemons' "occupation" in the claim action plan, as follows: "During the PTI [interview] with the insured it was determined that he previously worked for Trinity OB/Gyn when his employment ended with them in August of 2015. Following this he started the launch of his own OB/Gyn practice which opened in April 2016 and closed in July 2016. In the meantime while launching his own medical practice he began working for Blue Cross of Alabama doing insurance chart review and is still currently doing this and also began working at Birmingham Metro Treatment Center in February 2015 [sic 2016] doing face to face time with patients doing consulting about opiate addiction. He also worked at another addiction-based clinic seeing patients and is still currently

15

working at all three of these jobs. I explained to him that we would consider this as his occupations as well as he was doing these jobs prior to his disability and therefore would review his claim under residual disability."

January 12, 2017

Amy Ralston speaks with Dr. Lemon to discuss the outstanding financial information she is missing. She notes in the action plan that "based on the medical I feel that I could approve the claim for residual at this time under the dx of anxiety and depression but I do not have financial beyond 10/31/16 and based on the info that we have Dr. Lemons would have only satisfied 79 days of the 90 days under the interrupted EP."

January 17, 2017

File pulled by Doug Hanselman for 90 day pending review.

January 21, 2017

Email from Dr. Lemons to Amy Ralston in which he expresses his disagreement with discussions he has had with Ms. Ralston regarding his occupation and the fact that his claim is not being considered under the Regular Occupation Rider because his occupation was that of a OB/Gyn physician at the time he purchased the policy.

January 23, 2017

Doug Hanselman makes a decision to pay the claim while Amy Ralston is on vacation because he had enough information to pay based upon a loss of earnings (residual) and support of restrictions and limitations based upon Dr. Gallagher's review. Hanselman notifies Dr. Lemons by letter that he has approved payment of the claim based on loss of earnings.

January 30, 2017

Amy Ralston telephones Dr. Lemons in response to his email of 1/21/17 (sent while she was out of the office). She explains in detail why the claim is not being paid under the Regular Occupation Rider. She indicated that she would be sending him a detailed letter explaining her decision.

February 1, 2017

Janie Hendricks, DO provides a medical review of Dr. Lemons' file wherein she opined that, "Dr. Lemons has an essential tremor that is worsened by anxiety. This tremor impedes his ability to perform procedures required in his OB/Gyn practice. He notes a trial of propranolol which was not helpful. It might be helpful to try Primidone, however this will not likely improve his tremor enough for him to perform procedures. It does appear that he has undergone an appropriate evaluation and treatment. He has reached his maximum medical improvement. Most likely his

16

tremor will continue to gradually worsen. The restrictions and limitations as far as fine manipulation seem appropriate. Otherwise, he has no physical restrictions".

| | |
|---|---|
| February 5, 2017 | Dr. Lemons sends another email to Ms. Ralston in which he "vehemently challenged" Principal Life's determination of his occupation and asked Principal Life to reconsider their decision. He also posed questions to Ms. Ralston regarding "expenses" and calculation of his monthly benefit. |
| February 9, 2017 | Amy Ralston provides a detailed letter to Dr. Lemons wherein she explains the reason his claim is being paid under loss of earnings and not under the Regular Occupation Rider. |
| February 9, 2017 | Dr. Lemons' claim file was transferred to Michael Curry for ongoing handling. Mr. Curry continued to pay monthly benefits upon receipt of Dr. Lemons' financial information until the file was transferred to Natasha Johnson in early May of 2017. |
| May 11, 2017 | On or about this date Dr. Lemons' claim file was transferred to Natasha Johnson for ongoing handling. |
| May 25, 2017 | Natasha Johnson speaks with Dr. Lemons to discuss his current medical status. She documented in her action plan that she would email her contact information to Dr. Lemons, follow up for May income and request follow-up information in June. |
| June 12, 2017 | Principal Life receives Dr. Lemons' request for reconsideration of his claim by letter dated June 3, 2017. Dr. Lemons outlined the same opinion as was expressed in prior discussions/letters and provides no new information upon which a reconsideration could be made. He did indicate he would be seeking legal counsel in the event Principal Life maintained their position. |
| June 28, 2017 | Natasha Johnson writes to Dr. Lemons and advises him that he had provided no new information upon which they could change their original decision. She enclosed a copy of the original decision for his reference. |
| February 19, 2018 | Principal Life receives a demand letter dated February 14, 2018 from Laura Gibson at White Arnold & Dowd. |
| February 27, 2018 | Natasha Johnson responds to Ms. Gibson's letter by explaining the determination on Dr. Lemons file. The letter sets forth |

17

documentation that Ms. Gibson might consider submitting in support of Dr. Lemons' claim, including: copies of his CPT codes with charges for 2015 and 2016 up to his date of disability, any other additional financial or occupational information and any information that would support a different date of disability.

March 29, 2018      Principal Life receives a notice of representation dated 3/28/17 from Thomas Sinclair of Sinclair Law Firm. In that letter he also requested certain documents from Principal Life.

**Alabama Insurance Law & Unfair Claims Settlement Practices Act**

With respect to the NAIC Model Unfair Claims Settlement Practices Act, Ms. Parker infers that Principal Life violated a "modified version" of the Act and she cites several instances using the language of the model act throughout her report, i.e. Principal Life "misconstrued the policy language", "misrepresenting relevant facts", and "refusing to pay claims without conducting a full, fair evaluation".

I disagree with Ms. Parker's statements and cites to the model act language in part because that language is not controlling in Alabama. Alabama has not adopted the NAIC Unfair Claim Settlement Practices Model Act or a "modified version". Alabama Administrative Code 482-1-124 governs "Standards for Life, Accident and Health Insurance Claims". It does not appear that Alabama includes "disability insurance" in its definition of "health benefit plan" which is defined in Section 27-54-2 of the Alabama Insurance Code. Thus, those sections of this code that apply to Life and Health insurance are not necessarily applicable to this disability policy. Even if sections of this chapter were, in part, applicable to disability claims, it does not remotely resemble the typical Unfair Claims Settlement Practices Acts so I would not even refer to it as a "modified version." Also, under 482-1-124-.02, Purpose, it states "Evidence of violation of this chapter and the provisions contained herein shall be utilized for the purpose of administrative and regulatory proceedings conducted by the Department of Insurance and shall not be utilized for any other purpose or admissible as evidence for any purpose in any civil or criminal court proceeding."

    **482-1-124-.02 Purpose.**

    (1) The purpose of this chapter is to set forth minimum standards for the investigation and disposition of life, accident and health claims arising under policies or certificates issued pursuant to State law. It is not intended to cover claims involving workers' compensation nor credit insurance. Evidence of violation of this chapter and the provisions contained herein shall be utilized for the purpose of administrative and regulatory proceedings conducted by the Department of Insurance and shall not be utilized for any other purpose or admissible as evidence for any purpose in any civil or criminal court proceeding. This is merely a clarification of original intent and does not indicate any change of position.

**Lemons 7678**

In this section I have set forth the NAIC Model Act for reference only. As I noted, the model act does not govern disability claim handling in the state of Alabama. Nevertheless, I'll provide commentary in the Opinion section on Principal Life's handling of Dr. Lemons' claim referring to the Unfair Claims Settlement Practices Act even though it is not controlling because Principal Life did not violate the Act as Ms. Parker infers.

**Section 3. Unfair Claims Settlement Practices Prohibited**

It is an improper claims practice for a domestic, foreign or alien insurer transacting business in this state to commit an act defined in Section 4 of this Act if:

A**.** It is committed flagrantly and in conscious disregard of this Act or any rules promulgated hereunder; or

B. It has been committed with such frequency to indicate a general business practice to engage in that type of conduct.

**Section 4.**

**Unfair Claims Practices Defined**

Any of the following acts by an insurer, if committed in violation of Section 3, constitutes an unfair claims practice:

  A. Knowingly misrepresenting to claimants and insureds relevant facts or policy provisions relating to coverages at issue;
  B. Failing to acknowledge with reasonable promptness pertinent communications with respect to claims arising under its policies;
  C. Failing to adopt and implement reasonable standards for the prompt investigation and settlement of claims arising under its policies;
  D. Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear;
  E. Compelling insureds or beneficiaries to institute suits to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered in suits brought by them;
  F. Refusing to pay claims without conducting a reasonable investigation;
  G. Failing to affirm or deny coverage of claims within a reasonable time after having completed its investigation related to such claim or claims;
  H. Attempting to settle or settling claims for less than the amount that a reasonable person would believe the insured or beneficiary was entitled by reference to written or printed advertising material accompanying or made part of an application;
  I. Attempting to settle or settling claims on the basis of an application that was materially altered without notice to, or knowledge or consent of, the insured;

19

**Lemons 7679**

J. Making claims payments to an insured or beneficiary without indicating the coverage under which each payment is being made;

K. Unreasonably delaying the investigation or payment of claims by requiring both a formal proof of loss form and subsequent verification that would result in duplication of information and verification appearing in the formal proof of loss form;

L. Failing in the case of claims denials or offers of compromise settlement to promptly provide a reasonable and accurate explanation of the basis for such actions;

M. Failing to provide forms necessary to present claims within fifteen (15) calendar days of a request with reasonable explanations regarding their use;

N. Failing to adopt and implement reasonable standards to assure that the repairs of a repairer owned by or required to be used by the insurer are performed in a workmanlike manner.

**Opinion Regarding Claim Handling by Principal Life in Rebuttal of Expert Witness Reports by Laura B. Parker and Elliott Flood**

For reasons which I will outline in this section, it is my opinion that Principal Life neither violated any aspects of the Model Unfair Claims Practices Act, (which, again, is not controlling here) nor did they violate industry standards regarding adjudication of individual disability income claims.

**Initial Claim Handling**

Ms. Ralston acknowledged receipt of Dr. Lemons' disability claim within one day of receiving the initial notice of claim, which was an attending physician's statement received directly from one of Dr. Lemons' physicians. In her letter she outlined the applicable policy provisions and requested additional information from Dr. Lemons. This was the first time that she indicated Principal Life's need for CPT codes to determine Dr. Lemons' occupation. In her telephone call of November 18, 2016 with Dr. Lemons she explained in detail how Principal Life would be looking at his occupation just prior to his date of disability. She again requested that he submit CPT codes as part of proof of loss. In response to her request Dr. Lemons advised her that he could not obtain CPT codes because he was no longer "paying the third party who handled that for him".

It is well established in the industry that burden of proof with respect to eligibility for insurance benefits is the responsibility of the claimant not the insurance company. Federal law mandates that health care providers keep and retain their records for a minimum of seven years from the date of the last service to the patient. Similarly, the Alabama Board of Medicine recommends that practitioners retain records for a minimum of ten years. Dr. Lemons submitted a tax return dated 3/20/17 for Covenant and is required to retain the tax return and supporting documentation for 3 years from the date he filed the original return (in this case 3/20/20). The need for CPT codes was discussed several times with Dr. Lemons and also his attorney that initially represented him during the pendency of the claim.

Lemons 7680

Ms. Ralston referred the file to have CoventBridge conduct an interview (December 19, 2016) with Dr. Lemons on behalf of Principal Life. It is a common practice in the industry, both group and individual claims, to arrange an in-person meeting with the claimant. It is a best practice from a customer service perspective. Often times if the insurer has questions of the claimant, they can get the information from an interview instead of going back and forth on the telephone or by letter to obtain the information. Also, there is no substitute for meeting someone in person from a customer focus perspective. The processes whereby Principal Life engaged CoventBridge and CoventBridge set up the interview were within industry standards.

Ms. Ralston's decision on this claim was set forth in her action plan. There is no evidence that she had "pre-conceived opinions" regarding the outcome of the claim. **She was transparent in all of her communications with Dr. Lemons whereas at the onset he was determined not to provide CPT codes to Principal Life.** There is no evidence that Principal Life "failed to seek appropriate documentation" from Dr. Lemons. The written communications and well-documented telephone logs are indicative of the documents they sought to adjudicate Dr. Lemons' claim. Principal Life's interview process, documents sought and communications are consistent with industry practices.

### The Date of Disability

All of the documentation submitted by Dr. Lemons and his physicians indicated a date of disability of 7/15/2016. No restrictions and limitations were documented prior to 7/15/2016. To suggest that he was disabled at an earlier date would be contradictory to all of the time frames set forth in the file. In order to be considered disabled under the policy, Dr. Lemons would have had to have been receiving care from a Doctor that was appropriate for the condition causing disability. Paul Atchison, MD, Neurologist, first diagnosed Dr. Lemons' essential tremor on 3/11/2016 at his first visit with this physician. Dr. Atchison did not complete an attending physician statement until 10/17/2016 and, despite having seen Dr. Lemons only the one time, he opined that his restrictions began on 7/15/2016. Dr. Atchison was clear that restrictions were not present at Dr. Lemons' first visit. Also, after the visit with Atchison he opened his gynecological practice. Dr. Lemons testified in his deposition that his regular occupation just prior to his disability date of July 15, 2016 was that of a gynecologist and a gynecological surgeon (page 102). He also testified that he was performing medical exams and two surgeries, biopsies, interpretation of labs, review of pathology reports and imaging reports although he was beginning to refer out a lot of surgical cases. (page 103).

### Determination of Regular Occupation

Regular Occupation is typically understood in the industry to mean the manner in which you are earning an income at the time disability starts. With respect to claims adjudication, Regular Occupation does not, and never has, referred to the duties an individual is engaged in at the time the policy is purchased. An individual disability policy is designed to protect one's income at the time of a disability. Any "occupation code" assigned to a policy, at the time it is issued, is for sales and underwriting purposes. It is the specific occupation at the time of disability or as

21

stated in Principal Life's policy "just prior" to Disability. The analysis of Regular Occupation is based on the totality of the facts and circumstances and takes into account all income producing endeavors in the few weeks or months before the date of disability. In this case Dr. Lemons was unable to provide proof of loss of income that may have assisted Principal Life in their analysis. Nevertheless, Principal Life gave him the benefit of a doubt and included his Gyn practice of 4 months at Covenant as one of four components of what actually comprised his "Regular Occupation". Given that Dr. Lemons could not provide CPT codes, or any other documentation substantiating his work at Covenant, and only had this business for 4 months, Principal Life could have investigated whether this component of his occupation should have been better described as "business owner". Dr. Lemons could not provide any detailed evidence of his material and substantial duties being those of a Gyn physician during this four-month period. He was apparently not disabled from engaging in the substantial activities of trying to get his business up and running, such as establishing office space for the medical practice, finding a third party vendor to perform medical coding and billing support services, making a decision to rent or purchase a colposcope and determining what supplies and instruments would be needed for the practice.  Likewise, Dr. Lemons was unable to produce any financial evidence that the business generated any significant income. It is an industry standard to consider material and substantial duties as the tasks that are performed regularly, that generate income or are directly related to the duties that generate income.

The fact that Principal Life used Dr. Lemons' salary from his OB/Gyn employment prior to 2015 has no bearing on the determination of his Regular Occupation as of July 2016. Prior Earnings is a defined term in the policy that indicates what income will be used to determine "Prior Earnings" for purposes of the Loss of Earnings provision of the policy. In Dr. Lemons' claim Prior Earnings was calculated using consecutive 12 months in the last 24 months as prescribed by the policy. Conversely, the period for determining Regular Occupation is "just prior" to the date of disability. These represent two provisions with two distinct time periods.

Typically, in the disability claim industry it is a best practice to obtain CPT Codes in determining the regular occupation of a physician. Most companies rely on this information and once obtained the codes are analyzed either in-house or by a third-party vendor to determine exact procedures that are performed on a day to day basis just prior to the date of disability. It would be highly unusual for a practicing physician not to capture CPT codes because these are presented to health insurers for reimbursement of medical procedures. The only physicians that I could think of that might not capture CPT codes are potentially those who are providing medical services to private pay patients only. In today's medical practice environment that is a highly unlikely scenario.

Despite not having access to Dr. Lemons' CPT codes, Principal Life's claim file contained the following information which they used to determine his material and substantial duties of what he was doing just prior to disability:

1. Information obtained from Dr. Lemons during a meeting between him and CoventBridge including a detailed discussion of his employment background, duties and hours worked;
2. Financial records (salary and approximate hours worked) for his work with BCBS of Alabama, Fritz Clinic and Birmingham Metro Clinic.
3. Telephone discussions between Dr. Lemons and Amy Ralston as evidenced in the claim file.
4. Ongoing monthly profit and loss involving his continued work with BCBS of Alabama, Fritz Clinic and Birmingham Metro Clinic.

The use of this information is consistent with Principal Life's claim guidelines, also known as "Your Resource". Disability claim guidelines in the industry are "guidelines" not mandates. It is impossible to address every scenario that may arise on a claim in the guidelines because every case is different. Principal Life's claim handling was consistent with their claim guidelines regarding obtaining information to review. Even if Principal Life had requested any additional documentation as Ms. Parker suggested, it would not have changed the determination of Dr. Lemons' occupation at the time of disability. During the period of time that he was at Covenant, Dr. Lemons continued to work at BCBS of Alabama, The Fritz Clinic and Birmingham Metro Treatment Clinic.

It is my opinion that, based upon the facts and circumstances presented in the file, Principal Life made an appropriate decision as to the nature of Dr. Lemons' Regular Occupation as an addiction counselor, insurance consultant and a sole Gyn practitioner, albeit with undocumented duties. There was sufficient information collected by Principal Life to determine the substantial and material duties that Dr. Lemons was engaged in at the time of disability with the exception of those he performed at Covenant.  Rather than to continue pressing Dr. Lemons for that information, Principal Life gave him the benefit of a doubt, assuming that as of July 15, 2016 he was unable to perform those duties. Principal Life did not misconstrue the terms of the policy. The Regular Occupation Rider was not triggered in this case and the claim was appropriately adjudicated under the policy definition of Disability which takes into consideration loss of earnings if you are able to work part-time in your Regular Occupation. Dr. Lemons continued to perform most of the substantial and material duties of the jobs he held just prior to disability and was able to work and was not engaged in a different occupation.

The Regular Occupation Rider states that **"**Solely due to Injury or Sickness you are unable to perform the substantial and material duties of your Regular Occupation in which you were engaged just prior to Disability." This is consistent with language in other individual disability policies of which I am familiar.

**Use of Marketing Materials in Adjudicating Disability Claims**

Dr. Lemons' expert seems to indicate that he was misled by the marketing materials in 1995 and that the claim department was responsible for reviewing the marketing materials in arriving at their decision as to Dr. Lemons' Regular Occupation.  I know of no industry standard

23

that requires claims personnel to review marketing materials when adjudicating a claim. Claims personnel are tasked with reviewing the individual facts and circumstances of a disability claim when such a claim is made and making a determination on the claim in accordance with the policy provisions- the legal contract for which consideration was provided (premiums) by the insured.

It is industry custom and practice that a policy include a "10 Day Examination Offer" be disclosed on the face page of the policy to provide insureds with an option to read and understand the policy before accepting it. Dr. Lemons' policy contained such a notice on the face page:

10 DAY EXAMINATION OFFER. The owner may return this policy to either the agent or our home office within ten days of its receipt. We will refund any premiums paid and the policy will be considered void from its inception. Please read this policy carefully to better use its many benefits.

Dr. Lemons apparently did not take advantage of this option.

**Decision to Pay Benefits by Doug Hanselman**

On January 17, 2017 Doug Hanselman pulled Dr. Lemons' file for a 90-day pending review. This type of review by either a manager or senior reviewer is common in the industry to assure that a file is moving toward a determination and is not sitting dormant. During the time frame that Mr. Hanselman was reviewing the file Ms. Ralston was out of the office on vacation but had requested updated medical records and paystubs from November. Mr. Hanselman made a decision that he had enough information in the file to at least pay benefits based on Dr. Lemons' loss of earnings. Mr. Hanselman processed the benefits and notified Dr. Lemons by letter dated January 23, 2017 that the claim was paid under the loss of earnings provision. Subsequently, when Ms. Ralston returned to the office, she telephoned Dr. Lemons on January 30, 2017 and explained why the claim was not eligible under the Regular Occupation Rider. She advised him in writing by letter dated February 9, 2017 and explained her decision in detail.

 As part of the model Unfair Claims Practices Act (which Alabama has not adopted) and as an industry standard, claims personnel should "effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear". Mr. Hanselman felt that he was able to pay a benefit on Dr. Lemons' claim and he processed the payment on January 23, 2017. Ms. Ralston was the owner of the file and had made a determination of Regular Occupation in her action plan dated January 11, 2017. On January 30, 2017 Ms. Ralston contacted Dr. Lemons, explained the denial of the Regular Occupation Rider and advised him she would send a detailed letter. She did so on February 9, 2017. Ms. Ralston telephoned Dr. Lemons within a week of the payment and provided the written denial soon thereafter.

Lemons 7684

**Reconsideration Process**

Dr. Lemons expressed his disagreement with Principal Life's decision and requested a reconsideration of his claim by letter dated June 3, 2017. The reconsideration was handled by Natasha Johnson who did not make the initial decision on the file. Dr. Lemons provided his opinion in his letter which was a repetition of prior emails and letters. He provided no new information for Principal Life to "reconsider" despite the fact that Ms. Ralston made reference in her letter of February 9, 2017 to the CPT codes requested but never received.

In the Initial Claim Handling section above, it is industry custom that the burden of proof with respect to eligibility for a claim is the responsibility of the claimant not the insurance company. This is true when requesting a reconsideration or an appeal of a claim. If the information that is necessary to review the claim is not submitted by the claimant there would be little to reconsider. Dr. Lemons either did not want to provide the CPT codes or none existed. Ms. Johnson reviewed the file and made the correct decision with what information she had before her which was essentially the same information that was collected up to the date of Ms. Ralston's initial decision.

**Regulatory Findings**

**Market Conduct Examinations**

I reviewed both the California Market Conduct Exam for the period March 1, 2008 to February 28, 2009 as well as the Iowa Market Conduct Exam for the period January 1, 2013 to December 31, 2017.

California is known for its stringent market conduct examinations and they are probably the most thorough in the United States.  I note portions of the scope of their review included:

1. A review of the guidelines, procedures, training plans and forms adopted by the Company for use in California including any documents maintained by the Company in support of positions or interpretation of fair claims settlement practices; and
2. A review of the application of such guidelines, procedures, and forms, by means of an examination of a sample of individual claim files and related records.

A sample of 90 claim files were reviewed across all product lines with 10 of those files being reviewed on individual disability claims. There were no findings/citations on those 10 claims.

There were 45 consumer complaints across all product lines and only 2 were justified. The State does not indicate which product lines those 2 files involved.

The Iowa market conduct examination for claim handling did not include the individual disability product line. With respect to complaint handling overall, the state indicated that complaints were being handled in accordance with Principal Life's guidelines.

25

In summary, neither market conduct examination reveals a pattern or practice of inappropriate claim handling for the individual disability claims product line. Mr. Flood's findings are entirely inconsistent with the regulatory findings.

**Alabama Department of Insurance Complaints**

In reviewing the complaints filed with the Alabama DOI (Lemons 1649 to 2105) I found one individual disability complaint related to a policy rescission. The DOI entered a finding of "company position substantiated." Mr. Flood's findings are also entirely inconsistent with the Alabama DOI Complaints.

Everything I reviewed suggests that Principal Life's claims handling practices generally, and specifically its handling of Dr. Lemons' claim, was reasonable and consistent with industry customs and norms.

**Miscellaneous Comments**

Laura Parker critiques Doug Hanselman's involvement with the claim because he had access to reserves. I disagree with that inference because there is no evidence that Mr. Hanselman saw a reserve amount on Dr. Lemons' claim or made an inappropriate decision. Reserve information on specific claims may or may not be available to members of the claim department. Typically, it is information that is available to people in the department that have a need to know the reserve amount on claims. Mr. Hanselman noted in his deposition that he was responsible for working with the financial department to assist in reserve accuracy. In certain situations, a claims department must manually oversee reserve accuracy from the perspective of unique situations that are not captured in the claim system and thus, don't flow through to the finance system. In this case Mr. Hanselman indicated he had access to reports that contained reserve information and that part of his responsibilities included making sure that child support payments were accurately reflected for the finance team because the claim system (Fineos) did not capture those payments. Anytime a manual payment is made, because a system is not designed to capture every payment situation that might arise, there has to be a process to capture those few instances manually, otherwise the reserves will be misstated. This is common in the industry. Claims management personnel are responsible for ensuring that claim benefit payments are accurately reflected in the claim system and may be called upon to attest to this on an annual basis for auditing purposes. Just because someone in claims has access to the reserve information does not automatically equate to the assumption that the Company is placing its financial interests above those of the insured. Based upon my review of the action plans, the decision on the file was made correctly. There is no evidence that Mr. Hanselman, Ms. Ralston or Ms. Johnson were aware of the reserves for Dr. Lemons' claim. There is no evidence the reserves were a factor in the determination of this claim; to infer that is speculation on Ms. Parker's part.

26

With respect to the **Robert Beal report on Individual Disability Income in the U.S.** (Lemons 4694-4693) as referenced by Ms. Parker she notes that:

"Prior to 1991, Principal was not listed in the top 20 Individual Disability Insurance carriers. It is further noted that Principal bumped from 17th up to 7th from 1996-2004. The report also indicates catastrophic results for the individual disability income market from 1991 to 1995 and that 21 out of 70 individual disability carriers had exited the business during that time. Dr. Lemons policy was issued in 1995, at a time when multiple carriers were exiting the individual disability income market. Principal, however, did not exit the market. On the contrary, Principal went from 17th to 7th in the top 20 individual disability carriers by 1996, the very time other carriers were experiencing losses."

Ms. Parker's conclusion is misleading. Ms. Parker failed to mention that from 1981 to 2004, 47 out of 70 individual carriers exited the business. By virtue of the compression in the market and release of market share by the 47 companies, Principal Life had nowhere to go but up the chart in the rankings.

**Summary**

Based on my foregoing review and commentary it is my opinion that Principal Life reached the correct decision on Dr. Lemons' disability claim after conducting a full, fair and thorough analysis. The claim file, activities log and telephone calls were well-documented. Principal Life's letters and telephone calls evidenced respect for Dr. Lemons throughout the process. Additionally, Principal Life assisted Dr. Lemons in obtaining proof of loss where possible and identifying other proof of loss that he might submit but chose not to.  I found no evidence in the documents or testimony I reviewed that Principal Life placed its financial interests above that of Dr. Lemons.

In summary, Principal Life's investigation and decision on this claim conform to industry standards. Principal Life's claim practices, as demonstrated in this file, conform to generally accepted disability insurance practices in the industry. Had Principal Life ignored the material and substantial duties of Dr. Lemons' jobs with BCBS of Alabama, The Fritz Clinic or Birmingham Metro Treatment Clinic and determined that Dr. Lemons was entitled to benefits under the Regular Occupation Rider, its investigation and decision would have been contrary to industry custom and practice.

Respectfully Submitted,

Debra A. Conner

Debra A. Conner, JD

27

Publications:

The Proverbial "Resolutions" LinkedIn, December 2019

"Why Self-Awareness is so Important in Life" LinkedIn, July 2019

"How to Create Momentum" LinkedIn, June 2019

"The Power of Reward and Recognition" LinkedIn, May 2019

"5 Reasons why you should Surround Yourself with Diversity" LinkedIn, April 2019

"What's Your Brand?" LinkedIn, March 2019

"Maintaining Resiliency in the Face of Adversity" LinkedIn, March 2019

"Why is a Vocational Counselor Calling Me?" BenefitsPro, June 2015


Expert Witness Testimony:

December 16, 2019, Deposition: Robert "Luke" Adams v. Symetra Life Insurance Company (D. Arizona, Case No. CV-18-378)

28

**Lemons 7688**