FILED

2021 Jun-18 PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

Exhibit

1



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS







(800) 528-3335

NAEGELIUSA.COM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

WILLIAM A. LEMONS, JR., M.D.,

      Plaintiff,

vs.              Civil Action No.: 2:18-CV-1040-CLM

PRINCIPAL LIFE INSURANCE COMPANY,

      Defendant.

_____

**REMOTE VIDEOCONFERENCE DEPOSITION OF**

**DEBRA A. CONNER**

**TAKEN ON**
**WEDNESDAY, APRIL 29, 2020**
**9:52 A.M.**

**2**

```
1                    APPEARANCES
2
3  APPEARING ON BEHALF OF THE PLAINTIFF:
4  THOMAS O. SINCLAIR, ESQUIRE
5  SINCLAIR LAW FIRM, LLC
6  2000 SouthBridge Parkway, Suite 601
7  Birmingham, Alabama 35209
8  (205) 868-0818
9  (205) 868-0894 Fax
10 tsinclair@sinclairlawfirm.com
11
12 APPEARING ON BEHALF OF THE DEFENDANTS:
13 GRACE ROBINSON MURPHY, ESQUIRE
14 MAYNARD COOPER GALE
15 1901 Sixth Avenue North
16 Regions Harbert Plaza, Suite 2400
17 Birmingham, Alabama 35203
18 (205) 254-1170
19 (205) 254-1999 Fax
20 gmurphy@maynardcooper.com
21
22 ALSO PRESENT:
23 Lee Fernon
24
25
```

**3**

```
1              EXAMINATION INDEX
2                          Page
3
4  EXAMINATION BY MR. SINCLAIR          5
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
1                    EXHIBITS
2
3  NUMBER                           PAGE
4
5  Exhibit 1    47-page document including a 2-page   80
6
7        Individual Disability Insurance
8        Policy Annual Statement for William
9        Andrew Lemons, Jr.
10
11 Exhibit 59   Subpoena to testify for          11
12       Debra A. Conner.
13
14 Exhibit 60   28-page report by Debra A. Conner,   13
15       Bates stamped Lemons 7661 through
16       Lemons 7688.
17
18
19
20
21
22
23
24
25
```

**5**

```
1       REMOTE VIDEOCONFERENCE DEPOSITION OF
2               DEBRA A. CONNER
3                    TAKEN ON
4             WEDNESDAY, APRIL 29, 2020
5                   9:52 A.M.
6
7  DEBRA CONNER, having been administered an oath, was
8  examined and testified as follows:
9        MR. SINCLAIR:  All right.  Grace, we are
10 stipulating to the remote swearing in in this
11 matter?
12        MS. MURPHY:  Yes, we are.  And I believe
13 that Ms. Conner would like the right to read and
14 sign her deposition as well.
15        MR. SINCLAIR:  Okay.  So we are going to
16 have the usual stipulations then by counsel with the
17 exception of read and sign.  Is that correct, Grace?
18        MS. MURPHY:  Correct.
19 EXAMINATION
20 BY MR. SINCLAIR:
21    Q.  All right.  Ms. Conner, we are obviously
22 doing this remotely and I have never met you before.
23 I take it you are, in fact, Debra Conner, correct?
24    A.  I am and I do have my license -- my state-
25 issued license with me.
```

6

1   Q.  Well, you know, we didn't do it for the
2   other two witnesses.  I think I can swear that those
3   were our witnesses.
4       Grace, that is Debra Conner on the video,
5   isn't it?
6       MS. MURPHY:  Yes.  We have never met in
7   person, but yes.
8   BY MR. SINCLAIR:
9   Q.  Good.  Then we don't need the -- we will
10  move on from that.  Are you -- Ms. Conner, are you
11  by yourself in that room today?
12  A.  Yes, I am.
13  Q.  Okay.  Do you -- and this is because of
14  the technology.  Do you have any instant messaging
15  system presently open?
16  A.  I -- I get notifications on my screen.  I
17  don't know if that means it is open or not.
18  Q.  Okay.  An honest answer.  Let me ask you
19  this while you are under oath.  Will you agree not
20  to be in contact with any person involved in this
21  litigation?
22  A.  Oh, absolutely.
23  Q.  All right.  I have a copy of your CV,
24  which was provided by defense counsel and Bates
25  numbered Conner 1 through Conner 4.  Has your CV

7

1   changed since you provided it to defense counsel?
2   A.  It has not.
3   Q.  Okay.  And I'm going to probably dispense
4   with a lot of the background questions here by
5   asking you -- I have a copy of the deposition taken
6   of you in the matter entitled Adams v. Symetra Life
7   Insurance Company and that deposition was taken in
8   Portland, Maine, on December 16th, 2019.  Do you
9   recall providing that deposition in that matter?
10  A.  Yes.
11  Q.  Has your testimony changed in any way
12  other than the way it is recorded in that
13  deposition?
14  A.  I don't understand what you are asking me.
15  Has my testimony of the entire case changed?
16  Q.  No.  Let me ask it this way.  In the Adams
17  matter you were deposed, correct?
18  A.  Yes.
19  Q.  And in the Adams matter you provided
20  truthful answers in response to those questions,
21  correct?
22  A.  Yes.
23  Q.  Has your testimony changed from the date
24  that that testimony was taken in that matter?
25  A.  Not to my knowledge.

8

1   Q.  In other words, you were asked a lot of
2   questions about qualifications and background.  Has
3   your testimony changed from the way that you
4   provided those responses in that matter?
5   A.  It may change only by virtue of having
6   gained even more experience in the last five months,
7   but other than that, no.
8   Q.  Okay.  Have you been deposed since you
9   were deposed in the Adams matter?
10  A.  I have not.
11  Q.  Have you been retained to serve as an
12  expert in other matters since you were deposed in
13  the Adams case?
14  A.  I have.
15  Q.  Without disclosing any confidential
16  information, how many cases have you been retained
17  in since the Adams case deposition?
18  A.  My cases are in the various stages of
19  ongoing.  I can tell you that I have had eight cases
20  to date.
21  Q.  And that's since you opened your
22  consulting service?
23  A.  Correct.
24  Q.  Are any of those eight cases on behalf of
25  insureds?

9

1   A.  No.
2   Q.  So the eight cases that you have been
3   retained in have been on -- you have been retained
4   as an expert on behalf of the insurance companies?
5   A.  Correct.
6   Q.  Have you been retained by Principal Life
7   Insurance Company in any matter other than this
8   case?
9   A.  No, I have not.
10  Q.  And I asked that question poorly, which I
11  am apt to do.  Have you been retained by any counsel
12  serving Principal Life Insurance Company other than
13  in this case?
14  A.  I don't know who my counsel that I work
15  with -- I don't know who they represent.  I have not
16  been retained to act as an expert for Principal in
17  any other matters.  Aside from that, I don't know
18  who my counsel represent in the matter of their day-
19  to-day work.
20  Q.  Understood.  Thank you for that
21  clarification.  All right.  If we could -- I think we
22  skipped over this part.  I am going to go ahead and
23  identify myself and Mr. Lee Fernon as being here on
24  behalf of Dr. Andy Lemons.
25      Ms. Murphy?  I don't think we did the

10

1   identifications for the record.
2       MS. MURPHY:  Oh, on the record.  Oh, okay.
3   Excuse me.  My name is Grace Murphy and I am here on
4   behalf of Defendant Principal Life Insurance
5   Company.
6   BY MR. SINCLAIR:
7       Q.  And I understand Ms. Conner that you are
8   here serving as an expert in this matter retained by
9   Principal Life.  Is that correct?
10      A.  That is correct.
11      Q.  Are you represented by counsel in this
12  matter?
13      A.  I am not.
14      MR. SINCLAIR:  Grace, may we attach by
15  reference exhibits today?  It will be limited to the
16  -- my apologies.  The exhibits that were circulated
17  yesterday in the share file account, may we attach
18  those by reference as opposed to having the court
19  reporter attach them to the deposition?
20      MS. MURPHY:  I believe that would be fine.
21  If I have any concerns as we go I will alert you,
22  but if we are limited to ones that you circulated
23  yesterday I am fine with that.  That should be fine.
24      MR. SINCLAIR:  All right.  Very good.
25  BY MR. SINCLAIR:

11

1       Q.  Ms. Conner, you were provided a share file
2   link yesterday that contained, it appears, eight
3   exhibits. Did you gain access to that share file
4   account yesterday or today and download those
5   exhibits?
6       A.  I did.
7       Q.  I want to confirm before we begin that you
8   have access to the following exhibit numbers:
9   Exhibit 1, Exhibit 7, Exhibit 29, Exhibit 30,
10  Exhibit 59, 60, 61 and 62?  Do you have access to
11  those exhibits, Ms. Conner?
12      A.  I do.
13      Q.  Very good.  All right.  Ms. Conner, did
14  you actually bring anything with you to the
15  deposition other than those exhibits?
16      A.  I brought my CV with me.
17      Q.  And I think I have already covered it, but
18  you actually didn't have any changes to your CV
19  since it was Bates numbered and provided to me,
20  correct?
21      A.  Correct.
22      Q.  All right.  Did you bring anything else
23  besides your CV?
24      A.  No, I did not.
25      Q.  All right.  I understand that you would

12

1   like to read and sign.  Do you understand that if
2   you provide any substantive changes we may request
3   to re-depose you regarding those substantive
4   changes?
5       A.  Yes.
6       Q.  Would you please state your full name for
7   the record?
8       A.  Debra Ann Conner.
9       Q.  And Ms. Conner, where are you presently
10  located?
11      A.  In West Yarmouth, Massachusetts.
12      Q.  Are you in your home office at present?
13      A.  I am.
14      Q.  Very good. what is the address?
15      A.  300 Buck, B-u-c-k, Island Road, Apartment
16  15G, West Yarmouth, Massachusetts 02673.
17      Q.  Thank you.  I am going to ask that you
18  pull up Plaintiff's Exhibit 59, which is the revised
19  subpoena to testify at deposition in a civil action
20  issued by me regarding this matter.  Do you have a
21  copy of that Exhibit 59 in front of you?
22      A.  I do.
23      (Exhibit 59 was marked for
24  identification.)
25  BY MR. SINCLAIR:

13

1       Q.  Very good.  And, I take it, we have
2   identified your location and that no one else is
3   present in the room with you.  Did you bring any
4   documents in response to this subpoena?
5       A.  No.
6       Q.  All right.  If you could set that aside
7   and pull up Plaintiff's Exhibit 60.  Plaintiff's
8   Exhibit 60, for the record, is Bates numbered Lemons
9   7661 through Lemons 7688.  Do you have that Exhibit
10  60 in front of you, Ma'am?
11      A.  I do.
12      (Exhibit 60 was marked for
13  identification.)
14  BY MR. SINCLAIR:
15      Q.  All right.  And is that your report that
16  you prepared in this matter?
17      A.  It is.
18      Q.  Have you been asked to provide any other
19  opinions other than what is in Plaintiff's Exhibit
20  60?
21      A.  No.
22      Q.  Have you reviewed any documents since
23  drafting this report or preparing this final report
24  with regard to this matter?  And I asked that
25  question poorly.  Let me ask you, before you



14

1 prepared your report marked as Plaintiff's Exhibit
2 60 you reviewed certain documents, correct?
3    A.   Correct.
4    Q.   And I believe you actually set out in
5 Plaintiff's Exhibit 60 -- beginning on page 5 of
6 your report in Exhibit 60 you listed the documents
7 that you had reviewed; is that correct?
8    A.   Correct.
9    Q.   Do you have any documents that you wish to
10 add to this list that you have since reviewed?
11    A.   I do.
12    Q.   What documents have you reviewed since
13 this list was prepared?
14    A.   I have reviewed Judge Harwood's rebuttal
15 report.  I have reviewed underwriting guidelines
16 from Principal.  I have also reviewed Doug
17 Hanselman's job description and there may be one or
18 two others that I don't recall.
19    Q.   Are you in any way modifying or expounding
20 on your report based upon your review of additional
21 documents?
22    A.   Not that I know of right now.
23    Q.   The additional documents that you have
24 identified are number 1, Judge Harwood's report,
25 correct?

16

1    Q.   And then you indicated one or two others
2 that you had reviewed.  Can you provide me any
3 description of what those documents were?
4    A.   I don't recall what they were, sitting
5 here.
6    Q.   Were they subpoena responses?
7    A.   Not that I can recall, no.
8    Q.   Were they provided by Ms. Murphy's office?
9    A.   Yes.
10    Q.   Are all of the documents that you have now
11 listed for me, were those provided by Ms. Murphy's
12 office?
13    A.   Yes.
14    Q.   Are there any additional documents other
15 than what you have already identified which you have
16 reviewed since providing your original document list
17 in Exhibit 60?
18    A.   No.
19    Q.   Did any of the documents that you reviewed
20 cause you to want to revise or otherwise edit your
21 report in Exhibit 60?
22    A.   No, not sitting here today.
23    Q.   Well, I understand that you may have had
24 an opportunity at some point, but did you actually
25 prepare for today's deposition?

15

1    A.   Correct.
2    Q.   And number 2, you indicated underwriting
3 guidelines.  Is that a document that is entitled,
4 "Product Description and Underwriting Guidelines"?
5    A.   I don't -- I don't recall.  I can
6 certainly revise my report to reflect the additional
7 documents.
8    Q.   Well, I am not going to ask you to go back
9 in and list out three documents for me.  Maybe we
10 can do it this way.  Will you agree to provide me
11 with a copy of the additional documents that you
12 have been provided in this matter?
13    A.   Yes.
14    Q.   Very good.  If you will -- in this day and
15 age you can just e-mail me.  I am sure Grace will
16 want some input on that.  E-mail me the documents so
17 I know what those are.
18        MS. MURPHY:  I will help facilitate that.
19 We can provide those.
20        MR. SINCLAIR:  All right.
21 BY MR. SINCLAIR:
22    Q.   You also indicated as the third document
23 that you had reviewed Doug Hanselman's job
24 description; is that correct?
25    A.   Yes.

17

1    A.   I did.
2    Q.   Okay.  Did you review these additional
3 documents as part of your preparation?
4    A.   I did.
5    Q.   As you sit here today do you wish to
6 modify, edit, expound on or otherwise make any
7 changes to your report as contained in Exhibit 60?
8    A.   No.
9    Q.   All right.  Let me go through some basics.
10 I understand from your prior deposition testimony in
11 the Adams matter that you have been deposed before
12 so you know the ground rules, but I am going to go
13 over them just because it is my habit.  Please
14 excuse me.  I am sure you understand these things.
15 First off, we are taking your deposition today and
16 this is being governed by the Federal Rules of Civil
17 Procedure and the dictates of the Northern District
18 of Alabama.  Do you understand the oath that you
19 have just taken with the court reporter?
20    A.   Yes.
21    Q.   Do you understand that that oath is taken
22 in the same manner as though you were standing
23 before the judge in this case?
24    A.   Yes.
25    Q.   Do you have any present impairments to



18

1  providing truthful and accurate responses to my
2  questions?
3      A.   No.
4      Q.   Are you presently on any medications or
5  suffering from any illnesses which would impair your
6  ability to provide truthful and accurate responses
7  to my questions?
8      A.   No.
9      Q.   Given these strange times this is more
10  important than ever.  If you would please verbalize
11  your responses.  Okay?
12      A.   Yes.
13      Q.   I will try very hard not to speak over you
14  despite the technology lag.  If you would kindly do
15  the same I would greatly appreciate it.  Okay?
16      A.   Yes.
17      Q.   If you need a break, please let me know.
18  This is not a marathon session.  All right?
19      A.   Yes.
20      Q.   I understand that you have a hard stop
21  today at 3:00 and I am going to do my best to march
22  through this as quickly as possible.  Will you agree
23  to tell me if you don't understand or are confused
24  by my question?
25      A.   Yes.

19

1      Q.   Will you agree to tell me if you believe I
2  have assumed an incorrect fact in my question?
3      A.   Yes.
4      Q.   Will you agree to tell me if you don't
5  know the answer to my question?
6      A.   Yes.
7      Q.   Have you ever been a plaintiff in a matter
8  -- in a case?
9      A.   Not that I recall, no.
10      Q.   Have you personally or your company ever
11  been sued?
12      A.   No.
13      Q.   And what is the name of your company?
14      A.   It is D.A. Conner's Consulting.
15      Q.   And when was that established?
16      A.   September of 2018.
17      Q.   And since establishing D.A. Conner
18  Consulting you have gone into providing -- the field
19  of providing expert testimony in eight cases; is
20  that correct?
21      A.   That is correct.
22      Q.   Does that number eight include files that
23  you have been retained as a consulting expert?
24      A.   That eight consists of files -- claim
25  files that I have been asked to review primarily for

20

1  litigation purposes.
2      Q.   Do you understand the distinction between
3  a disclosed or testifying expert and a consulting
4  expert under the federal rules?
5      A.   Yes.
6      Q.   And I should have noted for the record you
7  are actually a licensed attorney; is that correct?
8      A.   That is correct.
9      Q.   And where is your license at present?
10      A.   Connecticut.
11      Q.   And it is still current?
12      A.   Yes.
13      Q.   All right.  So back to my question.  I
14  understand that you have been retained in eight
15  cases since opening D.A. Conner Consulting in
16  September of 2018; is that right?
17      A.   Yes.
18      Q.   Are there additional cases in which you
19  have been retained as a consulting expert?
20      A.   Not specifically specific to claims.
21      Q.   I see.  So as part of your D.A. Conner
22  Consulting business you, in addition to providing
23  expert testimony, also provide expert consulting
24  services; is that correct?
25      A.   That's correct.

21

1      Q.   All right.  So how many additional matters
2  do you have beyond the eight that we have already
3  talked about in which you are providing consulting
4  service?
5      A.   I have had two.
6      Q.   Are any of those matters those -- excuse
7  me.  I will rephrase the question.
8          With regard to solely the two consulting
9  matters -- and I asked the question poorly again.
10  Let me start over.
11          With regard to the two matters in which
12  you were providing consulting services were either
13  of those matters involving Principal Life Insurance
14  Company?
15      A.   No.
16      Q.   Were either of those matters providing
17  service to attorneys at Maynard Cooper & Gale?
18      A.   No.
19      Q.   With regard to the two matters in which
20  you were providing consulting services, were both of
21  those serving as a consultant to insurance
22  companies?
23      A.   No.
24      Q.   Were either of those matters serving as a
25  consultant to insureds?



22

1    A.   No.
2    Q.   Did either of those matters, the two
3 consulting matters, involve individual disability
4 income insurance policies?
5    A.   They could.
6    Q.   With regard to the eight cases in which
7 you have -- well, I should ask that question.
8         The eight cases that you referenced
9 earlier, have you been disclosed as an expert in all
10 of those cases?
11    A.   I know that I have been disclosed as an
12 expert in seven of those cases.  I am not sure about
13 the eighth case.
14    Q.   Being cognizant of other attorneys'
15 privilege given that we are all lawyers on the phone
16 call, I am not going to ask you specifics about that
17 except with regard to this.  None of those cases
18 from the eight that you have told me about and the
19 two consulting service cases, none of those cases
20 other than this one involve a Principal insured, do
21 they?
22    A.   No.
23    Q.   In your role as an expert I would like to
24 sort of go over some ground rules, if we could, to
25 understand the scope of your testimony and your

23

1 opinion.  We will start with this question.  Is it
2 appropriate for an expert to omit evidence that is
3 not supportive of the expert's opinion?
4    A.   Not on its face.
5    Q.   I am sorry.  You broke up a little bit.
6 Maybe that was my speaker.  Not what?
7    A.   On its face.
8    Q.   With regard to the supportiveness --
9 supportive nature of the evidence, is that what you
10 are saying?
11    A.   Correct, or the lack of -- or the lack of
12 evidence or information, lack of information or
13 difference of opinion about the information.
14    Q.   So as part of being an expert in a case
15 you believe it is important to point out any
16 evidence that may conflict with your opinion on its
17 face.  Is that fair?
18    A.   If I feel it is relevant to the matter.
19    Q.   So you base, at least in part, your
20 analysis of the evidence based upon the relevancy
21 requirements as we use them in the legal profession?
22         MS. MURPHY:  Object to the form.
23         THE DEPONENT:  We supply -- I base it on
24 the relevance that I see as an expert witness.
25 BY MR. SINCLAIR:

24

1    Q.   Is there a standard that you employ to
2 determine relevancy as an expert witness?
3    A.   It would be my years of experience.
4    Q.   Are there any written standards or
5 guidelines that we could consult that you use in
6 determining relevancy as you used it in your
7 response?
8    A.   I don't believe so.
9    Q.   What was the methodology that you used in
10 preparing your report?
11    A.   So I looked at all of the documents that
12 were provided to me, took into consideration any
13 experience that I have gained over 40 years,
14 evaluated the claim and the claim handling and wrote
15 my report.
16    Q.   Have you provided me with a full response
17 to my prior question?
18    A.   I believe so.
19    Q.   Would it be appropriate for an expert to
20 provide opinions that are not the product of
21 reliable methodology?
22    A.   I don't know what your definition of
23 reliable methodology is.
24    Q.   How would you define the word reliability?
25         MS. MURPHY:  Object to the form.

25

1         THE DEPONENT:  I don't understand the
2 concept -- the context from which you are using the
3 word so I really can't define it.
4 BY MR. SINCLAIR:
5    Q.   When you think about something being
6 reliable can we agree that that would mean it is
7 something that you can count on as being a
8 repeatable conclusion?
9    A.   I don't think so.
10    Q.   Why not?
11    A.   I think -- I think it depends on what you
12 are talking about.  Are you talking about the
13 machine?  Are you talking about a human?  I think
14 there is different factors and it all depends on
15 facts and circumstances.
16    Q.   All right.  So let's go to what you were
17 saying there about being a human.  I take it you
18 mean that a machine would come to the same
19 conclusion or result over and over again whereas a
20 human may not.  Is that your distinction?
21    A.   Yes.
22    Q.   So what factors with regard to your
23 methodology would you say are more machine-like in
24 nature?
25         MS. MURPHY:  Object to the form.



26

1      THE DEPONENT:  I don't understand the
2  question.
3  BY MR. SINCLAIR:
4      Q.   Sure.  I am trying to figure out what
5  methodology you utilized that you feel like is more,
6  in your way of saying it, machine-like in that the
7  result is repeatable and it will come to the same
8  conclusion over and over again.  So let me try to
9  rephrase the question a little bit for us.  When we
10  talk about reliability, when you are talking about
11  the methodology that you utilize, what elements of
12  your methodology do you believe are more machine-
13  like in nature?
14      A.   None.
15      Q.   Is there anything in your -- all right.
16  First off, I should back up.
17      Have you provided me now a list of all the
18  methodology you used to prepare your report?
19      A.   I don't agree with the term "methodology"
20  to prepare my report.  When you are reviewing a
21  claim every single claim that you review is
22  different.  All of the facts and circumstances are
23  different.  There is no one methodology for
24  reviewing a claim.
25      Q.   Well, we are talking about Dr. Lemons'

27

1  claim in this matter and we are talking about the
2  methodology that you used to review Dr. Lemons'
3  claim in this matter.  Did you use the same
4  methodology that you used in the other eight cases
5  in reviewing Dr. Lemons' claim?
6      A.   Not necessarily.  All of those claims are
7  different.  There is different pieces -- different
8  documentation that is reviewed.  There is different
9  things that you think about when you analyze the
10  claim. So, no, there is no common methodology in
11  reviewing a claim.  Reviewing a claim is not a
12  process.  It is an analytical situation.
13      Q.   And that comes into play when you actually
14  analyze the underlying facts of each claim is what
15  you are saying.  Am I correct in that?
16      A.   When you analyze the underlying facts and
17  circumstances as well as the policy and all the
18  surrounding evidence that is included with the
19  claim.
20      Q.   Well, let me ask it this way.  Did you
21  make sure that there was a concrete basis for every
22  statement in your opinion before including it?
23      A.   I believe so.
24      Q.   Did you -- let me back up a little bit
25  further.

28

1      In preparing for today's deposition did
2  you create any new documents?
3      A.   No.
4      Q.   Have you identified all of the materials
5  that you reviewed to prepare for today's deposition?
6      A.   With the exception of -- with the
7  exception of the documents that we previously
8  discussed.
9      Q.   Which were the additional documents of
10  which you could identify three for certain and then
11  two additional beyond that that you could not
12  identify, correct?
13      A.   I believe it was one or two.  I am not
14  sure of the exact number.
15      Q.   Okay.  Are there any agreements to which
16  you are a signatory which would impair your ability
17  to respond fully to these questions today?
18      A.   Potentially, yes.
19      Q.   What agreements are those?
20      A.   Those would be agreements with prior
21  employers and by that I mean insurance companies.
22      Q.   So, for example, you may have signed a
23  non-disclosure agreement with Sun Life that might
24  and otherwise impair your ability to respond to a
25  question if I asked about that business?

29

1      A.   Correct.
2      Q.   Will you agree to tell me if any of your
3  responses are restricted by any of those agreements?
4      A.   Yes.
5      Q.   Did you meet with or speak with anyone in
6  preparing for today's deposition?
7      A.   Yes.
8      Q.   Without responding as to the substance of
9  those conversations, when did those meetings take
10  place or those conversations take place?
11      A.   Last night, which would have been Tuesday,
12  and last Thursday, I believe.
13      Q.   Were those telephone conferences?
14      A.   Yes.
15      Q.   And who was present in those telephone
16  conferences?
17      A.   Thursday I spoke with Grace and last night
18  I spoke with Ashley and Grace.
19      Q.   I want you to pause after this next
20  question if you would, Ms. Conner.  What did Grace
21  and Ashley tell you in those phone conversations?
22      MS. MURPHY:  Objection.
23      THE DEPONENT:  They did not tell me --
24  they did not tell me.  They -- it was more of them
25  asking me.



30

1 BY MR. SINCLAIR:
2    Q.   Take another pause, if you would, Ms.
3 Conner. What did they ask you?
4       MS. MURPHY:  Object to the form.
5       THE DEPONENT:  In the Thursday meeting --
6 in Thursday's meeting we discussed generally Judge
7 Harwood's report, if I had read it.  We spoke for a
8 very brief amount of time and in Tuesday's meeting
9 we just discussed generally whether I was
10 comfortable, had reviewed my documents.  They
11 suggested that I have the documents available to the
12 exhibits.  Just general -- in general we spoke.
13 BY MR. SINCLAIR:
14    Q.   With regard to Judge Harwood's report,
15 which was discussed on Thursday, have you been asked
16 to amend or provide any supplemental reports in this
17 matter to respond to Judge Harwood's report?
18    A.   No.
19    Q.   Are you planning on doing that yourself?
20    A.   No.
21    Q.   Are you representing yourself to be an
22 expert in law?
23    A.   No.
24    Q.   Have you been instructed by anyone to not
25 tell me certain things?

31

1    A.   No.
2    Q.   With respect to the knowledge regarding
3 your knowledge regarding your opinions in your
4 report you indicated, I believe, previously that
5 that was based on your 40 years of experience.  I
6 want to now cover specifically formal training that
7 is encompassed within that 40-year period.  With
8 respect to the knowledge, in your opinion was some
9 of that learned in school, college or post graduate
10 work?
11    A.   It may have been.
12    Q.   In the Adams matter did you provide a
13 complete and full list of all your formal school,
14 college and post-graduate training?
15    A.   Yes, with the exception of classes that I
16 have taken from time to time.  That was not part of
17 that testimony.
18    Q.   When you reference "classes" are you
19 talking about classes provided by a school, college
20 or university?
21    A.   It could have been, yes, evening classes
22 or ongoing education classes, but I am talking
23 single classes not connected to a degree.
24    Q.   All right.  Let's cover if we can without
25 having to go into covering Adams' testimony all over

32

1 again, let me have you, if you would, list out every
2 university that you have attended either as a formal
3 student or in taking a single class.
4    A.   University or college?
5    Q.   We will go with either university or
6 college.
7    A.   Okay.  Greenfield Community College,
8 University of Massachusetts at Amherst, Western New
9 England University School of Law.  I believe that's
10 it for colleges or universities.
11    Q.   With regard to Western New England School
12 of Law was that a full-time program?
13    A.   No.
14    Q.   That was, I take it then, a part-time
15 program with the Western New England School of Law?
16    A.   It was part-time evening classes, yes,
17 because I worked during the day.
18    Q.   And that was while you were working at --
19 was it Sun Life that you were working at at the
20 time?
21    A.   No, it was Phoenix -- Phoenix.
22    Q.   And how long did you attend Western New
23 England School of Law?
24    A.   Four years.
25    Q.   Is that an accredited university in the

33

1 state?
2    A.   Yes.
3    Q.   Is that an ABA accredited university or --
4 Western New England School of Law, is that an ABA
5 accredited school of law?
6    A.   Yes.  Yes.
7    Q.   And did you then take the Connecticut
8 State Bar?
9    A.   Yes.
10    Q.   Did you pass the bar on your first try?
11    A.   No.
12    Q.   How many times did you take the bar?
13    A.   Two.
14    Q.   And then -- I take it you then did pass on
15 the second try?
16    A.   Yes.
17    Q.   With regard to the University of
18 Massachusetts at Amherst what classes did you take
19 at that university?
20    A.   I took a mixture of classes because it was
21 similar to their university without law.  So I was
22 able to put together a pre-law program, consisted
23 primarily of English classes, speaking classes as
24 well as history classes.
25    Q.   Was that an online program at the



34

1  University of Massachusetts at Amherst?
2      A.   No.
3      Q.   You attended that in person?
4      A.   Yes.
5      Q.   Did you receive a degree from the
6  University of Massachusetts at Amherst?
7      A.   Yes.
8      Q.   And what was that degree?
9      A.   Bachelor of Arts.
10     Q.   And how long did it take you from start to
11  finish at the University of Massachusetts at
12  Amherst?
13     A.   I don't -- I don't recall when I started
14  to go back and actually got the degree.  It was
15  probably three -- maybe three years.  That was part-
16  time at night as well.
17     Q.   That was while you were also working?
18     A.   Yes.
19     Q.   And then with regard to Greenfield
20  Community College, did you receive a degree from
21  Greenfield Community College?
22     A.   I did.
23     Q.   What degree was that?
24     A.   Associate in Science.
25     Q.   Have we now covered all of the degrees or

35

1  classes that you attended at colleges or
2  universities?
3      A.   Yes.
4      Q.   Have we also covered all of your post-
5  graduate work?
6      A.   Yes.
7      Q.   With regard to classes that you referenced
8  earlier that you may have taken from time to time,
9  were those classes provided by your various
10  employers?
11     A.   Some of them were, yes.
12     Q.   Which were not?
13     A.   Any classes that I would have taken on my
14  own.
15     Q.   Outside of the colleges and universities
16  that we have now covered where else did you take
17  those classes outside of your employers?
18     A.   I -- are you talking business classes,
19  leisure classes?  I have taken, you know --
20     Q.   Let's just focus if we can on business.
21  Let's not talk about, you know, whatever class you
22  may have taken for fun -- anything related to
23  business of insurance or law.  I am just focusing on
24  your class work, okay.  I know we have covered the
25  colleges and universities that you have attended and

36

1  taken classes at, correct?
2      A.   Correct.
3      Q.   What other institutions or providers did
4  you take classes at related to insurance or law?
5      A.   I don't believe there were any other
6  related to insurance or law.  There may have been
7  some that were related to business, but I don't
8  recall.  Business from a business development,
9  strategic planning, but not the law specifically.
10     Q.   Okay.  Let me ask then with regard to
11  those classes or training -- I am adding the word
12  training in here.  With regard to those classes or
13  training that we have not previously discussed, I
14  want to ask where those were provided to you.  I
15  guess the first starting point would be are you a
16  member of any insurance industry association or
17  trade group?
18     A.   Not at the present time.
19     Q.   Were you at some point in the past?
20     A.   Yes.
21     Q.   What industry or trade association or
22  group were you a member of?
23     A.   The New England Claim Association.
24     Q.   Any others?
25     A.   The New England Anti-Fraud Association.

37

1      Q.   Any others?
2      A.   Those are the two that I can recall that I
3  was an actual member of.
4      Q.   Have you ever been a member of LOMA?
5      A.   No.
6      Q.   Have you ever been a member of any
7  insurance industry group or association outside of
8  the New England Claim Association and New England
9  Anti-Fraud Association?
10     A.   No.
11     Q.   Is your report and its contents based on
12  your experience or academic knowledge or both?
13     A.   Both.
14     Q.   Did you conduct your own research
15  independent of the litigation in this matter?
16     A.   I don't understand what you're asking me.
17     Q.   Then I probably asked it poorly.  So let
18  me rephrase.
19          I understand that you were provided
20  documents by the attorneys for Principal; is that
21  correct?
22     A.   Yes.
23     Q.   Did you then conduct your own research
24  outside of what was provided you by the attorneys
25  for Principal?



38

1    A.   I believe we looked up the Alabama
2 statutes regarding fair claims practices.
3    Q.   Anything else?
4    A.   I also looked at generally some good
5 faith/bad faith issues in Alabama.
6    Q.   Anything else?
7    A.   Not that I recall.
8    Q.   Have you with regard to the -- your
9 reference to looking up Alabama statutes regarding
10 fair claims, did you put into your report all of the
11 information that you learned from your review of the
12 Alabama statute regarding fair claims?
13       MS. MURPHY:  Object to the form.
14       THE DEPONENT:  I included all the
15 information that I thought was pertinent.
16 BY MR. SINCLAIR:
17    Q.   Was there information that you felt was
18 not pertinent?
19    A.   I don't recall.
20    Q.   How did you determine whether or not
21 information would be pertinent?
22    A.   Whether I thought it was applicable to the
23 case at hand.
24    Q.   Was that a determination you made based
25 upon some guide or written instructions?

39

1    A.   No.
2    Q.   With regard to your reference to reviewing
3 generally good faith/bad faith issues, what
4 materials did you review?
5    A.   I don't recall exactly.
6    Q.   Would all of those materials that you
7 reviewed be referenced in your report?
8    A.   No, because I was not -- I was not
9 necessarily asked to opine specifically about good
10 faith and bad faith.  There is another person that
11 submitted the expert report with regard to that
12 issue.
13    Q.   And who is that person?
14    A.   Lynn Hare, I believe is her name.
15    Q.   And for the benefit of the court reporter
16 that is H-a-r-e.  Correct?
17    A.   I believe so.
18       MS. MURPHY:  Correct.
19 BY MR. SINCLAIR:
20    Q.   What did your good faith and bad faith in
21 Alabama research entail?
22    A.   I probably would have pulled up some case
23 law as well as any other documents that I could
24 find.
25    Q.   I did not see any reference in your report

40

1 to any case law.  Did you --
2    A.   That's because I didn't -- because I
3 didn't -- I didn't feel the need to include any of
4 that information.  I wasn't primarily opining on
5 that.
6    Q.   Did you review Ms. Hare's report before
7 you prepared your report?
8    A.   No.
9    Q.   Can you tell me, since we don't have those
10 documents or cases, what steps would you have taken
11 in doing that -- in conducting that research?
12    A.   I --
13    Q.   In other words -- I am sorry.  Go ahead.
14    A.   I would have just looked online to see
15 what I could find.
16    Q.   I should have asked this to begin with.
17 Do you have a Westlaw account?
18    A.   I do not.
19    Q.   Okay.  You would have looked at whatever
20 publicly available opinions are out there with
21 regard to Alabama good faith or bad faith laws?
22    A.   Yes.
23    Q.   So just to be clear, your opinion does not
24 involve any assessment of good faith or bad faith in
25 this matter, does it?

41

1       MS. MURPHY:  Object to the form.
2       THE DEPONENT:  My opinion may include some
3 aspect of good faith versus bad faith handling, but
4 I was not asked to render that opinion specifically.
5 BY MR. SINCLAIR:
6    Q.   Well, are you going to be offering any
7 opinion in the trial of this matter as to the
8 assessment of good faith or bad faith in Alabama?
9    A.   No, I am not.
10    Q.   Are you familiar with the NAIC?
11    A.   I am.
12    Q.   Can you tell me, what is the NAIC?
13    A.   Do you mean what does that stand for?
14    Q.   That's a better way of asking it.  Yes,
15 please, what does the NAIC stand for?
16    A.   It is the -- National Association of
17 Insurance Commissioners, I believe.
18    Q.   And who is the NAIC and what do they do?
19       MS. MURPHY:  Object to the form.
20       THE DEPONENT:  I am not sure what you mean
21 by who are they, but among the things that they do
22 is they propose model acts for insurance carriers
23 similar to the Unfair Claims Settlement Practices
24 Act.
25 BY MR. SINCLAIR:



42

1    Q.  In your opinion do they have any role to
2  play with regard to the assessment of Dr. Lemons'
3  claim?
4       MS. MURPHY:  Object to the form.
5       THE DEPONENT:  Does the NAIC have any role
6  to play in Dr. Lemons' claim?  Is that your
7  question?
8  BY MR. SINCLAIR:
9    Q.  In the assessment -- in your assessment of
10  Dr. Lemons' claim -- does the NAIC have any role in
11  your assessment of Dr. Lemons' claim?
12       MS. MURPHY:  Same objection.
13       THE DEPONENT:  I am not real sure on how
14  to answer that question the way that it is posed.
15  BY MR. SINCLAIR:
16    Q.  Then let me rephrase.  Let's turn, if we
17  can, to Exhibit 60, which is your report.
18    A.  Yes.
19    Q.  Do you have Exhibit 60 in front of you?
20    A.  I do.
21    Q.  All right.  With regard to Exhibit 60,
22  that is page 18, Bates numbered Lemons 7678,
23  correct?
24    A.  Yes.
25    Q.  You indicate in this report -- under the

43

1  heading, "Alabama Insurance Law and Unfair Claims
2  Settlement Practices Act," you indicate certain
3  things with regard to the NAIC, so I want to cover
4  that.  That is the reason for this line of
5  questioning.  First off, with regard to the heading,
6  "Alabama Insurance Law and Unfair Claims Settlement
7  Practices Act" -- with regard to that heading
8  itself, I want to make sure I understand the scope
9  of your testimony.  You are not offering an opinion
10  on what is controlling precedent in Alabama
11  insurance law, are you?
12    A.  I believe that would be for the court to
13  determine.
14    Q.  So with regard to referencing your
15  research into case law you are not opining on, for
16  example, whether or not the NAIC laws control fair
17  claims practices in Alabama, are you?
18    A.  I am opining that it did not appear to me
19  from reviewing the Alabama administrative code that
20  they had adopted -- they had not adopted the NAIC
21  Model Act nor could I find any similar act, anything
22  that was anything similar to the model Unfair Claims
23  Settlement Practices Act.
24    Q.  Okay.  So other than the NAIC's Unfair
25  Claims Settlement Practices Act model rules not

44

1  being controlling in Alabama were there any other
2  reasons that you found NAIC model rules to be
3  irrelevant here?
4    A.  To be irrelevant here?
5    Q.  Irrelevant here, yes.
6    A.  I don't understand the question.
7    Q.  Sure.  You indicate that it is your
8  opinion that the NAIC's Unfair Claims Settlement
9  Practices Act model rules have not been adopted in
10  full in Alabama; is that correct?
11    A.  In full or in part.
12    Q.  What did you base that opinion on?
13    A.  My review of the Alabama Insurance Code.
14    Q.  Anything else?
15    A.  No.
16    Q.  Is it your opinion that the NAIC's model
17  rules are not relevant to your opinion on Dr.
18  Lemons' claim?
19       MS. MURPHY:  Object to the form.
20       THE DEPONENT:  No.
21  BY MR. SINCLAIR:
22    Q.  You indicated no.  So would you agree that
23  the NAIC model rules are relevant to your analysis
24  of Dr. Lemons' claim?
25       MS. MURPHY:  Object to the form.

45

1       THE DEPONENT:  I can't answer -- you need
2  to restate your question.  I can't answer it as you
3  have posed it.
4  BY MR. SINCLAIR:
5    Q.  What -- all right.  So I am not sure what
6  I did there that was confusing.  What was it that
7  you were confused about?  Was it you just didn't
8  understand the question or --
9    A.  I don't -- I don't understand the question
10  that you are asking me, if it is -- I don't
11  understand the question you are asking me.
12    Q.  Okay.  Do you feel like the NAIC model
13  rules should have been used in your analysis of Dr.
14  Lemons' claim?
15    A.  I believe that I should have used them
16  from the perspective that most insurance carriers
17  know the Model Claims Act and have training on an
18  annual basis on the California Unfair Claims
19  Settlement Practices Act.  So whether or not it is
20  controlling to this specific case, given the fact
21  that most insurance carriers have the annual
22  training and are aware of it and typically follow
23  the California Unfair Claims Act because of the fact
24  that it is the most stringent in the United States,
25  from that perspective it is applicable.

46

1     Q.   Okay.  I think I just picked up on
2   something and you are a lawyer so you can help me
3   with this.  Are you familiar with the fact that
4   multi-state law firms will use the most stringent
5   state's ethical rules to guide their practice.  Are
6   you familiar with that practice?
7     A.   No.
8     Q.   Okay.  So in the insurance industry field
9   multi-state insurance companies, those companies
10   with product lines in multiple states, they will
11   pick the most stringent rules to guide their
12   process; is that correct?
13        MS. MURPHY:  Object to the form.
14        THE DEPONENT:  They will choose the most
15   stringent rules to do training on annual training,
16   but that does not mean that it is a mandate that
17   they are -- followed in every single state,
18   depending on the facts and circumstances of course.
19   But all companies are required to do annual training
20   on the California Act for their claims people.
21   BY MR. SINCLAIR:
22     Q.   As a matter of fact, that was done in this
23   -- in Principal's practice, right?
24     A.   It is my understanding, yes, that they
25   underwent annual training.

47

1     Q.   You saw that in Mr. Hanselman's testimony,
2   didn't you?
3     A.   Correct.
4     Q.   Could Principal treat a California
5   resident better than an Alabama resident?
6        MS. MURPHY:  Object to the form.
7        THE DEPONENT:  From -- I don't understand
8   from what perspective you mean, treat someone
9   better.  The contracts may be different.  The facts
10   and circumstances may be different and I guess I
11   object to treating someone differently or better.
12   That is not something that happens in claims
13   departments.
14   BY MR. SINCLAIR:
15     Q.   So, in other words, if you had a
16   California insured and an Alabama insured with the
17   same policy you would have to treat them equally,
18   right?
19     A.   You would have to adjudicate the claim in
20   accordance with the policy.
21     Q.   And there would be no distinction made
22   between residency of an Alabama insured or a New
23   York insured, would there?
24     A.   There may be.
25     Q.   How so?

48

1     A.   Depending upon the laws of the state.  For
2   example, there are some extra territorial laws in
3   the different states that apply to residents of the
4   state which may differ from other states.  So it
5   depends on the laws of the state.
6     Q.   Why did you disagree with Ms. Parker's
7   statement that the NAIC has indicated that Alabama
8   has adopted a modified version of the Unfair Claims
9   Settlement Practices Act?
10     A.   I disagreed with Ms. Parker's statement
11   that Alabama has adopted a modified version because
12   I could find nothing that was anywhere near similar
13   to the Model Act in the Alabama Insurance Code.
14        MS. MURPHY:  Deb, feel free to say you
15   need a break.  It's been over an hour.
16        MR. SINCLAIR:  Oh, I am sorry.
17        MS. MURPHY:  Take a break when you want.
18        MR. SINCLAIR:  Ms. Conner, would you like
19   -- would you like to take a quick break?
20        THE DEPONENT:  So let me ask you this.  Is
21   this -- if you are going to be on this subject for
22   just a few more minutes I would say, "Let's finish
23   it," if you're going to a new subject.  But if you
24   are going to be on this subject for more than, you
25   know, 11:30 perhaps we could take a quick break.

49

1        MR. SINCLAIR:  I don't think it is going
2   to take that long to finish this subject.  Let's go
3   ahead and march through this subject then.
4   BY MR. SINCLAIR:
5     Q.   Is it your opinion that the NAIC's model
6   rules unfairly prohibit any claims practices?
7     A.   I don't know what you just asked me.  I
8   don't understand the question.
9     Q.   Sure.  Do you disagree with any of the
10   substance in the NAIC's Model Unfair Claims
11   Settlement Practices Act?
12     A.   Do I personally agree or disagree with the
13   Model Act?
14     Q.   Well --
15     A.   I personally have no problem with the NAIC
16   Model Act .  We -- it has been around forever and
17   it's been used forever in claims departments.
18     Q.   As a matter of fact, I think Mr. Hanselman
19   testified it was used by him in drafting the claims
20   manual for Principal.  Did you see that testimony?
21     A.   Yes, I did.  And that -- yes, that would
22   be expected.
23     Q.   That would be in compliance with industry
24   standards, right?
25     A.   Perhaps.



50

1    Q.   How would it not be in compliance with
2   industry standards?
3       A.   I think that the industry would
4   acknowledge that it is a state -- you know, if you
5   are talking true strict letter of the law the state-
6   by-state situation and they generally adhere to the
7   NAIC Model Act , but it is state-by-state as to what
8   the particular states have adopted.
9       Q.   Is it your opinion that Alabama does not
10  have in any way the NAIC model Unfair Claims
11  Settlement Practices Act applicable to Alabama
12  claims?
13      A.   It is my opinion that Alabama has not
14  adopted the NAIC Model Act nor any similar version
15  of it.
16      Q.   Well, would it be acceptable for Principal
17  in this matter to not utilize the NAIC's unfair
18  practice prohibitions in Alabama?
19      MS. MURPHY:  Object to the form.
20      THE DEPONENT:  I don't know the answer to
21  that question.
22  BY MR. SINCLAIR:
23      Q.   Why not?
24      A.   It is too broad and too ambiguous.  I
25  can't answer that question.

51

1       Q.   Okay.  Let me -- let me ask it this way
2   then. When you examined Dr. Lemons' claim did you
3   find any violations to have occurred of the NAIC's
4   Unfair Claims Settlement Practices Act?
5       A.   No, I did not.
6       Q.   With regard to your report and your
7   testimony today have we now covered all those
8   statutes in Alabama that you felt relevant or
9   material to the way in which Dr. Lemons' claim
10  should be analyzed?
11      A.   Could you repeat that?
12      Q.   Sure.  Trying to wrap up this line of
13  questioning.  When we -- or have we covered all of
14  the statutes in Alabama, either today in the
15  testimony or in your report, that you felt are
16  relevant to the analysis of Dr. Lemons' claim?
17      A.   To my knowledge, yes.
18      Q.   Are there any other materials setting out
19  the relevant standards for claims handling practices
20  in Alabama that we have not covered?
21      A.   Not to my knowledge.
22      Q.   You mentioned in your opinion that the
23  NAIC Model Act does not govern disability claims
24  handling in the state of Alabama.  Do you recall
25  mentioning that at page 19 of Exhibit 60?

52

1       A.   Yes.
2       Q.   Why did you state that?
3       MS. MURPHY:  Object to the form.
4       THE DEPONENT:  I stated that for --
5   because Alabama, to my knowledge, has not adopted
6   the Model Act and the other thing that I did not see
7   was that the definition of disability was included
8   in any of the claims handling procedures that they
9   may have referred to in the administrative code.
10  BY MR. SINCLAIR:
11      Q.   Any other reason that you opined that the
12  NAIC Model Act does not govern disability claims
13  handling in the state of Alabama other than what you
14  have already answered?
15      A.   When you use the term "govern disability
16  claim," I am looking at this from a perspective of
17  controlling in -- controlling or governing
18  disability claims as per the Alabama Code.
19      Q.   Okay.  This may be wrapping up with my
20  line of questioning then.  So when you say,
21  "controlling," you mean it in the purely legal
22  requirement context, correct?
23      A.   Yes.
24      Q.   All right.  I guess now is a good time for
25  a break then.  How long would you like to take a

53

1   break, Ms. Conner?
2       A.   How about to 11:30?  15 minutes?
3       MR. SINCLAIR:  Yes, that works, 15
4   minutes. All right.  Thank you.  We will be back in
5   15.
6       (Off the record.)
7   BY MR. SINCLAIR:
8       Q.   Let's go back on the record if we can.  So
9   if we can, Ms. Conner, if you wouldn't mind, turn to
10  page 20 of your report, which is Exhibit 60, Bates
11  number Lemons 7680.
12      A.   Yes.
13      Q.   In that report -- the last full paragraph
14  of that report you indicate federal law mandates
15  that health care providers keep and retain their
16  records for a minimum of seven years from the date
17  of last -- the last service to the patient.  Do you
18  see that sentence?
19      A.   Yes.
20      Q.   What federal law are you referencing
21  there?
22      A.   I don't recall which federal law it was.
23      Q.   Do you recall if it was a statute or some
24  regulation?
25      A.   I believe it was a statute or a

54

1  regulation.
2     Q.   So it was a statute or a regulation.  Was
3  that --
4     A.   I --
5     Q.   I am sorry.
6     A.   I am not sure.  I am not sure which.
7     Q.   When you use the sentence -- in that
8  sentence you used the word "records."  What records
9  are you referring to?
10    A.   I believe it was patient records.
11    Q.   What types of patient records are you
12  referencing?
13    A.   Any records to do with the patient.
14    Q.   What -- what investigation did you do in
15  order to ascertain that federal law required what
16  you set out in that sentence?
17    A.   I looked online at the federal laws with
18  respect to retention of health records.
19    Q.   And what online reference did you utilize?
20  Did you go to the federal code or to some agency's
21  website?
22    A.   I don't recall which it was.
23    Q.   Well, can we say that, based upon your
24  recollection, that there is a federal law in place
25  that requires Dr. Lemons to retain patient records?

55

1     A.   Based upon my recollection, yes.
2     Q.   Does that federal law mandate that Dr.
3  Lemons retain CPT billing codes for seven years?
4     A.   Not that I recall.
5     Q.   What are CPT billing codes?
6     A.   It is the billing code used for each of
7  the medical procedures that a physician performs.
8     Q.   Do you hold yourself out to be an expert
9  in the CPT billing code field?
10    A.   No.
11    Q.   That next sentence in Exhibit 60 page 20
12  of your report in this matter indicates similarly,
13  "The Alabama Board of Medicine recommends that
14  practitioners retain records for a minimum of 10
15  years."  Do you see that sentence?
16    A.   I do.
17    Q.   Upon what did you base that portion of
18  your opinion?
19    A.   That would have been something that I
20  looked at as far as recommendations or mandates by
21  the Alabama Board of Medicine.
22    Q.   What is the difference between a
23  recommendation and a mandate in your opinion?
24    A.   A recommendation is just a guideline
25  whereas a mandate is something that they would

56

1  require.  In this case they recommended not
2  required.
3     Q.   Was that something that you found on the
4  Alabama Board of Medicine website?
5     A.   I don't recall specifically, but -- it
6  probably would have been, but I don't recall.
7     Q.   With regard to your reference to the word
8  "records" in that sentence are you also referring to
9  patient billing records?
10    A.   I don't believe I saw a definition of
11  records, but I don't recall.
12    Q.   Do you believe the Alabama Board of
13  Medicine's recommendation applies to CPT billing
14  codes?
15    A.   Given the importance of CPT codes in
16  submitting insurance claims, I would think so, but I
17  don't know for sure.
18    Q.   When you say, "the importance of CPT
19  billing codes in insurance claims," are you
20  referring to individual disability income policies?
21    A.   No.
22    Q.   You are referring to what type of
23  insurance?
24    A.   I am referring to medical insurance,
25  Medicare insurance, any type of insurance that Dr.

57

1  Lemons would be submitting his patients' claims to
2  for reimbursement.
3     Q.   Is there any other basis for your opinion
4  that the recommendation applies to CPT codes?
5     A.   I believe those would be essential in any
6  malpractice suit as well, as well as supporting
7  documentation for a tax return submitted to the IRS.
8     Q.   All right.  So with regard to your opinion
9  as to its importance in those matters, what are you
10  basing that on?
11    A.   On the tax -- you know, part of the tax
12  code talks about supporting documentation of your
13  income.  CPT codes would be a supporting part of
14  documentation of a physician's income; from a
15  malpractice perspective it seems to me one of the
16  factors that would be taken into consideration
17  depending on the facts and circumstances of a
18  malpractice lawsuit.
19    Q.   Anything else that you are basing your
20  opinion on?
21    A.   Not that I can think of right now.
22    Q.   Was there anything that you based that
23  opinion on that you have not described to me?
24    A.   I don't -- I don't recall if there is
25  anything else.



58

1    Q.   Well, are you holding yourself out as a
2  tax expert?
3    A.   No.
4    Q.   Are you holding yourself out as an expert
5  in malpractice insurance for physicians?
6    A.   No.
7    Q.   Have you ever handled claims for mal --
8  physician malpractice?
9    A.   I have handled physician claims that there
10 was a component of malpractice insurance that was
11 involved over the years.
12   Q.   How was that involved?  With regard to a
13 disability claim?
14   A.   Yes.
15   Q.   Okay.  But have you handled physician
16 malpractice insurance claims at an insurance company
17 that issued physician malpractice insurance?
18   A.   No.
19   Q.   All right.  So with regard to what you
20 mentioned about the tax returns, what materials are
21 you relying on when you assert that Dr. Lemons is
22 required to retain CPT billing codes for three years
23 from the date he files a tax return?
24   A.   The tax code.
25   Q.   What portion of the tax code?

59

1    A.   I don't recall.  It would have been
2  retention of -- the portion that dealt with
3  retention of records and supporting documentation to
4  your tax return.
5    Q.   Do you hold any specialized law degree or
6  certification with regard to tax law?
7    A.   No.
8    Q.   You don't have, for example, an LLM, do
9  you?
10   A.   No.
11   Q.   What portion of Dr. Lemons' tax returns
12 mentioned CPT billing codes?
13   A.   There is no portion of Dr. -- Dr. Lemons'
14 tax returns, to my knowledge, that references CPT
15 codes.
16   Q.   Do you recall the specific provision of
17 the tax code that you were basing your opinion on?
18   A.   I believe you just asked me that and I
19 answered it.
20   Q.   I did ask you that and you answered it?
21   A.   Yes.
22   Q.   Okay.  Was that answer that you didn't
23 recall?
24   A.   I described the section that I reviewed.
25   Q.   Was that a portion of the USC, United

60

1  States Code?
2    A.   It would have been part of the Tax Code,
3  yes.
4    Q.   Part of the Tax Code.  Did you review
5  billing records for Dr. Lemons' practice group,
6  Covenant?
7    A.   I have reviewed documents that related to
8  Dr. Lemons' practice.  I don't recall specific
9  billing codes, billing records, nor do I recall any
10 CPT codes involved.  I don't recall reviewing
11 anything that was specific to patient billing
12 records.
13   Q.   Did you review the subpoena that was
14 issued by Principal and the response that was
15 received from the third party that provided billing
16 service for Covenant?
17   A.   I believe I did, yes.
18   Q.   Would that have been one of the subpoenas
19 and its response that you reviewed in addition to
20 the materials set out in your report?
21       MS. MURPHY:  Object to the form that it is
22 in her report.
23 BY MR. SINCLAIR:
24   Q.   All right.  I will rephrase the question
25 then.  With regard to the billing records that you

61

1  reviewed for Covenant there were, I believe, three
2  pages of a spreadsheet.  Did you review those
3  billing records?
4    A.   I don't recall.
5    Q.   Let's turn to page 21, if we can, of your
6  report in Exhibit 60.
7    A.   Okay.
8    Q.   We're talking about CPT billing codes here
9  in your report and you indicate that -- second
10 paragraph in Exhibit 60, Bates labeled Lemons 7681,
11 bolded sentence, "She" -- and in that sentence I
12 believe you are referring to Ms. Walston; is that
13 correct?
14   A.   Yes.
15   Q.   At sentence 3, "She was transparent in all
16 of her communications with Dr. Lemons whereas at the
17 onset he was determined not to provide CPT codes to
18 Principal Life."  Do you see that sentence?
19   A.   Yes.
20   Q.   When you use the word "he" are you
21 referring to Dr. Lemons?
22   A.   Yes.
23   Q.   So it's your understanding that Dr. Lemons
24 at the onset was determined not to provide CPT codes
25 to Principal Life; is that correct?

62

1    A.   It is my opinion that initially when he
2 was asked by Ms. Ralston for the CPT code he
3 dismissed the request and said that he could not
4 provide those because he no longer employed the
5 third party vendor that handled those for him.
6    Q.   Is there anything else that you base that
7 sentence and its opinion on?
8    A.   The -- just the documentation in the claim
9 file where he was asked to provide them and did not
10 respond.
11    Q.   Are you able today to identify any
12 specific legal obligation that Dr. Lemons violated
13 with regard to CPT billing codes?
14       MS. MURPHY:  Object to the form.
15       THE DEPONENT:  I think that -- I don't
16 know if legal obligation is the correct term to use,
17 but certainly Principal considered that part of
18 proof of claim.  Nevertheless, in the end they took
19 into consideration his occupation as an OB-GYN
20 without the CPT code.
21 BY MR. SINCLAIR:
22    Q.   Okay.  I am not sure that we are speaking
23 about the same thing.  So let me -- let me back up
24 to that question again if I can.  Can you cite to
25 any statute that Dr. Lemons violated with regard to

63

1 CPT billing codes?
2       MS. MURPHY:  Object to the form.  Lacks
3 foundation.
4       THE DEPONENT:  I -- when I refer to proof
5 of claim and submission of proof of claim, what
6 Principal would consider proof of claim I -- I am
7 referring to just general contract law.
8 BY MR. SINCLAIR:
9    Q.   All right.  So my question -- you
10 understand what I mean by the word statute, correct?
11    A.   Correct.
12    Q.   All right.  So setting aside the question
13 of whether or not Principal's opinion or what
14 constitutes a proof of claim in this matter may or
15 may not encompass, is there a statute that you can
16 cite to that identifies what you believe Dr. Lemons
17 should have done with regard to CPT billing codes?
18       MS. MURPHY:  Same objections.
19       THE DEPONENT:  Not -- not to my knowledge.
20 BY MR. SINCLAIR:
21    Q.   Is there any rule or regulation that you
22 can provide citation to that indicates in your
23 opinion Dr. Lemons violated that rule or regulation
24 with regard to CPT billing codes?
25    A.   Do you mean with regards to submission of

64

1 CPT codes to Principal?
2    Q.   I am just talking about rules and
3 regulations that govern CPT billing codes for
4 physicians.
5    A.   I don't know the answer to that question.
6    Q.   Can you provide citation to any statute,
7 rule or regulation that in your opinion Dr. Lemons
8 violated with regard to the retention of CPT billing
9 codes?
10       MS. MURPHY:  Object to the form.  Lacks
11 foundation.
12       THE DEPONENT:  That question is overly
13 broad. I can't answer it. I don't know the answer
14 to that.
15 BY MR. SINCLAIR:
16    Q.   Sure.  Why do you feel like it is
17 overbroad?
18    A.   I feel like you are asking me if -- you
19 know, to pick out some type of a statute that could
20 encompass any aspect of retaining CPT code and I
21 can't -- I can't. I don't know. There could be. I
22 don't know.
23    Q.   Well, what I am asking for is actually
24 whether or not -- maybe I can make this simpler.  Is
25 it your opinion that he violated any statute with

65

1 regard to the retention of CPT billing codes?
2    A.   He may have, but I can't say one way or
3 another sitting here today.
4    Q.   Same question with regard to any rule or
5 regulation.  Can you identify any rule or regulation
6 that in your opinion he violated with regard to the
7 retention of CPT billing codes?
8    A.   I don't know.
9    Q.   With regard to CPT billing codes does
10 submitting a CPT code to a medical insurance
11 provider guarantee payment?
12       MS. MURPHY:  Object to the form.
13       THE DEPONENT:  Does it guarantee payment
14 of the medical bill?
15 BY MR. SINCLAIR:
16    Q.   Yes.
17    A.   Not necessarily.  There could be other
18 reasons why it wouldn't be -- a procedure wouldn't
19 be covered. I mean, it is contract-specific to each
20 medical insurance contract.
21    Q.   Are you holding yourself out as qualified
22 to render medical opinions in this matter?
23    A.   I am holding myself out to have been
24 involved in medical insurance claims during my
25 career.



66

1    Q.  Do you feel like you are qualified to
2  offer a medical opinion on Dr. Lemons' tremors?
3    A.  No.
4    Q.  Do you feel you are qualified to offer a
5  medical opinion on the treatment of Dr. Lemons'
6  tremors?
7    A.  No.
8    Q.  From your review is there any reason to
9  doubt the legitimacy of Dr. Lemons' tremors?
10    A.  No.
11    Q.  Is there any reason to doubt that his
12  condition is a progressive one that worsens with
13  time?
14    A.  No.
15    Q.  If that is the case then why is it your
16  opinion that his tremors could not have provided an
17  earlier date of disability?
18    MS. MURPHY:  Object to the form.
19    THE DEPONENT:  I believe -- I believe I
20  set forth several reasons why an earlier date of
21  disability was not possible, including contractual
22  requirements that would have had to have come in
23  play during that earlier period of time that did not
24  to my knowledge.
25  BY MR. SINCLAIR:

67

1    Q.  Okay.  So let's turn, if we can, to --
2  well, I believe we have the heading here just under
3  what we were looking at on page 21.  You have a
4  heading here indicating the date of disability on
5  page 21 of your report in Lemons -- in Exhibit 60.
6  Do you see that heading?
7    A.  Yes.
8    Q.  You indicate at the bottom of that
9  paragraph just underneath that heading the
10  following, "Dr. Lemons testified in his deposition
11  that his regular occupation just prior to his
12  disability date of July 15, 2016, was that of a
13  gynecologist and a gynecologic surgeon."  Do you see
14  that sentence?
15    A.  Yes.
16    Q.  Do you have any evidence disputing Dr.
17  Lemons' testimony in that regard, that he was a
18  gynecologist and a gynecologic surgeon just prior to
19  his date of disability of July 15th, 2016?
20    A.  Yes.
21    Q.  What evidence do you believe contradicts
22  that?
23    A.  I don't know that the evidence contradicts
24  that, but Dr. Lemons was also engaged in three other
25  jobs that made up his entire occupation.  So it is

68

1  unclear at what percentage he was performing
2  gynecological OB-GYN practice, but he was engaged in
3  three other jobs at that time.
4    Q.  In your view of the materials related to
5  Dr. Lemons' claim did you find anything to indicate
6  that Dr. Lemons could have had an earlier date of
7  disability?
8    A.  In my review of the claim file in the
9  documents I did not find anything that would lead me
10  to believe that his date of disability, according to
11  the definitions and requirements of the contract,
12  was any earlier than 7-15-2016.
13    Q.  If there had been evidence to suggest that
14  potential earlier date you would have addressed that
15  in your report, correct?
16    A.  Yes.
17    Q.  And if there had been evidence in this
18  file that an earlier date of disability may have
19  been involved that issue should have been
20  investigated, correct?
21    A.  Yes.
22    Q.  Let's turn -- actually stay on the same
23  page under the heading, "Determination of Regular
24  Occupation."
25    A.  Okay.

69

1    Q.  That first sentence, "Regular occupation
2  is typically understood in the industry to mean the
3  manner in which you are earning an income at the
4  time disability starts."  Do you see that sentence?
5    A.  Yes.
6    Q.  What did you base that portion of your
7  opinion on?
8    A.  Just my experience in the industry.
9    Q.  Can we agree that it is important for
10  policy terms to be written in a manner so that lay
11  persons can understand what the insurance company
12  means?
13    A.  Yes.  That is what is mandated typically
14  by the different state insurance departments when
15  they are reviewing contracts.
16    Q.  With regard to your opinion in Exhibit 60
17  on page 22, second full paragraph, you indicate in
18  that second-to-last sentence of that paragraph,
19  "Conversely the period for determining regular
20  occupation is 'just prior,'" and you put that in
21  quotes, "to the date of disability."  So my question
22  with regard to that sentence in that portion of your
23  opinion is how do you define "just prior"?
24    A.  I define it as very close to or very near
25  the date of disability depending on the facts and



70

1 circumstances presented in the claim.
2    Q.   Did you find a definition of "just prior"
3 in Principal's claims manual?
4    A.   No.
5    Q.   Would the definition of "just prior" vary
6 depending on the facts of the claim?
7    A.   It may vary by a matter of days, but I
8 don't believe it would vary by a matter of months or
9 weeks.
10    Q.   What do you base that opinion on?
11    A.   My experience in adjudicating disability
12 claims.
13    Q.   Anything else that you base that opinion
14 on?
15    A.   No.
16    Q.   Can you describe to me the maximum amount
17 of days that you would find falls within the
18 category of what constitutes "just prior"?
19    A.   No, that's fact-specific.
20    Q.   Same question with regard to the minimum
21 number of days that must be examined when you use
22 the phrase "just prior"?
23    A.   No, that is fact-specific.
24    Q.   All right.  Let's go up to the paragraph
25 preceding that one we were just covering.  In the

71

1 middle of that paragraph on page 22 of your report
2 in Exhibit 60, Bates numbered Lemons 7682, there is
3 a sentence which reads, "Dr. Lemons could not
4 provide any detailed evidence of his material and
5 substantial duties being those of a GYN physician
6 during this four-month period." Do you see that
7 sentence?
8    A.   Yes.
9    Q.   Is this referring to anything beyond a
10 lack of CPT codes?
11    A.   Yes.
12    Q.   What is it referring to then?
13    A.   I believe there was a general lack of
14 evidence of what Dr. Lemons was doing on a day-to-
15 day basis.
16    Q.   When you say, "general lack of evidence,"
17 what evidence was requested that he did not provide?
18    A.   I don't recall specifically what evidence
19 was requested.  I believe that -- I know that the
20 CPT codes were requested and, you know, typically
21 the insurance company says, "and anything else that
22 you may think would answer this question for us."
23    Q.   Okay.  Perhaps I could put it differently
24 since you can't recall.  Would you have listed in
25 your report all that evidence that you felt

72

1 substantiated your opinion in that sentence that I
2 just read?
3    A.   I don't believe I listed all of the
4 evidence that would have substantiated it.  Some of
5 that is fact-specific to what Dr. -- what
6 information or records Dr. Lemons kept, which is why
7 the insurance companies typically say, "Please
8 submit any other additional information you feel may
9 be helpful in this case."
10    Q.   Let me -- let me try to put it another way
11 then.  What -- tell me what it is that you think Dr.
12 Lemons should have submitted to Principal besides
13 CPT billing codes that he didn't submit to
14 Principal?
15    A.   I don't recall exactly what he submitted.
16 I don't believe he submitted calendar entries.  I am
17 not sure if he submitted calendar entries, evidence
18 of billing that he submitted to the medical
19 insurance carriers.  I am not sure exactly what he
20 did submit, but there was a lack of evidence overall
21 in what was he doing on a day-to-day basis.  Was he
22 doing OB-GYN procedures?  Was he merely acting
23 initially as a business owner, getting the business
24 up and running in order that he could start to do
25 medical procedures?  You know, I am not sure.

73

1    Q.   Well, is there some industry standard that
2 we could look to to provide us a list of what Dr.
3 Lemons should have, in your opinion, provided to
4 Principal?
5    A.   I mean, there is a number of things that
6 he could have provided.  Is there an industry
7 standard?  I mean, it varies based upon the
8 physician and the records that the physician keeps,
9 but I can tell you that CPT codes are standardly
10 requested by almost all insurance carriers.
11    Q.   With regard to individual disability
12 insurance policies?
13    A.   With regard to disability insurance
14 policies in general, both individual and group.
15    Q.   So it is an industry standard to utilize
16 CPT billing codes in the adjustment of disability
17 insurance claims?
18    A.   For physicians, yes.  There are --
19    Q.   Is there --
20    A.   There are vendors that take those CPT
21 codes and put them into charts and graphs for the
22 insurance carriers.  That is -- they are widely
23 used.
24    Q.   To your knowledge is there any state
25 statute or regulation prohibiting the use of CPT



74

1  billing codes in the adjustment of disability
2  insurance for physicians?
3       MS. MURPHY:  Object to the form.
4       THE DEPONENT:  I don't know of any
5  statutes that prohibit the use as long as the
6  personal information is not included in the data.
7  So from a different perspective, although disability
8  is not subject to the HIPAA law, typically the CPT
9  code will be submitted to the company and they would
10 be scrubbed of personal data.
11 BY MR. SINCLAIR:
12      Q.  Okay.  Well, when you say HIPAA is
13 applicable to disability insurance you mean HIPAA
14 isn't applicable to disability insurance companies;
15 is that correct?
16      MS. MURPHY:  Object to form.
17      THE DEPONENT:  It is not applicable -- it
18 is not applicable to the disability insurance
19 product.  The disability insurance product is
20 affected by HIPAA by virtue of the fact that they
21 request medical records.
22 BY MR. SINCLAIR:
23      Q.  So are you aware of any Insurance
24 Commissioner prohibiting the use of CPT billing
25 codes in the adjustment of disability insurance

76

1       Q.  What other disability policies in
2  particular are you referencing there?
3       A.  I am referencing individual disability
4  policies and group disability policies.
5       Q.  What -- is that -- I wasn't really looking
6  for categories of policies.  I was asking you what
7  specific policies or series of policies you were
8  referencing in the report when you said, "This is
9  consistent with language in other individual
10 disability policies of which I am familiar."
11      A.  I am not sure what you're asking me.
12      Q.  Okay.  I am looking for a specific policy.
13 I am looking for a response that says, "Well, I
14 compared this language to the Met Life series 4260
15 policy issued in 2004."  Do you have a specific
16 policy cite that you can give me with regard to the
17 sentence, "This is consistent with the language in
18 other individual disability policies of which I am
19 familiar"?
20      A.  So this would be consistent with other
21 policies at employers that I have worked at and/or
22 have had discussions with, other insurance carriers
23 throughout my career.
24      Q.  Can you identify what -- either by series
25 of policy or even insurance company -- what policies

75

1  claims?
2       MS. MURPHY:  Object to the form.
3       THE DEPONENT:  No, I am not.
4  BY MR. SINCLAIR:
5       Q.  And with regard to HIPAA, Dr. Lemons would
6  have been required to comply with HIPAA with regard
7  to his patients even in the context of this claim,
8  right?
9       A.  Correct.
10      Q.  Let's turn, if we can, to page 23 of your
11 report.  Above the heading, "Use of Marketing
12 Materials in Adjudicating Disability Claims," on
13 page 23 of your report marked as Exhibit 60, Bates
14 numbered Lemons 7683, that last paragraph above the
15 heading, "Use of Marketing Materials," reads, "The
16 regular occupation rider states that solely due to
17 injury or sickness you are unable to perform the
18 substantial or material duties of your regular
19 occupation in which you were engaged just prior to
20 disability.  This is consistent with language in
21 other individual disability policies of which I am
22 familiar."  Do you see that paragraph?
23      A.  Yes.
24      Q.  And did I read that correctly?
25      A.  Yes.

77

1  you are referring to there?
2       A.  No.
3       Q.  Was there a particular policy or policies
4  that you utilized in providing the opinion this is
5  consistent with the language "in other disability
6  policies"?
7       A.  No.  That would be within the purview of
8  my 40 years of experience in the industry.
9       Q.  When you say you are familiar with these
10 other IDF policies what do you mean by that?
11      MS. MURPHY:  Object to the form.
12      THE DEPONENT:  I have -- I indicated that
13 this applies -- this language is pretty predominant
14 in both individual disability policies as well as
15 group policies.  I have specifically worked with
16 individual disability policies and group policies,
17 so I am not sure what you're asking me.  I mean, the
18 companies that I have worked for are certainly
19 listed in my resume.
20 BY MR. SINCLAIR:
21      Q.  Should a policy's terms be consistent with
22 marketing materials selling that policy?
23      A.  I don't think that I could answer that
24 question from a claims perspective.
25      Q.  You feel like that is outside your -- I am

78

1 sorry if I am taking you outside your field of
2 expertise or your opinion. Tell me, is that outside
3 your opinion?
4    A.   I was not involved typically in developing
5 marketing materials throughout my career.
6    Q.   Okay. So --
7    A.   The marketing department may or may not
8 have asked for a claims opinion and many times they
9 did not ask for the claims department opinion.
10    Q.   Was it a problem, in your opinion, if the
11 marketing materials contradicted policy terms?
12    A.   Not --
13       MS. MURPHY: Object to the form.
14       THE DEPONENT: -- necessarily.
15 BY MR. SINCLAIR:
16    Q.   Are you familiar with industry standards
17 on the manner in which insurance companies are
18 required to represent policy terms in the sale of a
19 policy?
20    A.   I don't know what you are asking.
21    Q.   Sure. Are you familiar with rules,
22 regulations, statutes, governing the manner in which
23 insurance companies can and may represent policy
24 terms to potential insureds?
25    A.   Only from a peripheral perspective.

79

1    Q.   Is that outside your field of expertise
2 then?
3    A.   I have dealt with it on an occasion, but I
4 am not professing to be an expert in rules and
5 regulations regarding marketing materials.
6    Q.   Let's take a look at your report, page 246
7 Exhibit 60, just about the heading, "Decision to pay
8 benefits by Doug Hanselman."
9    A.   Yes.
10    Q.   You indicate Dr. Lemons apparently did not
11 take advantage of this option. What specific basis
12 do you have for making that statement?
13    A.   I did not see any evidence that Dr. Lemons
14 attempted to return the policy when it was issued
15 and get his refund on his premium.
16    Q.   Is there anything else that you base that
17 statement on?
18    A.   No.
19    Q.   Why would he have returned the policy?
20    A.   If the policy was issued -- when the
21 policy was issued back in 1995 he would have
22 reviewed the policy and if there were any
23 contradictory terms, things that he did not
24 understand or was led to believe in the actual
25 contract he had 10 days to return the contract and

80

1 get a refund of his premium.
2    Q.   So --
3    A.   He did not -- so if Dr. Lemons did not
4 agree with the definition of regular occupation or
5 did not like the fact that it said, "just prior to
6 date of disability," he could have returned the
7 policy and gotten his premiums back within the 10
8 days.
9    Q.   Is the term "regular occupation" defined
10 in the main portion of this policy excluding the
11 riders?
12    A.   I believe it is primarily in the riders.
13 I don't recall it being in the body of the contract
14 but, as you know, the entire contract is the body
15 and the riders and the occupation.
16    Q.   So with regard to Dr. Lemons' policy then
17 let's go ahead, if you would please, and pull up
18 Plaintiff's Exhibit 1. Tell me when you have that
19 in front of you.
20    A.   I have that.
21       (Exhibit 1 was marked for identification.)
22 BY MR. SINCLAIR:
23    Q.   All right. Looking at the policy portion
24 of Plaintiff's Exhibit 1, which begins on page 20 of
25 that PDF document, do you see that first page of the

81

1 policy in Exhibit 1?
2    A.   Are you talking about the definitions in
3 this policy? Is that the page you are referring to?
4    Q.   Okay. I was going to get there but, yes,
5 we can turn to that as well. Definitions of the
6 policy begins on page 4 of the policy, correct?
7    A.   Yes.
8    Q.   Okay. All right. Is there a definition
9 of "regular occupation" on page 4 through page 7 in
10 the definitions section of this policy?
11    A.   Yes.
12    Q.   Where is that?
13    A.   On page 4 under the term "Disability 1 A2
14 -- "You are unable to perform a substantial and
15 material duty of your regular occupation in which
16 you were engaged just prior to the date of
17 disability."
18    Q.   And that is, in your opinion, a definition
19 of the phrase "regular occupation"?
20    A.   Yes.
21    Q.   Anywhere else that you find the definition
22 of "regular occupation" in the main body of the
23 definitions in this policy from page 4 to page 7?
24    A.   No.
25    Q.   All right. If we can let's turn back to



82

1  the riders attached to the policy following page 14
2  of the policy in Exhibit 1.  The first rider that we
3  come to in Exhibit 1 is "regular occupation rider."
4  Do you see that rider?
5      A.  Yes.
6      Q.  Is the phrase "regular occupation" defined
7  in that regular occupation rider?
8      A.  Yes.
9      Q.  Where is that definition?
10     A.  Under the category called "Definition,"
11 "Total disability from your regular occupation means
12 solely due to injury or sickness you are unable to
13 perform the substantial and material duties of your
14 regular occupation in which you were engaged just
15 prior to the disability."
16     Q.  In your opinion is the phrase "regular
17 occupation" defined anywhere else in the regular
18 occupation rider?
19     A.  That is the primary location.
20     Q.  Is there a secondary location in that
21 regular occupation rider containing a definition of
22 "regular occupation"?
23     A.  Well, the second paragraph of the rider
24 states that, "The rider provides benefits under this
25 policy for disability when you are unable to perform

83

1  the substantial and material duties of your regular
2  occupation that are working in another occupation."
3  So it does refer -- make reference to substantial
4  and material duties being part of the definition of
5  regular occupation.
6      Q.  All right.  Have you pointed out all the
7  occurrences in which you feel in your opinion
8  "regular occupation" is defined in the regular
9  occupation rider?
10     A.  Yes.
11     Q.  Is it industry standard to document all
12 activities and communications regarding a claim?
13     MS. MURPHY:  Object to the form.
14     THE DEPONENT:  Typically, yes.
15 BY MR. SINCLAIR:
16     Q.  Would there be occasions on which it would
17 be an industry standard to withhold claim file
18 materials that are not privileged?
19     A.  To withhold claim file materials that are
20 not privileged?  I cannot think of a specific
21 example at this moment.  There is certainly
22 information that insurance companies have that is
23 proprietary information.  I don't -- I don't know if
24 that would come into play in a particular claim.  It
25 depends on what is happening with the claim.

84

1      Q.  Should all the reasons for denial be
2  explained in writing to the insured?
3      A.  Yes.  The reasons for denial should be
4  explained in writing to the insured.
5      Q.  Should they set forth all of the reasons
6  for denying the claim?
7      A.  Typically, yes.
8      Q.  If we can let's turn to page 3 of your
9  report, which is Exhibit 60 and --
10     A.  Yes.
11     Q.  Going by the page numbers that you
12 assigned to your report that is Exhibit 60, Bates
13 numbered Lemons 7663.
14     A.  Yes.
15     Q.  In the third paragraph the sentence midway
16 through that paragraph begins, "I was responsible
17 for working with Internal Audit Department to ensure
18 the proper controls were in place in the claim
19 department." Do you see that sentence?
20     A.  Yes.
21     Q.  I did not read the entirety of that
22 sentence, but if you would take a moment and read
23 that sentence I am going to have some questions
24 regarding that sentence. Tell me when you're done.
25     A.  I am done.

85

1      Q.  Okay.  You capitalized Internal Audit
2  Department.  With regard to your prior work with the
3  Internal Audit Department what -- what is an
4  Internal Audit Department?
5      A.  It is a department -- corporate department
6  that ensures that the company is maintaining
7  practice -- practices that comply with all of the
8  regulatory agencies for statutes that have been
9  passed or internal controls are being put in place.
10 It is a department that is separate from the claim
11 department.
12     Q.  Did you review Principal's audit of Dr.
13 Lemons' claim?
14     A.  I don't believe I saw an audit specific to
15 Dr. Lemons' claim.
16     Q.  Did you review Principal's internal audit
17 department rules, regulations, guides, any of that
18 material?
19     A.  I don't believe I saw that, no.
20     Q.  You would have indicated that in your
21 report if you had, right?
22     A.  Perhaps.
23     Q.  Well, would you have at least listed out
24 those internal audit materials --
25     A.  Yes.



86

1    Q.   -- in your report if you had received
2  them?
3    A.   Yes.
4    Q.   In that sentence you indicate that you
5  were also responsible for making sure that authority
6  levels were appropriate for level of experience.  Do
7  you see that portion of the sentence?
8    A.   Yes.
9    Q.   Did you review Principal's authority
10  levels to determine if they were appropriate for the
11  level of experience of the various claims personnel?
12    A.   That information was not provided.
13    Q.   Did you review Principal's training
14  programs?
15    A.   I only reviewed the references to the
16  training programs as set forth in the depositions
17  that I reviewed.
18    Q.   And those are the depositions that I took
19  of Principal's personnel?
20    A.   Yes.
21    Q.   Did you request Principal provide you
22  copies of those training programs?
23    A.   No, I did not.
24    Q.   You also in the next sentence indicate,
25  "If deficiencies were noted I had oversight of the

87

1  department's response and action plan to remedy
2  them." Do you see that?
3    A.   Yes.
4    Q.   In your review of Dr. Lemons' claim is it
5  your opinion that there are any deficiencies that
6  need to be remedied with regards to Principal's
7  claims handling?
8    A.   At what point in time?
9    Q.   At any point in time of Dr. Lemons' claim.
10    A.   Not that I recall.
11    Q.   Would you have noted that in your report?
12    A.   I would think so, yes.
13    Q.   Did you note in your report any
14  deficiencies in Principal's claims handling of Dr.
15  Lemons' claim?
16    A.   Not that I recall, no.
17    Q.   In other words, you wouldn't have hidden
18  that from me, would you?
19    A.   No.
20    Q.   You indicated in your report that you had
21  reviewed Mr. Pearce's report.  Did you have any
22  opinion to offer on Mr. Pearce's report?
23    A.   No, I did not.
24    Q.   For the benefit of the court reporter,
25  Pearce is spelled P-e-a-r-c-e.

88

1    On page 7, that is your page numbering
2  system of your report, which is Exhibit 60 on page 7
3  at the top under the heading, "Policy Language."
4  Next to the heading, "Maximum Monthly Benefit," you
5  put the number 10,000.  Do you see that?
6    A.   Yes.
7    Q.   Where did you obtain that information as
8  to the maximum monthly benefit?
9    A.   I believe it would have been the face page
10  of the policy, Exhibit 1.
11    Q.   Are you aware that there is a dispute with
12  regard to the use of a cap being placed on Dr.
13  Lemons' benefit update rider?
14    A.   I'm not sure I know what you're talking
15  about.  No.
16    Q.   Okay.  Were you asked to opine on the
17  benefit update rider attached to Dr. Lemons' policy?
18    A.   No.
19    Q.   Were you asked to respond to, for example,
20  Mr. Pearce's calculations about the adjustment of
21  Dr. Lemons' benefit update rider claims?
22    A.   No.  I am not a CPA or -- I was not asked
23  to opine.
24    Q.   Under the heading, "Riders," of your
25  report on page 7 you list out four different riders

89

1  there.  Do you see that heading?
2    A.   Yes.
3    Q.   Other than the regular occupation rider
4  which you styled as HH 649, are you offering
5  opinions on any of the other riders?
6    A.   No, not unless it involves the dove tail
7  of the return to work in conjunction with the
8  regular occupation benefit.
9    Q.   I am sorry.  What do you mean by that?
10    A.   The issue of the definition of regular
11  occupation because regular occupation is defined in
12  the return to work benefit as well, but only from
13  that perspective.
14    Q.   I see.  Do you know whether or not the
15  return to work rider was required if you purchased
16  the HH 649 regular occupation rider?
17    A.   I do not know that, no.
18    Q.   Did you review the product description and
19  underwriting manual to ascertain whether or not the
20  HH 674 return to work rider was required if you
21  purchased the HH 649 regular occupation rider?
22    A.   No.
23    Q.   Can we agree that Dr. Lemons' claim has
24  been denied?
25    A.   We can agree that Dr. Lemons' claim was



90

1  paid and denied in part from a perspective of the
2  regular occupation benefit.
3      Q.  Does the regular occupation rider modify
4  the main body of the policy's definition of
5  disability in your opinion?
6      MS. MURPHY:  Object to the form.
7      THE DEPONENT:  You have to -- in order to
8  determine that you have to read the first paragraph
9  or so of the rider because it determines in that
10  paragraph what it modifies and what it does not
11  modify.
12  BY MR. SINCLAIR:
13     Q.  Okay.
14         And in your opinion that you are offering
15  in this matter are you opining that the regular
16  occupation rider modifies the main portion of the
17  contract definition of disability?
18     MS. MURPHY:  Object to the form.
19     THE DEPONENT:  I don't know what you are
20  asking me.  I don't know if I opined -- I can't
21  connect your question with what my opinion has been.
22  BY MR. SINCLAIR:
23     Q.  Then perhaps the answer is no to the
24  question I asked poorly.  Let me try it a different
25  way.

91

1         Are you going to offer an opinion in court
2  that the regular occupation rider modified the main
3  policy's definition of disability?
4      MS. MURPHY:  Object to the form.
5      THE DEPONENT:  I don't know.
6  BY MR. SINCLAIR:
7      Q.  Have you offered that opinion in your
8  report?
9      A.  I don't know.
10     Q.  Why do you not know the answer?
11     A.  Because I think I am not understanding the
12  structure of your question in order to answer it.  I
13  think I would need to go back through all of my
14  report, look at the policy language and look at the
15  intro to the regular occupation rider to see what it
16  modifies and how that had an impact upon my report.
17  It seems somewhat complex to me to connect those and
18  perhaps it is the way that you are asking the
19  question.
20     Q.  So -- all right.  Would it be beyond the
21  scope of your opinion in this matter to claim that
22  the regular occupation rider modified the policy
23  definition of disability?
24     MS. MURPHY:  Object to the form.
25     THE DEPONENT:  I don't think -- I don't

92

1  think it would be beyond the scope if I had an
2  opinion about it or if it is -- I am not sure.
3  BY MR. SINCLAIR:
4      Q.  Okay.
5         But as you sit here today you don't have
6  an opinion about it?
7      A.  I don't because I don't understand the
8  structure of the question of what you are asking me
9  to cry it back to.
10     Q.  Okay.  So can we agree that riders modify
11  coverage?
12     MS. MURPHY:  Object to the form.
13     THE DEPONENT:  Can I just look at
14  something for a minute?
15  BY MR. SINCLAIR:
16     Q.  Sure.
17     A.  Because I don't know that I can agree to
18  that.  So the general rule is within -- within the
19  rider the rider outlined that -- and I will read it
20  to you.  "All definitions provisions and exceptions
21  of the policy apply to the rider unless changed
22  specifically by the rider."  And each rider states
23  that.  So there may be situations where the rider
24  does change the body of the policy, does modify it,
25  but it would make specific reference to that.

93

1      Q.  So would that be a fact-intensive question
2  in your mind that you would have to have the facts
3  of the claim to make that determination?
4      MS. MURPHY:  Object to the form.
5      THE DEPONENT:  No.  You would have to know
6  what part of the contract is being referenced as it
7  -- as it dovetails with the rider and whether or not
8  the rider supports to modify it.  I believe in my
9  report I gave as an example that the business -- on
10  page 8, I -- the first -- at the end of the first
11  paragraph I said, "This definition is replaced by
12  the business earnings rider."  So that's one example
13  of a place where the rider did modify the body.
14  BY MR. SINCLAIR:
15     Q.  All right.  So turn to page 9 of your
16  report if you would, please, under the heading,
17  "Disability Benefit Section."
18     A.  Yeah.
19     Q.  You set out there you are reporting on the
20  body of the policy itself under the heading,
21  "Disability Benefits Section," of the policy, right?
22     A.  Yes.
23     Q.  Okay.
24         So using that same analysis that you just
25  used with regard to the business earnings rider,



94

1  take a look at page 11 of your report and tell me if
2  you indicated in any way that the regular occupation
3  rider modifies what you set out in your report at
4  page 9 under the heading, "Disability Benefits
5  Section."
6       MS. MURPHY:  Object to the form.
7       THE DEPONENT:  So from a benefits
8  perspective if you are totally disabled from your
9  regular occupation you will receive a maximum
10  monthly benefit, but from the perspective of the
11  body of the policy, the body of the policy says if
12  you are disabled in accordance with the typical def
13  -- the definition of disability we will pay all or a
14  portion of the maximum monthly benefit.  So the
15  rider changes the amount of the monthly benefit that
16  is paid.  It is paid at a maximum for the regular
17  occupation.
18  BY MR. SINCLAIR:
19     Q.  Does it change -- does that rider -- the
20  regular occupation rider change the policy
21  definition of disability in any other way?
22     A.  I don't believe so.  The regular
23  occupation rider provides benefits if you are
24  totally disabled from your regular occupation.
25     Q.  Okay.  I tell you what.  If I could just

95

1  take a couple of minutes, hopefully I can wrap up
2  here if we can just take like a very short break.
3     A.  10 minutes?
4     Q.  10 minutes is fine.
5     A.  That would be 1 o'clock, okay.
6     Q.  All right.
7       (Off the record.)
8  BY MR. SINCLAIR:
9     Q.  Back on the record then.  Ms. Conner, have
10  you provided truthful testimony today?
11     A.  I believe so.
12     Q.  Have you placed any restrictions on your
13  responses?
14     A.  No.
15       MR. SINCLAIR:  Grace, if I may attach by
16  reference those exhibits that we have referred to in
17  this deposition, which I am hoping the court
18  reporter has been keeping track of for me.  If you
19  have, Madam Court Reporter, please identify what
20  those exhibits are for us.
21       COURT REPORTER:  Sir, you want me to
22  identify which exhibits you have used thus far?
23       MR. SINCLAIR:  Yes, ma'am, if you would
24  please.  By my count it has been 1, 59 and 60.
25       COURT REPORTER:  That is what I have as

96

1  well.
2       MR. SINCLAIR:  Outstanding.  Grace, if I
3  may, without objection attach by reference
4  Plaintiff's Exhibit 1, 59 and 60 to the deposition.
5       MS. MURPHY:  No objection.
6  BY MR. SINCLAIR:
7     Q.  Thank you.  Ms. Conner, during the course
8  of your deposition today have you been instructed by
9  anyone on how to respond to any of my questions?
10     A.  No.
11     Q.  All right.  I don't think I have any
12  further questions then unless Grace has some.
13       MS. MURPHY:  No, I do not.  If we could go
14  off the record for a second that would be great.
15       MR. SINCLAIR:  Okay.  Take us off the
16  record, Madam Court Reporter, if you would.
17       (Off the record.)
18       COURT REPORTER:  Did you want this
19  deposition transcribed, Mr. Sinclair?
20       MR. SINCLAIR:  I do.  Absolutely, I want a
21  copy.  What formats do you have available?  And I am
22  going to give you my boss lady's e-mail address.  It
23  is cfowler, c-f-o-w-l-e-r, @sinclairlawfirm.  I
24  think Claudette set this up.  Tell her what kinds of
25  format you have and she will order what she wants.

97

1       MR. SINCLAIR:  All right.  Grace, you want
2  to order one too?
3       MS. MURPHY:  I would like a copy.  If you
4  could tell me -- send it to me -- let me know the
5  formats that would be helpful.
6       (Deposition concluded at 1:04 p.m. EST)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 98

1    I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby certify:
3  That the foregoing proceedings were taken before me at the
4  time and place herein set forth; that any witnesses in the
5  foregoing proceedings, prior to testifying, were placed
6  under oath; that a verbatim record of the proceedings was
7  made by me using machine shorthand which was thereafter
8  transcribed under my direction; further, that the foregoing
9  is an accurate transcription thereof.
10
11    I further certify that I am neither financially
12  interested in the action nor a relative or employee of any
13  attorney or any of the parties.
14
15  IN WITNESS WHEREOF, I have this date subscribed my name.
16  Dated: May 11, 2020
17  _____
18  ELIZABETH A. WILLIS-LEWIS, CCRR, RPR, CSR
19
20
21
22
23
24
25

## 99

1  Date:    May 13, 2020         Assignment #: 30183-14
2  Attorney: Grace R. Murphy, Esquire
3  Deponent: Debra Conner
4  Case:    Lemons vs. Principal Life Insurance Company
5
6  ATTORNEY - TRANSCRIPT ENCLOSED:  Signature of your
   client
7  is required.  Please have your client make any corrections
8  necessary.  Sign the Correction Sheet where indicated.
9  Forward a COPY of the executed Correction Sheet directly
10  to the attorney(s) listed below.  (The Address(es) can be
11  found on the Appearance page of the deposition.)  Also,
12  send a COPY of the executed Correction Sheet to our
13  corporation.
14
15
16
17
18
19
20
21  CC:  Naegeli Deposition & Trial
22     Thomas O. Sinclair, Esquire
23
24
25

## 100

1         CORRECTION SHEET
2  Deposition of: Debra Conner    Date: 4/29/20
3  Regarding:    Lemons vs. Principal Life Insurance
4  Reporter:    Willis-Lewis
5  _____
6  Please make all corrections, changes or clarifications
7  to your testimony on this sheet, showing page and line
8  number.  If there are no changes, write "none" across
9  the page. Sign this sheet on the line provided.
10  Page  Line  Reason for Change
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24         Signature_____
25              Debra Conner

## 101

1         DECLARATION
2  Deposition of: Debra Conner    Date: 4/29/20
3  Regarding:    Lemons vs. Principal Life Insurance
4  Reporter:    Willis-Lewis
5  _____
6
7  I declare under penalty of perjury the following to
8  be true:
9
10  I have read my deposition and the same is true and
11  accurate save and except for any corrections as made
12  by me on the Correction Page herein.
13
14  Signed at _____, _____
15  on the _____ day of _____, 2020.
16
17
18
19
20
21
22
23         Signature_____
24              Debra Conner
25

## @

**@sinclairlawf
irm** 96:23

## 0

**02673** 12:16

## 1

**1** 6:25 11:9
14:24 80:18
80:21 80:24
81:1
81:13
82:2 82:3
88:10
95:5
95:24 96:4

**1:04** 97:6

**10** 55:14
79:25
80:7 95:3
95:4

**10,000** 88:5

**11** 94:1

**11:30** 48:25
53:2

**14** 82:1

**15** 53:2
53:3 53:5
67:12

**15G** 12:16

**15th** 67:19

**16th** 7:8

**18** 42:22

**19** 51:25

**1995** 79:21

## 2

**2** 15:2

**20** 53:10
55:11 80:24

**2004** 76:15

**2016** 67:12
67:19

**2018** 19:16
20:16

**2019** 7:8

**2020** 5:4

**21** 61:5
67:3 67:5

**22** 69:17 71:1

**23** 75:10
75:13

**246** 79:6

**29** 5:4 11:9

## 3

**3** 61:15 84:8

**3:00** 18:21

**30** 11:9

**300** 12:15

## 4

**4** 6:25 81:6
81:9
81:13 81:23

**40** 24:13 31:5
77:8

**40-year** 31:7

**4260** 76:14

## 5

**5** 14:5

**59** 11:10
12:18 12:21
12:23 95:24
96:4

## 6

**60** 11:10 13:7
13:8
13:10 13:12
13:20
14:2 14:5
14:6
16:17 16:21
17:7
42:17 42:19
42:21 51:25
53:10 55:11
61:6
61:10
67:5
69:16
71:2
75:13
79:7 84:9
84:12
88:2
95:24 96:4

**61** 11:10

**62** 11:10

**649** 89:4
89:16 89:21

**674** 89:20

## 7

**7** 11:9 81:9
81:23
88:1 88:2
88:25

**7-15-2016**

**68**:12

**7661** 13:9

**7663** 84:13

**7678** 42:22

**7680** 53:11

**7681** 61:10

**7682** 71:2

**7683** 75:14

**7688** 13:9

## 8

**8** 93:10

## 9

**9** 93:15 94:4

**9:52** 5:5

## A

**A.M** 5:5

**A2** 81:13

**ABA** 33:3 33:4

**ability**
18:6
28:16 28:24

**able** 33:22
62:11

**absolutely**
6:22 96:20

**academic**
37:12

**acceptable**
50:16

**access** 11:3
11:8 11:10

**accordance**
47:20 94:12

according
 68:10

account 10:17
 11:4 40:17

accredited
 32:25
 33:3 33:5

accurate 18:1
 18:6

acknowledge
 50:4

act 9:16
 41:24
 43:2 43:7
 43:21 43:21
 43:23 43:25
 44:9
 45:17 45:19
 45:23 46:20
 48:9
 48:13 49:11
 49:13 49:16
 50:7
 50:11 50:14
 51:4
 51:23
 52:6 52:12

acting 72:22

action
 12:19 87:1

activities
 83:12

acts 41:22

actual 37:3
 79:24

actually
 11:14 11:18
 14:4 16:24

20:7
 27:13 34:14
 64:23 68:22

Adams 7:6
 7:16 7:19
 8:9 8:13
 8:17
 17:11 31:12
 31:25

add 14:10

adding 36:11

addition
 20:22 60:19

additional
 14:20 14:23
 15:6
 15:11 16:14
 17:2
 20:18
 21:1 28:9
 28:11 72:8

address 12:14
 96:22

addressed
 68:14

adhere 50:6

adjudicate
 47:19

adjudicating
 70:11 75:12

adjustment
 73:16
 74:1
 74:25 88:20

administered
 5:7

administrativ
e 43:19

52:9

adopted 43:20
 43:20
 44:9 48:8
 48:11
 50:8
 50:14 52:5

advantage
 79:11

affected
 74:20

age 15:15

agencies 85:8

agency's
 54:20

agreement
 28:23

agreements
 28:15 28:19
 28:20 29:3

ahead 9:22
 40:13
 49:3 80:17

Alabama 17:18
 38:1 38:5
 38:9
 38:12 39:21
 40:21
 41:8 43:1
 43:6
 43:10 43:17
 43:19
 44:1
 44:10 44:13
 47:5
 47:16 47:22
 48:7
 48:11 48:13
 50:9

50:11 50:13
 50:18
 51:8
 51:14 51:20
 51:24
 52:5
 52:13 52:18
 55:13 55:21
 56:4 56:12

alert 10:21

already 11:17
 16:15
 21:2 52:14

am 5:24
 6:12 9:11
 9:22 10:3
 10:13 10:23
 12:13 12:17
 15:8
 15:15 17:12
 17:14 18:21
 22:12 22:16
 23:5 26:4
 27:15 28:13
 31:22 35:23
 36:11 40:13
 41:9
 41:11 41:20
 42:13 43:18
 45:5
 48:16 52:16
 54:5 54:6
 54:6
 56:24 62:22
 63:6 64:2
 64:23 65:23
 72:16 72:19
 72:25
 75:3
 75:21
 76:3
 76:10 76:11



76:12 76:13
76:18 77:17
77:25
78:1 79:4
84:23 84:25
88:22
89:9
91:11
92:2
95:17 96:21

**ambiguous**
50:24

**amend** 30:16

**Amherst**
32:8
33:18
34:1 34:6
34:12

**among** 41:21

**amount** 30:8
70:16 94:15

**analysis**
23:20 44:23
45:13 51:16
93:24

**analytical**
27:12

**analyze**
27:9
27:14 27:16

**analyzed**
51:10

**and/or** 76:21

**Andy** 9:24

**Ann** 12:8

**annual**
45:18 45:21
46:15 46:19

46:25

**answer** 6:18
19:5
42:14
45:1 45:2
50:20 50:25
59:22
64:5
64:13 64:13
71:22 77:23
90:23 91:10
91:12

**answered**
52:14 59:19
59:20

**answers** 7:20

**Anti-Fraud**
36:25 37:9

**anyone** 29:5
30:24 96:9

**anything**
11:14 11:22
26:15 35:22
38:3 38:6
43:21 43:22
44:14 57:19
57:22 57:25
60:11
62:6 68:5
68:9
70:13
71:9
71:21 79:16

**anywhere**
48:12 81:21
82:17

**Apartment**
12:15

**apologies**

10:16

**apparently**
79:10

**appear** 43:18

**appears** 11:2

**applicable**
38:22 45:25
50:11 74:13
74:14 74:17
74:18

**applies** 56:13
57:4 77:13

**apply** 48:3
92:21

**appreciate**
18:15

**appropriate**
23:2
24:19
86:6 86:10

**APRIL** 5:4

**apt** 9:11

**Arts** 34:9

**ascertain**
54:15 89:19

**Ashley**
29:18 29:21

**aside** 9:17
13:6 63:12

**aspect** 41:3
64:20

**assert** 58:21

**assessment**
40:24
41:8 42:2
42:9 42:9

42:11

**assigned**
84:12

**Associate**
34:24

**association**
36:16 36:21
36:23 36:25
37:7 37:8
37:9 41:16

**assumed** 19:2

**attach**
10:14 10:17
10:19 95:15
96:3

**attached** 82:1
88:17

**attempted**
79:14

**attend** 32:22

**attended** 32:2
34:3 35:1
35:25

**attorney** 20:7

**attorneys**
21:17 22:14
37:20 37:24

**audit** 84:17
85:1 85:3
85:4
85:12 85:14
85:16 85:24

**authority**
86:5 86:9

**available**
30:11 40:20
96:21

aware 45:22
74:23 88:11

---

B

Bachelor 34:9

background
7:4 8:2

bad 39:10
39:20 40:21
40:24
41:3 41:8

bar 33:8
33:10 33:12

base 23:19
23:23 44:12
55:17
62:6 69:6
70:10 70:13
79:16

based 14:20
23:20
31:5
37:11 38:24
54:23
55:1
57:22 73:7

basics 17:9

basing
57:10 57:19
59:17

basis 27:21
45:18
57:3
71:15 72:21
79:11

Bates 6:24
11:19
13:8
42:22 53:10

61:10
71:2
75:13 84:12

begin 11:7
40:16

beginning
14:5

begins
80:24
81:6 84:16

behalf 8:24
9:4 9:24
10:4

believe
5:12
10:20
14:4 19:1
23:15
24:8
24:18 26:12
27:23 28:13
29:12
31:4 32:9
36:5 38:1
39:14 39:17
41:17 43:12
45:15 53:25
54:10 56:10
56:12
57:5
59:18 60:17
61:1
61:12 63:16
66:19 66:19
67:2
67:21 68:10
70:8
71:13 71:19
72:3
72:16 79:24
80:12 85:14

85:19
88:9 93:8
94:22 95:11

benefit 39:15
87:24
88:4 88:8
88:13 88:17
88:21
89:8
89:12
90:2
93:17 94:10
94:14 94:15

benefits 79:8
82:24 93:21
94:4 94:7
94:23

besides 11:23
72:12

best 18:21

better
41:14
47:5 47:9
47:11

beyond 21:2
28:11
71:9
91:20 92:1

bill 65:14

billing
55:3 55:5
55:6 55:9
56:9
56:13 56:19
58:22 59:12
60:5 60:9
60:9
60:11 60:15
60:25
61:3 61:8

62:13
63:1
63:17 63:24
64:3 64:8
65:1 65:7
65:9
72:13 72:18
73:16
74:1 74:24

bit 23:5 26:9
27:24

Board 55:13
55:21
56:4 56:12

body 80:13
80:14 81:22
90:4
92:24 93:13
93:20 94:11
94:11

bolded 61:11

boss 96:22

bottom 67:8

break 18:17
48:15 48:17
48:19 48:25
52:25
53:1 95:2

brief 30:8

bring 11:14
11:22 13:3

broad 50:24
64:13

broke 23:5

brought 11:16

Buck 12:15

B-u-c-k 12:15



**business**
20:22 28:25
35:18 35:20
35:23
36:7 36:8
36:8
72:23 72:23
93:9
93:12 93:25

**by-state** 50:6

---
C
---

**calculations**
88:20

**calendar**
72:16 72:17

**California**
45:18 45:23
46:20
47:4 47:16

**cap** 88:12

**capitalized**
85:1

**care** 53:15

**career**
65:25 76:23
78:5

**carriers**
41:22 45:16
45:21 72:19
73:10 73:22
76:22

**case** 7:15
8:13 8:17
9:8 9:13
17:23
19:8
22:13 23:14
38:23 39:22

40:1
43:15 45:20
56:1
66:15 72:9

**cases** 8:16
8:18 8:19
8:24 9:2
19:19 20:15
20:18
22:6 22:8
22:10 22:12
22:17 22:19
22:19
27:4 40:10

**categories**
76:6

**category**
70:18 82:10

**cause** 16:20

**certain**
14:2
28:10 30:25
43:2

**certainly**
15:6
62:17 77:18
83:21

**certification**
59:6

**cfowler** 96:23

**c-f-o-w-l-e-r**
96:23

**change** 8:5
92:24 94:19
94:20

**changed** 7:1
7:11 7:15
7:23 8:3
92:21

**changes** 11:18
12:2 12:4
17:7 94:15

**charts** 73:21

**choose** 46:14

**circulated**
10:16 10:22

**circumstances**
25:15 26:22
27:17 46:18
47:10 57:17
70:1

**citation**
63:22 64:6

**cite** 62:24
63:16 76:16

**civil** 12:19
17:16

**claim** 19:24
24:14 24:14
26:21 26:21
26:24
27:1 27:3
27:5
27:10 27:11
27:11 27:14
27:19 36:23
37:8 42:3
42:6
42:10 42:11
44:18 44:24
45:14 47:19
51:2 51:9
51:16 52:16
58:13
62:8
62:18
63:5 63:5
63:6 63:14

68:5 68:8
70:1 70:6
75:7
83:12 83:17
83:19 83:24
83:25
84:6
84:18 85:10
85:13 85:15
87:4 87:9
87:15 89:23
89:25 91:21
93:3

**claims**
20:20
27:6 38:2
38:10 38:12
41:23
43:1 43:6
43:17 43:22
43:25
44:8
45:17 45:18
45:23 46:20
47:12
48:8 49:6
49:10 49:17
49:19 50:10
50:12
51:4
51:19 51:23
52:8
52:12 52:18
56:16 56:19
57:1 58:7
58:9
58:16 65:24
70:3
70:12 73:17
75:1
75:12 77:24
78:8 78:9



86:11
87:7
87:14 88:21

**clarification**
9:21

**class** 32:3
35:21 35:24

**classes** 31:15
31:18 31:19
31:21 31:22
31:23 32:16
33:18 33:20
33:23 33:23
33:24
35:1 35:7
35:9
35:13 35:17
35:18 35:19
36:1 36:4
36:11 36:12

**Claudette**
96:24

**clear** 40:23

**close** 69:24

**code** 43:19
44:13 48:13
52:9
52:18 54:20
55:6 55:9
57:12 58:24
58:25 59:17
60:1 60:2
60:4 62:2
62:20 64:20
65:10 74:9

**codes** 55:3
55:5
56:14 56:15
56:19 57:4

57:13 58:22
59:12 59:15
60:9
60:10
61:8
61:17 61:24
62:13
63:1
63:17 63:24
64:1 64:3
64:9 65:1
65:7 65:9
71:10 71:20
72:13
73:9
73:16 73:21
74:1 74:25

**cognizant**
22:14

**college**
31:9
31:14 31:19
32:4 32:6
32:7
34:20 34:21

**colleges**
32:10
35:1
35:15 35:25

**comes** 27:13

**comfortable**
30:10

**Commissioner**
74:24

**Commissioners**
41:17

**common** 27:10

**communication
s** 61:16

83:12

**Community**
32:7
34:20 34:21

**companies** 9:4
21:22 28:21
46:9 46:9
46:19
72:7
74:14 77:18
78:17 78:23
83:22

**company** 7:7
9:7 9:12
10:5
19:10 19:13
21:14 58:16
69:11 71:21
74:9
76:25 85:6

**compared**
76:14

**complete**
31:13

**complex** 91:17

**compliance**
49:23 50:1

**comply** 75:6
85:7

**component**
58:10

**concept** 25:2

**concerns**
10:21

**concluded**
97:6

**conclusion**
25:8

25:19 26:8

**concrete**
27:21

**condition**
66:12

**conduct** 37:14
37:23

**conducting**
40:11

**conferences**
29:13 29:16

**confidential**
8:15

**confirm** 11:7

**conflict**
23:16

**confused**
18:23 45:7

**confusing**
45:6

**conjunction**
89:7

**connect** 90:21
91:17

**connected**
31:23

**Connecticut**
20:10 33:7

**Conner** 5:2
5:7 5:13
5:21 5:23
6:4 6:10
6:25 6:25
10:7 11:1
11:11 11:13
12:8 12:9
19:17 20:15



NAEGELI
DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335
NAEGELIUSA.COM

20:21 29:20
30:3
48:18
53:1 53:9
95:9 96:7

**Conner's**
19:14

**consider** 63:6

**consideration**
24:12 57:16
62:19

**considered**
62:17

**consisted**
33:22

**consistent**
75:20
76:9
76:17 76:20
77:5 77:21

**consists**
19:24

**constitutes**
63:14 70:18

**consult** 24:5

**consultant**
21:21 21:25

**consulting**
8:22
19:14 19:18
19:23
20:3
20:15 20:19
20:22 20:23
21:3 21:8
21:12 21:20
22:3 22:19

**contact** 6:20

**contained**
11:2 17:7

**containing**
82:21

**contents**
37:11

**context**
25:2
52:22 75:7

**contract** 63:7
65:20 68:11
79:25 79:25
80:13 80:14
90:17 93:6

**contracts**
47:9 69:15

**contract-**
 **specific**
65:19

**contractual**
66:21

**contradicted**
78:11

**contradictory**
79:23

**contradicts**
67:21 67:23

**control** 43:16

**controlling**
43:10
44:1
45:20 52:17
52:17 52:21

**controls**
84:18 85:9

**conversations**
29:9

29:10 29:21

**Conversely**
69:19

**Cooper** 21:17

**copies** 86:22

**copy** 6:23 7:5
12:21 15:11
96:21 97:3

**corporate**
85:5

**correct**
5:17 5:18
5:23 7:17
7:21 8:23
9:5 10:9
10:10 11:20
11:21
14:2 14:3
14:7 14:8
14:25
15:1
15:24 19:20
19:21
20:7 20:8
20:24 20:25
23:11 27:15
28:12
29:1 36:1
36:2
37:21 39:16
39:18 42:23
44:10 46:12
47:3
52:22 61:13
61:25 62:16
63:10 63:11
68:15 68:20
74:15
75:9 81:6

**correctly**

75:24

**counsel**
5:16 6:24
7:1 9:11
9:14 9:18
10:11

**count** 25:7
95:24

**couple** 95:1

**course**
46:18 96:7

**court** 10:18
17:19 39:15
43:12 87:24
91:1
95:17 95:19
95:21 95:25
96:16 96:18

**Covenant** 60:6
60:16 61:1

**cover** 31:6
31:24 43:3

**coverage**
92:11

**covered** 11:17
34:25
35:4
35:16 35:24
51:7
51:13 51:20
65:19

**covering**
31:25 70:25

**CPA** 88:22

**CPT** 55:3 55:5
55:9
56:13 56:15
56:18



57:4
57:13 58:22
59:12 59:14
60:10
61:8
61:17 61:24
62:2
62:13 62:20
63:1
63:17 63:24
64:1 64:3
64:8
64:20
65:1 65:7
65:9
65:10 71:10
71:20 72:13
73:9
73:16 73:20
73:25
74:8 74:24

**create** 28:2

**cry** 92:9

**current** 20:11

**CV** 6:23
6:25
11:16 11:18
11:23

———————
D
———————
**D.A** 19:14
19:17 20:15
20:21

**data** 74:6
74:10

**date** 7:23
8:20
53:16 58:23
66:17 66:20
67:4

67:12 67:19
68:6
68:10 68:14
68:18 69:21
69:25
80:6 81:16

**day** 9:18
15:14 32:17
71:15

**days** 70:7
70:17 70:21
79:25 80:8

**day-to** 71:14

**day-to-day**
72:21

**dealt** 59:2
79:3

**Deb** 48:14

**Debra** 5:2 5:7
5:23 6:4
12:8

**December** 7:8

**Decision** 79:7

**def** 94:12

**Defendant**
10:4

**defense**
6:24 7:1

**deficiencies**
86:25
87:5 87:14

**define**
24:24
25:3
69:23 69:24

**defined**
80:9 82:6

82:17
83:8 89:11

**definition**
24:22
52:7
56:10
70:2 70:5
80:4 81:8
81:18 81:21
82:9
82:10 82:21
83:4
89:10
90:4
90:17
91:3
91:23 93:11
94:13 94:21

**definitions**
68:11
81:2 81:5
81:10 81:23
92:20

**degree**
31:23
34:5 34:8
34:14 34:20
34:23 59:5

**degrees** 34:25

**denial** 84:1
84:3

**denied**
89:24 90:1

**denying** 84:6

**department**
78:7 78:9
84:17 84:19
85:2 85:3
85:4 85:5
85:5

85:10 85:11
85:17

**departments**
47:13 49:17
69:14

**department's**
87:1

**depending**
46:18
48:1
57:17 69:25
70:6

**depends** 25:11
25:14
48:5 83:25

**DEPONENT**
23:23
25:1 26:1
29:23
30:5
38:14
41:2
41:20
42:5
42:13 44:20
45:1
46:14
47:7
48:20 50:20
52:4
62:15
63:4
63:19 64:12
65:13 66:19
74:4
74:17
75:3
77:12 78:14
83:14
90:7 90:19



91:5
91:25 92:13
93:5 94:7

**deposed**
7:17 8:8
8:9 8:12
17:11

**deposition**
5:1 5:14
7:5 7:7 7:9
7:13 8:17
10:19 11:15
12:19 16:25
17:10 17:15
28:1 28:5
29:6
67:10 95:17
96:4 96:8
96:19 97:6

**depositions**
86:16 86:18

**describe**
70:16

**described**
57:23 59:24

**description**
14:17
15:4
15:24
16:3 89:18

**despite** 18:14

**detailed** 71:4

**determination**
38:24 68:23
93:3

**determine**
24:2
38:20 43:13
86:10 90:8

**determined**
61:17 61:24

**determines**
90:9

**determining**
24:6 69:19

**developing**
78:4

**development**
36:8

**dictates**
17:17

**differ** 48:4

**difference**
23:13 55:22

**different**
25:14 26:22
26:23
27:7 27:7
27:7 27:8
47:9
47:10
48:3
69:14
74:7
88:25 90:24

**differently**
47:11 71:23

**disability**
22:3
51:23
52:7
52:12 52:15
52:18 56:20
58:13 66:17
66:21
67:4
67:12 67:19
68:7

68:10 68:18
69:4
69:21 69:25
70:11 73:11
73:13 73:16
74:1 74:7
74:13 74:14
74:18 74:19
74:25 75:12
75:20 75:21
76:1 76:3
76:4
76:10 76:18
77:5
77:14 77:16
80:6
81:13 81:17
82:11 82:15
82:25
90:5
90:17
91:3
91:23 93:17
93:21
94:4
94:13 94:21

**disabled** 94:8
94:12 94:24

**disagree** 48:6
49:9 49:12

**disagreed**
48:10

**disclosed**
20:3 22:9
22:11

**disclosing**
8:15

**discussed**
28:8 30:6
30:9

30:15 36:13

**discussions**
76:22

**dismissed**
62:3

**dispense** 7:3

**dispute** 88:11

**disputing**
67:16

**distinction**
20:2
25:20 47:21

**District**
17:17

**document** 15:3
15:22 16:16
80:25 83:11

**documentation**
27:8 57:7
57:12 57:14
59:3 62:8

**documents**
13:4
13:22
14:2 14:6
14:9
14:12 14:21
14:23
15:7 15:9
15:11 15:16
16:3
16:10 16:14
16:19
17:3
24:11
28:2 28:7
28:9
30:10 30:11
37:20 39:23


NAEGELI
DEPOSITION & TRIAL     CELEBRATING 40 YEARS IN BUSINESS     (800)528-3335
NAEGELIUSA.COM

40:10
60:7 68:9

**done** 46:22
63:17 84:24
84:25

**doubt** 66:9
66:11

**Doug** 14:16
15:23 79:8

**dove** 89:6

**dovetails**
93:7

**download** 11:4

**Dr** 9:24 26:25
27:2 27:5
42:2 42:6
42:10 42:11
44:17 44:24
45:13
51:2 51:9
51:16 54:25
55:2
56:25 58:21
59:11 59:13
59:13
60:5 60:8
61:16 61:21
61:23 62:12
62:25 63:16
63:23
64:7 66:2
66:5 66:9
67:10 67:16
67:24
68:5 68:6
71:3
71:14
72:5 72:6
72:11
73:2 75:5

79:10 79:13
80:3
80:16 85:12
85:15
87:4 87:9
87:14 88:12
88:17 88:21
89:23 89:25

**drafting**
13:23 49:19

**due** 75:16
82:12

**during**
32:17 65:24
66:23
71:6 96:7

**duties** 71:5
75:18 82:13
83:1 83:4

**duty** 81:15

---

**E**

**earlier**
22:9 35:8
66:17 66:20
66:23
68:6
68:12 68:14
68:18

**earning** 69:3

**earnings**
93:12 93:25

**edit** 16:20
17:6

**education**
31:22

**eight** 8:19
8:24 9:2
11:2

19:19 19:22
19:24 20:14
21:2 22:6
22:8
22:18 27:4

**eighth** 22:13

**either**
21:12 21:16
21:24
22:2 32:2
32:5
51:14 76:24

**elements**
26:11

**else** 11:22
13:2
35:16
38:3 38:6
44:14 57:19
57:25
62:6
70:13 71:21
79:16 81:21
82:17

**e-mail**
15:15 15:16
96:22

**employ** 24:1

**employed** 62:4

**employers**
28:21 35:10
35:17 76:21

**encompass**
63:15 64:20

**encompassed**
31:7

**engaged** 67:24
68:2
75:19 81:16

82:14

**England**
32:9
32:11 32:15
32:23
33:4
36:23 36:25
37:8 37:8

**English** 33:23

**ensure** 84:17

**ensures** 85:6

**entail** 39:21

**entire** 7:15
67:25 80:14

**entirety**
84:21

**entitled**
7:6 15:3

**entries** 72:16
72:17

**equally** 47:17

**essential**
57:5

**EST** 97:6

**established**
19:15

**establishing**
19:17

**ethical** 46:5

**evaluated**
24:14

**evening** 31:21
32:16

**evidence** 23:2
23:9
23:12 23:16



NAEGELI DEPOSITION & TRIAL     CELEBRATING 40 YEARS IN BUSINESS     (800)528-3335     NAEGELIUSA.COM

23:20 27:18
67:16 67:21
67:23 68:13
68:17
71:4
71:14 71:16
71:17 71:18
71:25
72:4
72:17 72:20
79:13

**exact** 28:14

**exactly**
39:5
72:15 72:19

**EXAMINATION**
5:19

**examined**
5:8 51:2
70:21

**example** 28:22
43:16
48:2 59:8
83:21 88:19
93:9 93:12

**except** 22:17

**exception**
5:17 28:6
28:7 31:15

**exceptions**
92:20

**excluding**
80:10

**excuse** 10:3
17:14 21:6

**exhibit**
11:8 11:9
11:9 11:9
11:9

11:10 12:18
12:21 12:23
13:7 13:8
13:9
13:12 13:19
14:1 14:5
14:6
16:17 16:21
17:7
42:17 42:19
42:21 51:25
53:10 55:11
61:6
61:10
67:5
69:16
71:2
75:13
79:7
80:18 80:21
80:24
81:1 82:2
82:3 84:9
84:12
88:2
88:10 96:4

**exhibits**
10:15 10:16
11:3 11:5
11:11 11:15
30:12 95:16
95:20 95:22

**expected**
49:22

**experience**
8:6 24:3
24:13
31:5
37:12
69:8
70:11
77:8 86:6

86:11

**expert** 8:12
9:4 9:16
10:8
19:19 19:23
20:3 20:4
20:19 20:23
20:23
22:9
22:12 22:23
23:2
23:14 23:24
24:2
24:19 30:22
39:11
55:8 58:2
58:4 79:4

**expertise**
78:2 79:1

**expert's** 23:3

**explained**
84:2 84:4

**expound** 17:6

**expounding**
14:19

**extra** 48:2

———————
F
———————

**face** 23:4
23:7
23:17 88:9

**facilitate**
15:18

**fact** 5:23
19:2
45:20 45:23
46:3
46:22 49:18
74:20 80:5

**fact-intensive**
93:1

**factors** 25:14
25:22 57:16

**facts** 25:15
26:22 27:14
27:16 46:18
47:9
57:17 69:25
70:6 93:2

**fact-specific**
70:19 70:23
72:5

**fair** 23:17
38:2
38:10 38:12
43:16

**faith** 38:5
39:3
39:10 39:10
39:20 39:20
40:21 40:21
40:24 40:24
41:3 41:3
41:8 41:8

**faith/bad**
38:5 39:3

**falls** 70:17

**familiar**
41:10
46:3 46:6
75:22 76:10
76:19
77:9
78:16 78:21

**federal** 17:16
20:4
53:14 53:20



53:22 54:15
54:17 54:20
54:24 55:2

**feel** 23:18
26:5 40:3
45:12 48:14
64:16 64:18
66:1 66:4
72:8
77:25 83:7

**felt** 38:17
51:8
51:15 71:25

**Fernon** 9:23

**field** 19:18
46:8 55:9
78:1 79:1

**figure** 26:4

**file** 10:17
11:1 11:3
62:9 68:8
68:18 83:17
83:19

**files** 19:22
19:24 19:25
58:23

**final** 13:23

**fine** 10:20
10:23 10:23
95:4

**finish**
34:11 48:22
49:2

**firms** 46:4

**first** 17:15
26:16 33:10
36:15
43:5 69:1

80:25
82:2 90:8
93:10 93:10

**five** 8:6

**focus** 35:20

**focusing**
35:23

**forever** 49:16
49:17

**form** 23:22
24:25 25:25
30:4
38:13
41:1
41:19
42:4
44:19 44:25
46:13
47:6
50:19
52:3
60:21 62:14
63:2
64:10 65:12
66:18
74:3
74:16
75:2
77:11 78:13
83:13
90:6
90:18
91:4
91:24 92:12
93:4 94:6

**formal** 31:6
31:13 32:2

**format** 96:25

**formats** 96:21
97:5

**forth** 66:20
84:5 86:16

**foundation**
63:3 64:11

**four-month**
71:6

**free** 48:14

**front** 12:21
13:10 42:19
80:19

**full** 12:6
24:16 31:13
44:10 44:11
53:13 69:17

**full-time**
32:12

**fully** 28:17

**fun** 35:22

─────────
G
─────────

**gain** 11:3

**gained** 8:6
24:13

**Gale** 21:17

**general** 30:12
30:12
63:7
71:13 71:16
73:14 92:18

**generally**
30:6 30:9
38:4 39:3
50:6

**getting** 72:23

**given** 18:9
22:15 45:20
56:15

**gone** 19:18

**gotten** 80:7

**govern**
51:23 52:12
52:15 64:3

**governed**
17:16

**governing**
52:17 78:22

**Grace** 5:9
5:17 6:4
10:3
10:14 15:15
29:17 29:18
29:20 95:15
96:2
96:12 97:1

**graduate** 31:9
35:5

**graphs** 73:21

**great** 96:14

**greatly** 18:15

**Greenfield**
32:7
34:19 34:21

**ground**
17:12 22:24

**group** 36:17
36:22
37:7 60:5
73:14
76:4
77:15 77:16

**guarantee**
65:11 65:13

**guess** 36:15
47:10 52:24



guide 38:25
46:5 46:11

guideline
55:24

guidelines
14:15
15:3 15:4
24:5

guides 85:17

GYN 71:5

gynecologic
67:13 67:18

gynecological
68:2

gynecologist
67:13 67:18

---

H

habit 17:13

hand 38:23

handled
58:7 58:9
58:15 62:5

handling
24:14
41:3
51:19 51:24
52:8
52:13
87:7 87:14

Hanselman
49:18 79:8

Hanselman's
14:17 15:23
47:1

happens 47:12

hard 18:13

18:20

Hare 39:14

H-a-r-e 39:16

Hare's 40:6

Harwood's
14:14 14:24
30:7
30:14 30:17

having 5:7
8:5 10:18
31:25

heading
43:1 43:5
43:7 67:2
67:4 67:6
67:9
68:23 75:11
75:15
79:7 88:3
88:4
88:24
89:1
93:16 93:20
94:4

health
53:15 54:18

help 15:18
46:2

helpful
72:9 97:5

HH 89:4 89:16
89:20 89:21

hidden 87:17

HIPAA 74:8
74:12 74:13
74:20
75:5 75:6

history 33:24

hold 55:8
59:5

holding
58:1 58:4
65:21 65:23

home 12:12

honest 6:18

hopefully
95:1

hoping 95:17

hour 48:15

human 25:13
25:17 25:20

---

I

identificatio
n 12:24
13:13 80:21

identificatio
ns 10:1

identified
13:2
14:24 16:15
28:4

identifies
63:16

identify 9:23
28:10 28:12
62:11
65:5
76:24 95:19
95:22

IDF 77:10

illnesses
18:5

I'm 7:3 88:14

impact 91:16

impair 18:5
28:16 28:24

impairments
17:25

importance
56:15 56:18
57:9

important
18:10 23:15
69:9

include 19:22
40:3 41:2

included
27:18 38:14
52:7 74:6

including
27:22 66:21

income 22:4
56:20 57:13
57:14 69:3

incorrect
19:2

independent
37:15

indicate
42:25
43:2 44:7
53:14
61:9 67:8
68:5
69:17 79:10
86:4 86:24

indicated
15:2
15:22
16:1 31:4
44:22
48:7
77:12 85:20



87:20 94:2

**indicates**
55:12 63:22

**indicating**
67:4

**individual**
22:3
56:20 73:11
73:14 75:21
76:3 76:9
76:18 77:14
77:16

**industry**
36:16 36:21
37:7 46:8
49:23
50:2 50:3
69:2 69:8
73:1 73:6
73:15
77:8
78:16 83:11
83:17

**information**
8:16
23:12 23:12
23:13 38:11
38:15 38:17
38:21
40:4 72:6
72:8 74:6
83:22 83:23
86:12 88:7

**initially**
62:1 72:23

**injury**
75:17 82:12

**input** 15:16

**instant** 6:14

**institutions**
36:3

**instructed**
30:24 96:8

**instructions**
38:25

**insurance** 7:7
9:4 9:7
9:12 10:4
21:13 21:21
22:4
28:21 35:23
36:4 36:6
36:16
37:7
41:17 41:22
43:1 43:6
43:11 44:13
45:16 45:21
46:8 46:9
48:13 56:16
56:19 56:23
56:24 56:25
56:25
58:5
58:10 58:16
58:16 58:17
65:10 65:20
65:24 69:11
69:14 71:21
72:7
72:19 73:10
73:12 73:13
73:17 73:22
74:2
74:13 74:14
74:18 74:19
74:23 74:25
76:22 76:25
78:17 78:23
83:22

**insured** 22:20
47:16 47:16
47:22 47:23
84:2 84:4

**insureds** 8:25
21:25 78:24

**internal**
84:17
85:1 85:3
85:4 85:9
85:16 85:24

**intro** 91:15

**investigated**
68:20

**investigation**
54:14

**involve**
22:3
22:20 40:24

**involved** 6:20
58:11 58:12
60:10 65:24
68:19 78:4

**involves** 89:6

**involving**
21:13

**irrelevant**
44:3 44:4
44:5

**IRS** 57:7

**Island** 12:15

**isn't** 6:5
74:14

**issue** 39:12
68:19 89:10

**issued** 5:25
12:20 58:17

60:14 76:15
79:14 79:20
79:21

**issues** 38:5
39:3

---

J

**job** 14:17
15:23

**jobs** 67:25
68:3

**judge** 14:14
14:24 17:23
30:6
30:14 30:17

**July** 67:12
67:19

---

K

**kindly** 18:14

**kinds** 96:24

**knowledge**
7:25 31:2
31:3 31:8
37:12 51:17
51:21
52:5
59:14 63:19
66:24 73:24

---

L

**labeled** 61:10

**lack** 23:11
23:11 23:12
71:10 71:13
71:16 72:20

**Lacks** 63:2
64:10

**lady's** 96:22


NAEGELI DEPOSITION & TRIAL     CELEBRATING 40 YEARS IN BUSINESS     (800)528-3335     NAEGELIUSA.COM

lag 18:14

language
  75:20
  76:9
  76:14 76:17
  77:5
  77:13
  88:3 91:14

last 8:6
  29:11 29:12
  29:17 53:13
  53:17 53:17
  75:14

law 30:22
  32:9
  32:12 32:15
  32:23
  33:4 33:5
  33:21 35:23
  36:4 36:6
  36:9
  39:23
  40:1 43:1
  43:6
  43:11 43:15
  46:4 50:5
  53:14 53:20
  53:22 54:15
  54:24
  55:2 59:5
  59:6 63:7
  74:8

laws 40:21
  43:16
  48:1 48:2
  48:5 54:17

lawsuit 57:18

lawyer 46:2

lawyers 22:15

lay 69:10

lead 68:9

learned
  31:9 38:11

least 23:19
  85:23

led 79:24

Lee 9:23

legal 23:21
  52:21 62:12
  62:16

legitimacy
  66:9

leisure 35:19

Lemons 9:24
  13:8 13:9
  26:25
  27:2 27:5
  42:2 42:6
  42:10 42:11
  42:22 44:18
  44:24 45:14
  51:2 51:9
  51:16 53:11
  54:25
  55:3 57:1
  58:21 59:11
  59:13
  60:5 60:8
  61:10 61:16
  61:21 61:23
  62:12 62:25
  63:16 63:23
  64:7 66:2
  66:5 66:9
  67:5
  67:10 67:17
  67:24
  68:5 68:6
  71:2 71:3
  71:14

72:6
72:12
73:3 75:5
75:14 79:10
79:13
80:3
80:16 84:13
85:13 85:15
87:4 87:9
87:15 88:13
88:17 88:21
89:23 89:25

let's 25:16
  31:24 35:20
  35:21 42:16
  48:22
  49:2 53:8
  61:5 67:1
  68:22 70:24
  75:10
  79:6
  80:17 81:25
  84:8

letter 50:5

level 86:6
  86:11

levels 86:6
  86:10

license
  5:24 5:25
  20:9

licensed 20:7

Life 7:6
  9:6 9:12
  10:4 10:9
  21:13 28:23
  32:19 61:18
  61:25 76:14

limited 10:15
  10:22

line 43:4
  51:12 52:20

lines 46:10

link 11:2

list 14:10
  14:13
  15:9
  16:16 26:17
  31:13
  32:1 73:2
  88:25

listed 14:6
  16:11 71:24
  72:3
  77:19 85:23

litigation
  6:21 20:1
  37:15

little 23:5
  26:9 27:24

LLM 59:8

located 12:10

location 13:2
  82:19 82:20

LOMA 37:4

long 32:22
  34:10
  49:2
  52:25 74:5

longer 62:4

lot 7:4 8:1

Lynn 39:14

_____
M
_____
ma'am 13:10
  95:23

machine 25:13

25:18 26:12

**machine-
    like**
    25:23 26:6

**Madam** 95:19
    96:16

**main** 80:10
    81:22
    90:4
    90:16 91:2

**Maine** 7:8

**maintaining**
    85:6

**mal** 58:7

**malpractice**
    57:6
    57:15 57:18
    58:5 58:8
    58:10 58:16
    58:17

**mandate** 46:16
    55:2
    55:23 55:25

**mandated**
    69:13

**mandates**
    53:14 55:20

**manner**
    17:22
    69:3
    69:10 78:17
    78:22

**manual**
    49:20
    70:3 89:19

**marathon**
    18:18

**march** 18:21

49:3

**marked**
    12:23 13:12
    14:1
    75:13 80:21

**marketing**
    75:11 75:15
    77:22
    78:5 78:7
    78:11 79:5

**Massachusetts**
    12:11 12:16
    32:8
    33:18
    34:1 34:6
    34:11

**material** 51:9
    71:4
    75:18 81:15
    82:13
    83:1 83:4
    85:18

**materials**
    28:4 39:4
    39:6
    51:18 58:20
    60:20
    68:4
    75:12 75:15
    77:22
    78:5
    78:11
    79:5
    83:18 83:19
    85:24

**matter** 5:11
    7:6 7:9
    7:17 7:19
    7:24 8:4
    8:9 9:7
    9:18 10:8

10:12 12:20
13:16 13:24
15:12 17:11
19:7
23:18
27:1 27:3
30:17 31:12
37:15 40:25
41:7
46:22 49:18
50:17 55:12
63:14 65:22
70:7 70:8
90:15 91:21

**matters**
    8:12 9:17
    21:1 21:6
    21:9
    21:11 21:13
    21:16 21:19
    21:24
    22:2 22:3
    57:9

**maximum** 70:16
    88:4 88:8
    94:9
    94:14 94:16

**may** 8:5 10:14
    10:17
    12:2
    14:17 16:23
    23:16 25:20
    28:22 31:11
    35:8
    35:22
    36:6 41:2
    47:9
    47:10 47:24
    48:4 52:9
    52:19 63:14
    63:15 65:2

68:18
70:7
71:22
72:8 78:7
78:7
78:23 92:23
95:15 96:3

**maybe** 15:9
    23:6
    34:15 64:24

**Maynard** 21:17

**mean** 25:6
    25:18 28:21
    41:13 41:20
    46:16
    47:8
    52:21 63:10
    63:25 65:19
    69:2 73:5
    73:7
    74:13 77:10
    77:17 89:9

**means** 6:17
    69:12 82:11

**medical**
    55:7
    56:24 65:10
    65:14 65:20
    65:22 65:24
    66:2 66:5
    72:18 72:25
    74:21

**Medicare**
    56:25

**medications**
    18:4

**Medicine**
    55:13 55:21
    56:4

**Medicine's**



56:13

**meet** 29:5

**meeting**
30:5 30:6
30:8

**meetings** 29:9

**member**
36:16 36:22
37:3 37:4
37:6

**mentioned**
51:22 58:20
59:12

**mentioning**
51:25

**merely** 72:22

**messaging**
6:14

**met** 5:22
6:6 76:14

**methodology**
24:9
24:21 24:23
25:23
26:5
26:11 26:12
26:18 26:19
26:23
27:2 27:4
27:10

**middle** 71:1

**midway** 84:15

**mind** 53:9
93:2

**minimum** 53:16
55:14 70:20

**minute** 92:14

**minutes** 48:22
53:2 53:4
95:1 95:3
95:4

**mixture** 33:20

**model** 41:22
43:21 43:22
43:25
44:2 44:9
44:16 44:23
45:12 45:17
48:13
49:5
49:10 49:13
49:16
50:7
50:10 50:14
51:23
52:6 52:12

**modified** 48:8
48:11
91:2 91:22

**modifies**
90:10 90:16
91:16 94:3

**modify** 17:6
90:3
90:11 92:10
92:24
93:8 93:13

**modifying**
14:19

**moment**
83:21 84:22

**monthly**
88:4 88:8
94:10 94:14
94:15

**months** 8:6

70:8

**move** 6:10

**multiple**
46:10

**multi-state**
46:4 46:9

**Murphy** 5:12
5:18 6:6
9:25 10:2
10:3
10:20 15:18
23:22 24:25
25:25 29:22
30:4
38:13 39:18
41:1
41:19
42:4
42:12 44:19
44:25 46:13
47:6
48:14 48:17
50:19
52:3
60:21 62:14
63:2
63:18 64:10
65:12 66:18
74:3
74:16
75:2
77:11 78:13
83:13
90:6
90:18
91:4
91:24 92:12
93:4 94:6
96:5
96:13 97:3

**Murphy's** 16:8

16:11

**myself** 9:23
65:23

---

N

**NAIC** 41:10
41:12 41:15
41:18
42:5
42:10
43:3
43:16 43:20
44:2
44:23 45:12
48:7
49:15
50:7
50:10 50:14
51:23 52:12

**NAIC's**
43:24
44:8
44:16
49:5
49:10 50:17
51:3

**National**
41:16

**nature** 23:9
25:24 26:13

**necessarily**
27:6 39:9
65:17 78:14

**Nevertheless**
62:18

**night** 29:11
29:17 34:16

**non-**
**disclosure**



28:23

**none** 22:17
22:19 26:14

**nor** 43:21
50:14 60:9

**Northern**
17:17

**note** 87:13

**noted** 20:6
86:25 87:11

**nothing** 48:12

**notifications**
6:16

----O----

**oath** 5:7 6:19
17:18 17:21

**OB-GYN**
62:19
68:2 72:22

**object**
23:22 24:25
25:25
30:4
38:13
41:1
41:19
42:4
44:19 44:25
46:13
47:6
47:11 50:19
52:3
60:21 62:14
63:2
64:10 65:12
66:18
74:3 74:16

75:2
77:11 78:13
83:13
90:6
90:18
91:4
91:24 92:12
93:4 94:6

**objection**
29:22 42:12
96:3 96:5

**objections**
63:18

**obligation**
62:12 62:16

**obtain** 88:7

**obviously**
5:21

**occasion** 79:3

**occasions**
83:16

**occupation**
62:19 67:11
67:25 68:24
69:1
69:20 75:16
75:19
80:4 80:9
80:15
81:9
81:15 81:19
81:22
82:3 82:6
82:7
82:11 82:14
82:17 82:18
82:21 82:22
83:2 83:2
83:5 83:8
83:9 89:3

89:8
89:11 89:11
89:16 89:21
90:2 90:3
90:16
91:2
91:15 91:22
94:2 94:9
94:17 94:20
94:23 94:24

**occurred** 51:3

**occurrences**
83:7

**o'clock** 95:5

**offer** 66:2
66:4
87:22 91:1

**offered** 91:7

**offering** 41:6
43:9 89:4
90:14

**office**
12:12
16:8 16:12

**Oh** 6:22
10:2 10:2
48:16

**okay** 5:15
6:13 6:18
7:3 8:8
10:2 17:2
18:11 18:15
28:15
32:7
35:24 36:10
40:19 43:24
45:12
46:1 46:8
51:1
52:19 58:15

59:22
61:7
62:22
67:1
68:25 71:23
74:12 76:12
78:6 81:4
81:8 85:1
88:16 90:13
92:4
92:10 93:23
94:25
95:5 96:15

**omit** 23:2

**ones** 10:22

**ongoing**
8:19 31:22

**online**
33:25 40:14
54:17 54:19

**onset** 61:17
61:24

**open** 6:15
6:17

**opened** 8:21

**opening** 20:15

**opine** 39:9
88:16 88:23

**opined**
52:11 90:20

**opining**
40:4
43:15 43:18
90:15

**opinion**
23:1 23:3
23:13 23:16
27:22



31:8
40:23
41:2 41:4
41:7 42:1
43:9 44:8
44:12 44:16
44:17
49:5 50:9
50:13 51:22
55:18 55:23
57:3 57:8
57:20 57:23
59:17
62:1 62:7
63:13 63:23
64:7
64:25
65:6 66:2
66:5
66:16
69:7
69:16 69:23
70:10 70:13
72:1 73:3
77:4 78:2
78:3 78:8
78:9
78:10 81:18
82:16
83:7 87:5
87:22
90:5
90:14 90:21
91:1 91:7
91:21
92:2 92:6
**opinions**
13:19 24:20
31:3
40:20 65:22
89:5
**opportunity**

16:24
**opposed** 10:18
**option** 79:11
**order** 54:15
72:24
90:7
91:12 96:25
97:2
**original**
16:16
**others**
14:18
16:1
36:24 37:1
**otherwise**
16:20
17:6 28:24
**outlined**
92:19
**outside** 35:15
35:17
37:7
37:24 77:25
78:1 78:2
79:1
**Outstanding**
96:2
**overall** 72:20
**overbroad**
64:17
**overly** 64:12
**oversight**
86:25
**owner** 72:23

———————
P
———————
**p.m** 97:6

**page** 14:5
42:22 51:25
53:10 55:11
61:5 67:3
67:5
68:23 69:17
71:1
75:10 75:13
79:6
80:24 80:25
81:3 81:6
81:9 81:9
81:13 81:23
81:23
82:1 84:8
84:11
88:1 88:1
88:2 88:9
88:25 93:10
93:15
94:1 94:4
**pages** 61:2
**paid** 90:1
94:16 94:16
**paragraph**
53:13 61:10
67:9
69:17 69:18
70:24
71:1
75:14 75:22
82:23 84:15
84:16
90:8
90:10 93:11
**Parker's** 48:6
48:10
**particular**
50:8 76:2
77:3 83:24
**part-time**

32:14 32:16
**party** 60:15
62:5
**pass** 33:10
33:14
**passed** 85:9
**past** 36:19
**patient** 53:17
54:10 54:11
54:13 54:25
56:9 60:11
**patients** 57:1
75:7
**pause** 29:19
30:2
**pay** 79:7
94:13
**payment** 65:11
65:13
**PDF** 80:25
**Pearce** 87:25
**P-e-a-r-c-e**
87:25
**Pearce's**
87:21 87:22
88:20
**people** 46:20
**per** 52:18
**percentage**
68:1
**perform** 75:17
81:14 82:13
82:25
**performing**
68:1
**performs** 55:7



perhaps 48:25
49:25 71:23
85:22 90:23
91:18

period 31:7
66:23 69:19
71:6

peripheral
78:25

person 6:7
6:20 34:3
39:10 39:13

personal 74:6
74:10

personally
19:10 49:12
49:15

personnel
86:11 86:19

persons 69:11

perspective
45:16 45:25
47:8
52:16 57:15
74:7
77:24 78:25
89:13
90:1 94:8
94:10

pertinent
38:15 38:18
38:21

Phoenix 32:21
32:21

phone 22:15
29:21

phrase
70:22 81:19

82:6 82:16

physician
55:7 58:8
58:9
58:15 58:17
71:5 73:8
73:8

physicians
58:5 64:4
73:18 74:2

physician's
57:14

pick 46:11
64:19

picked 46:1

pieces 27:7

placed
88:12 95:12

plaintiff
19:7

Plaintiff's
12:18
13:7 13:7
13:19
14:1 14:5
80:18 80:24
96:4

plan 87:1

planning
30:19 36:9

play 27:13
42:2 42:6
66:23 83:24

please 12:6
17:13 18:10
18:17 41:15
72:7
80:17 93:16

95:19 95:24

point 16:24
23:15 36:15
36:19
87:8 87:9

pointed 83:6

policies 22:4
56:20 73:12
73:14 75:21
76:1 76:4
76:4 76:6
76:7 76:7
76:10 76:18
76:21 76:25
77:3 77:6
77:10 77:14
77:15 77:16
77:16

policy
27:17 47:17
47:20 69:10
76:12 76:15
76:16 76:25
77:3
77:22 78:11
78:18 78:19
78:23 79:14
79:19 79:20
79:21 79:22
80:7
80:10 80:16
80:23
81:1 81:3
81:6 81:6
81:10 81:23
82:1 82:2
82:25
88:3
88:10 88:17
91:14 91:22
92:21 92:24

93:20 93:21
94:11 94:11
94:20

policy's
77:21
90:4 91:3

poorly 9:10
13:25
21:9
37:17 90:24

portion 55:17
58:25
59:2
59:11 59:13
59:25
69:6
69:22 80:10
80:23
86:7
90:16 94:14

Portland 7:8

posed 42:14
45:3

possible
18:22 66:21

post 31:9
35:4

post-graduate
31:14

potential
68:14 78:24

Potentially
28:18

practice 46:5
46:6
46:23 50:18
60:5 60:8
68:2 85:7



NAEGELI
DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335
NAEGELIUSA.COM

practices
  38:2
  41:23
  43:2 43:7
  43:17 43:23
  43:25
  44:9
  45:19
  48:9 49:6
  49:11 50:11
  51:4
  51:19 85:7

practitioners
  55:14

precedent
  43:10

preceding
  70:25

predominant
  77:13

pre-law 33:22

premium 79:15
  80:1

premiums 80:7

preparation
  17:3

prepare 16:25
  26:18 26:20
  28:5

prepared
  13:16
  14:1
  14:13 40:7

preparing
  13:23 24:10
  28:1 29:6

present 12:12
  13:3

  17:25
  20:9
  29:15 36:18

presented
  70:1

presently
  6:15 12:9
  18:4

pretty 77:13

previously
  28:7 31:4
  36:13

primarily
  19:25 33:23
  40:4 80:12

primary 82:19

Principal 9:6
  9:12 9:16
  10:4 10:9
  14:16 21:13
  22:20 37:20
  37:25
  47:4
  49:20 50:16
  60:14 61:18
  61:25 62:17
  63:6 64:1
  72:12 72:14
  73:4 86:21

Principal's
  46:23 63:13
  70:3
  85:12 85:16
  86:9
  86:13 86:19
  87:6 87:14

prior 17:10
  24:17 28:20
  67:11 67:18
  69:20 69:23

  70:2 70:5
  70:18 70:22
  75:19
  80:5
  81:16 82:15
  85:2

privilege
  22:15

privileged
  83:18 83:20

probably
  7:3 34:15
  37:17 39:22
  56:6

problem 49:15
  78:10

procedure
  17:17 65:18

procedures
  52:8 55:7
  72:22 72:25

process 27:12
  46:12

product
  15:4
  24:20 46:10
  74:19 74:19
  89:18

professing
  79:4

profession
  23:21

program 32:12
  32:15 33:22
  33:25

programs
  86:14 86:16
  86:22

progressive
  66:12

prohibit 49:6
  74:5

prohibiting
  73:25 74:24

prohibitions
  50:18

proof 62:18
  63:4 63:5
  63:6 63:14

proper 84:18

propose 41:22

proprietary
  83:23

provide
  12:2
  13:18 15:10
  15:19
  16:2 18:6
  20:23 24:20
  30:16 31:12
  61:17 61:24
  62:4 62:9
  63:22
  64:6 71:4
  71:17
  73:2 86:21

provided 6:24
  7:1 7:19
  8:4 11:1
  11:19 15:12
  16:8
  16:11 24:12
  24:16 26:17
  31:19
  35:9
  36:14 37:19
  37:24 60:15


NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

66:16
73:3 73:6
86:12 95:10

**provider**
65:11

**providers**
36:3 53:15

**provides**
82:24 94:23

**providing** 7:9
16:16
18:1
19:18 19:19
20:22
21:3
21:12 21:16
21:20 77:4

**provision**
59:16

**provisions**
92:20

**publicly**
40:20

**pull** 12:18
13:7 80:17

**pulled** 39:22

**purchased**
89:15 89:21

**purely** 52:21

**purposes** 20:1

**purview** 77:7

---
Q
---

**qualification
s** 8:2

**qualified**
65:21

66:1 66:4

**question** 9:10
13:25 18:24
19:2 19:5
20:13
21:7 21:9
22:7 23:1
24:17
26:2 26:9
28:25 29:20
42:7
42:14
44:6 45:2
45:8 45:9
45:11
49:8
50:21 50:25
60:24 62:24
63:9
63:12
64:5
64:12
65:4
69:21 70:20
71:22 77:24
90:21 90:24
91:12 91:19
92:8 93:1

**questioning**
43:5
51:13 52:20

**questions** 7:4
7:20 8:2
18:2 18:7
28:17 84:23
96:9 96:12

**quick** 48:19
48:25

**quickly** 18:22

**quotes** 69:21

---
R
---

**Ralston** 62:2

**reads** 71:3
75:15

**real** 42:13

**really** 25:3
76:5

**reason** 43:4
52:11
66:8 66:11

**reasons**
44:2
65:18 66:20
84:1 84:3
84:5

**rebuttal**
14:14

**recall** 7:9
14:18
15:5 16:4
16:7 19:9
34:13
36:8 37:2
38:7
38:19
39:5
51:24 53:22
53:23 54:22
55:4 56:5
56:6
56:11 57:24
59:1
59:16 59:23
60:8 60:9
60:10
61:4
71:18 71:24
72:15 80:13
87:10 87:16

**receive**
34:5
34:20 94:9

**received**
60:15 86:1

**recollection**
54:24 55:1

**recommendatio
n** 55:23
55:24 56:13
57:4

**recommendatio
ns** 55:20

**recommended**
56:1

**recommends**
55:13

**record** 10:1
10:2 12:7
13:8 20:6
53:6 53:8
95:7 95:9
96:14 96:16
96:17

**recorded** 7:12

**records** 53:16
54:8 54:8
54:10 54:11
54:13 54:18
54:25 55:14
56:8 56:9
56:11
59:3 60:5
60:9
60:12 60:25
61:3 72:6
73:8 74:21

**re-depose**
12:3



refer 63:4
83:3

reference
10:15 10:18
31:18
38:9 39:2
39:25 54:19
56:7 83:3
92:25 95:16
96:3

referenced
22:8 35:7
39:7 93:6

references
59:14 86:15

referencing
43:14 53:20
54:12
76:2 76:3
76:8

referred 52:9
95:16

referring
54:9 56:8
56:20 56:22
56:24 61:12
61:21
63:7 71:9
71:12
77:1 81:3

reflect 15:6

refund
79:15 80:1

regard
13:24
21:8
21:11 21:19
22:6 22:17

23:8
25:22 30:14
32:11 33:17
34:19
35:7
36:10 36:12
38:8 39:2
39:11 40:21
42:2
42:21
43:3 43:5
43:7
43:14
51:6 56:7
57:8
58:12 58:19
59:6
60:25 62:13
62:25 63:17
63:24
64:8 65:1
65:4 65:6
65:9
67:17 69:16
69:22 70:20
73:11 73:13
75:5 75:6
76:16 80:16
85:2
88:12 93:25

regarding
12:3
12:20
31:2 31:3
38:2 38:9
38:12
79:5
83:12 84:24

regards 63:25
87:6

regular 67:11
68:23

69:1
69:19 75:16
75:18
80:4 80:9
81:9
81:15 81:19
81:22
82:3 82:6
82:7
82:11 82:14
82:16 82:17
82:21 82:22
83:1 83:5
83:8 83:8
89:3 89:8
89:10 89:11
89:16 89:21
90:2 90:3
90:15
91:2
91:15 91:22
94:2 94:9
94:16 94:20
94:22 94:24

regulation
53:24
54:1 54:2
63:21 63:23
64:7 65:5
65:5 73:25

regulations
64:3
78:22
79:5 85:17

regulatory
85:8

reimbursement
57:2

related 35:22
36:4 36:6
36:7 60:7

68:4

relevance
23:24

relevancy
23:20
24:2 24:6

relevant
23:18 44:17
44:23
51:8
51:16 51:19

reliability
24:24 26:10

reliable
24:21 24:23
25:6

relying 58:21

remedied 87:6

remedy 87:1

remote 5:1
5:10

remotely 5:22

render 41:4
65:22

repeat 51:11

repeatable
25:8 26:7

rephrase 21:7
26:9
37:18 42:16
60:24

replaced
93:11

report
13:15 13:23
13:23
14:1 14:6



14:15  14:20
14:24
15:6
16:21
17:7
24:10  24:15
26:18  26:20
30:7
30:14  30:17
31:4
37:11  38:10
39:7
39:11  39:25
40:6  40:7
42:17  42:25
51:6
51:15  53:10
53:13  53:14
55:12  60:20
60:22
61:6  61:9
67:5
68:15
71:1
71:25  75:11
75:13
76:8  79:6
84:9
84:12  85:21
86:1
87:11  87:13
87:20  87:21
87:22
88:2
88:25
91:8
91:14  91:16
93:9
93:16
94:1  94:3

**reporter**
  10:19  17:19

39:15  87:24
95:18  95:19
95:21  95:25
96:16  96:18

**reporting**
  93:19

**reports** 30:16

**represent**
  9:15  9:18
  78:18  78:23

**represented**
  10:11

**representing**
  30:21

**request**
  12:2  62:3
  74:21  86:21

**requested**
  71:17  71:19
  71:20  73:10

**require** 56:1

**required**
  46:19  54:15
  56:2
  58:22
  75:6
  78:18  89:15
  89:20

**requirement**
  52:22

**requirements**
  23:21  66:22
  68:11

**requires**
  54:25

**research**
  37:14  37:23
  39:21  40:11

43:15

**residency**
  47:22

**resident** 47:5
  47:5

**residents**
  48:3

**respect**
  31:2  31:8
  54:18

**respond** 28:17
  28:24  30:17
  62:10  88:19
  96:9

**responding**
  29:8

**response** 7:20
  13:4  24:7
  24:16  60:14
  60:19  76:13
  87:1

**responses** 8:4
  16:6  18:1
  18:6
  18:11
  29:3  95:13

**responsible**
  84:16  86:5

**restate** 45:2

**restricted**
  29:3

**restrictions**
  95:12

**result**
  25:19  26:7

**resume** 77:19

**retain**

53:15  54:25
55:3
55:14  58:22

**retained** 8:11
  8:16  9:3
  9:3  9:6
  9:11  9:16
  10:8
  19:23  20:14
  20:19

**retaining**
  64:20

**retention**
  54:18
  59:2  59:3
  64:8  65:1
  65:7

**return** 57:7
  58:23
  59:4
  79:14  79:25
  89:7
  89:12  89:15
  89:20

**returned**
  79:19  80:6

**returns** 58:20
  59:11  59:14

**review**
  14:20
  17:2
  19:25  26:21
  27:2
  38:11
  39:4  40:6
  44:13
  60:4
  60:13
  61:2  66:8
  68:8



NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

85:12 85:16
86:9
86:13
87:4 89:18

**reviewed**
13:22
14:2 14:7
14:10 14:12
14:14 14:15
14:16 15:23
16:2
16:16 16:19
27:8 28:5
30:10
39:7
59:24
60:7
60:19
61:1
79:22 86:15
86:17 87:21

**reviewing**
26:20 26:24
27:5
27:11 27:11
39:2
43:19 60:10
69:15

**revise** 15:6
16:20

**revised** 12:18

**rider** 75:16
82:2 82:3
82:4 82:7
82:18 82:21
82:23 82:24
83:9
88:13 88:17
88:21
89:3
89:15 89:16

89:20 89:21
90:3 90:9
90:16
91:2
91:15 91:22
92:19 92:19
92:21 92:22
92:22 92:23
93:7 93:8
93:12 93:13
93:25
94:3
94:15 94:19
94:20 94:23

**riders**
80:11 80:12
80:15
82:1
88:24 88:25
89:5 92:10

**Road** 12:15

**role** 22:23
42:1 42:5
42:10

**room** 6:11
13:3

**rule** 63:21
63:23
64:7 65:4
65:5 92:18

**rules** 17:12
17:16
20:4
22:24 43:25
44:2 44:9
44:17 44:23
45:13
46:5
46:11 46:15
49:6 64:2
78:21

79:4 85:17

**running** 72:24

———————————

S

**sale** 78:18

**saw** 47:1
56:10 85:14
85:19

**school** 31:9
31:13 31:19
32:9
32:11 32:15
32:23
33:4 33:5

**Science** 34:24

**scope** 22:25
43:8
91:21 92:1

**screen** 6:16

**scrubbed**
74:10

**second**
33:15
61:9
69:17 82:23
96:14

**secondary**
82:20

**second-to-**
**last** 69:18

**section** 59:24
81:10 93:17
93:21 94:5

**seems** 57:15
91:17

**selling** 77:22

**send** 97:4

**sentence**
53:18
54:7 54:8
54:16 55:11
55:15
56:8
61:11 61:11
61:15 61:18
62:7
67:14
69:1 69:4
69:18 69:22
71:3 71:7
72:1
76:17 84:15
84:19 84:22
84:23 84:24
86:4 86:7
86:24

**separate**
85:10

**September**
19:16 20:16

**series** 76:7
76:14 76:24

**serve** 8:11

**service**
8:22 21:4
21:17 22:19
53:17 60:16

**services**
20:24 21:12
21:20

**serving**
9:12 10:8
21:21 21:24

**session** 18:18

**setting** 51:18
63:12

**Settlement**
41:23
43:2  43:6
43:23  43:25
44:8
45:19
48:9
49:11  50:11
51:4

**seven** 22:12
53:16  55:3

**several** 66:20

**share** 10:17
11:1  11:3

**short** 95:2

**sickness**
75:17  82:12

**sign** 5:14
5:17  12:1

**signatory**
28:16

**signed** 28:22

**similar** 33:21
41:23  43:21
43:22  48:12
50:14

**similarly**
55:12

**simpler** 64:24

**Sinclair**
5:9  5:15
5:20  6:8
10:6
10:14  10:24
10:25  12:25
13:14  15:20
15:21  23:25
25:4  26:3

30:1
30:13  38:16
39:19
41:5
41:25
42:8
42:15  44:21
45:4
46:21  47:14
48:16  48:18
49:1  49:4
50:22  52:10
53:3  53:7
60:23  62:21
63:8
63:20  64:15
65:15  66:25
74:11  74:22
75:4
77:20  78:15
80:22  83:15
90:12  90:22
91:6  92:3
92:15  93:14
94:18
95:8
95:15  95:23
96:2  96:6
96:15  96:19
96:20  97:1

**single**
26:21  31:23
32:3  46:17

**Sir** 95:21

**sit** 17:5  92:5

**sitting**
16:4
16:22  65:3

**situation**
27:12  50:6

**situations**

92:23

**skipped** 9:22

**solely** 21:8
75:16  82:12

**someone**
47:8  47:11

**somewhat**
91:17

**sorry** 23:5
40:13  48:16
54:5  78:1
89:9

**sort** 22:24

**speak** 18:13
29:5

**speaker** 23:6

**speaking**
33:23  62:22

**specialized**
59:5

**specific**
20:20  45:20
59:16
60:8
60:11  62:12
76:7
76:12  76:15
79:11  83:20
85:14  92:25

**specifically**
20:20
31:6  36:9
39:9  41:4
56:5
71:18  77:15
92:22

**specifics**
22:16

**spelled** 87:25

**spoke** 29:17
29:18
30:7  30:12

**spreadsheet**
61:2

**stages** 8:18

**stand** 41:13
41:15

**standard** 24:1
73:1  73:7
73:15  83:11
83:17

**standardly**
73:9

**standards**
24:4
49:24
50:2
51:19  78:16

**standing**
17:22

**start** 21:10
23:1
34:10  72:24

**started** 34:13

**starting**
36:15

**starts** 69:4

**state** 5:24
12:6  33:1
33:8
46:17
48:1  48:4
48:5  50:4
50:5
51:24  52:2



52:13 69:14
73:24

**state-by-**
**state** 50:7

**stated** 52:4

**statement**
27:22
48:7
48:10 79:12
79:17

**states**
46:10
48:3 48:4
50:8
75:16 82:24
92:22

**state's** 46:5

**States**
45:24 60:1

**statute** 38:12
53:23 53:25
54:2
62:25 63:10
63:15
64:6
64:19 64:25
73:25

**statutes** 38:2
38:9 51:8
51:14
74:5
78:22 85:8

**stay** 68:22

**steps** 40:10

**stipulating**
5:10

**stipulations**
5:16

**stop** 18:20

**strange** 18:9

**strategic**
36:9

**strict** 50:5

**stringent**
45:24
46:4
46:11 46:15

**structure**
91:12 92:8

**student** 32:3

**styled** 89:4

**subject** 48:21
48:23 48:24
49:2 49:3
74:8

**submission**
63:5 63:25

**submit** 72:8
72:13 72:20

**submitted**
39:11
57:7
72:12 72:15
72:16 72:17
72:18 74:9

**submitting**
56:16
57:1 65:10

**subpoena**
12:19
13:4 16:6
60:13

**subpoenas**
60:18

**substance**

29:8 49:10

**substantial**
71:5
75:18 81:14
82:13
83:1 83:3

**substantiated**
72:1 72:4

**substantive**
12:2 12:3

**sued** 19:11

**suffering**
18:5

**suggest** 68:13

**suggested**
30:11

**suit** 57:6

**Sun** 28:23
32:19

**supplemental**
30:16

**supply** 23:23

**supporting**
57:6
57:12 57:13
59:3

**supportive**
23:3 23:9

**supportivenes**
**s** 23:8

**supports** 93:8

**sure** 15:15
17:14 22:12
26:4
27:21 28:14
41:20 42:13
43:8 44:7

45:5 49:9
51:12
54:6 54:6
56:17 62:22
64:16 72:17
72:19 72:25
76:11 77:17
78:21
86:5
88:14
92:2 92:16

**surgeon** 67:13
67:18

**surrounding**
27:18

**swear** 6:2

**swearing** 5:10

**Symetra** 7:6

**system** 6:15
88:2

_____
T
_____

**tail** 89:6

**taking**
17:15
32:3 78:1

**talk** 26:10
35:21

**talked** 21:3

**talking** 25:12
25:12 25:13
26:10 26:25
27:1
31:19 31:22
35:18
50:5 61:8
64:2 81:2
88:14



talks 57:12

tax 57:7
57:11 57:11
58:2
58:20 58:23
58:24 58:25
59:4 59:6
59:11 59:14
59:17
60:2 60:4

technology
6:14 18:14

telephone
29:13 29:15

term 26:19
52:15 62:16
80:9 81:13

terms 69:10
77:21 78:11
78:18 78:24
79:23

territorial
48:2

testified 5:8
49:19 67:10

testify 12:19

testifying
20:3

testimony
7:11 7:15
7:23 7:24
8:3 17:10
19:19 20:23
22:25 31:17
31:25
43:9 47:1
49:20
51:7
51:15 67:17

95:10

Thank 9:20
12:17
53:4 96:7

third 15:22
60:15
62:5 84:15

throughout
76:23 78:5

Thursday
29:12 29:17
30:5 30:15

Thursday's
30:6

thus 95:22

today 6:11
10:15
11:4
16:22
17:5
17:15 18:21
28:17
51:7
51:14 62:11
65:3 92:5
95:10 96:8

to-day 9:19

today's 16:25
28:1 28:5
29:6

top 88:3

Total 82:11

totally
94:8 94:24

track 95:18

trade 36:17
36:21

training 31:6
31:14 36:11
36:12 36:13
45:17 45:22
46:15 46:15
46:19 46:25
86:13 86:16
86:22

transcribed
96:19

transparent
61:15

treat 47:4
47:8 47:17

treating
47:11

treatment
66:5

tremors
66:2 66:6
66:9 66:16

trial 41:7

true 50:5

truthful 7:20
18:1 18:6
95:10

try 18:13
26:8
33:10 33:15
72:10 90:24

trying 26:4
51:12

Tuesday 29:11

Tuesday's
30:8

turn 42:16
53:9 61:5
67:1

68:22 75:10
81:5
81:25
84:8 93:15

type 56:22
56:25 64:19

types 54:11

typical 94:12

typically
45:22
69:2
69:13 71:20
72:7 74:8
78:4
83:14 84:7

---

U

unable
75:17 81:14
82:12 82:25

unclear 68:1

underlying
27:14 27:16

underneath
67:9

understand
7:14 10:7
11:25
12:1
16:23 17:10
17:14 17:18
17:21 18:20
18:23
20:2
20:14 22:25
25:1 26:1
37:16 37:19
43:8 44:6
45:8 45:9
45:11



47:7  49:8
63:10  69:11
79:24  92:7

**understanding**
46:24  61:23
91:11

**understood**
9:20  69:2

**underwent**
46:25

**underwriting**
14:15
15:2  15:4
89:19

**unfair**
41:23
43:1  43:6
43:22  43:24
44:8
45:18  45:23
48:8
49:10  50:10
50:17  51:4

**unfairly** 49:6

**United**
45:24  59:25

**universities**
32:10
35:2
35:15  35:25

**university**
31:20
32:2  32:4
32:5  32:8
32:9
32:25
33:3
33:17  33:19
33:21
34:1  34:6

34:11

**unless** 89:6
92:21  96:12

**update**
88:13  88:17
88:21

**upon** 14:20
23:20  38:25
48:1
54:23
55:1
55:17
73:7  91:16

**USC** 59:25

**usual** 5:16

**utilize** 26:11
50:17  54:19
73:15

**utilized** 26:5
77:4

---
V
---

**varies** 73:7

**various**
8:18  35:9
86:11

**vary** 70:5
70:7  70:8

**vendor** 62:5

**vendors** 73:20

**verbalize**
18:10

**version**
48:8
48:11  50:14

**versus** 41:3

**video** 6:4

**VIDEOCONFEREN
CE** 5:1

**view** 68:4

**violated**
62:12  62:25
63:23
64:8
64:25  65:6

**violations**
51:3

**virtue** 8:5
74:20

---
W
---

**Walston** 61:12

**wasn't** 40:4
76:5

**website** 54:21
56:4

**WEDNESDAY** 5:4

**weeks** 70:9

**We're** 61:8

**West** 12:11
12:16

**Western**
32:8
32:11  32:15
32:22  33:4

**Westlaw** 40:17

**whatever**
35:21  40:19

**whereas** 25:19
55:25  61:16

**whether**
30:9
38:20  38:22
43:16  45:19

63:13  64:24
89:14  89:19
93:7

**widely** 73:22

**wish** 14:9
17:5

**withhold**
83:17  83:19

**witness** 23:24
24:2

**witnesses** 6:2
6:3

**work** 9:14
9:19
31:10
35:5
35:24
85:2  89:7
89:12  89:15
89:20

**worked**
32:17  76:21
77:15  77:18

**working** 32:18
32:19  34:17
83:2  84:17

**works** 53:3

**worsens** 66:12

**wrap** 51:12
95:1

**wrapping**
52:19

**writing**
84:2  84:4

**written**
24:4
38:25  69:10



**wrote** 24:14

_____

Y
_____

**Yarmouth**
  12:11 12:16

**yesterday**
  10:17 10:23
  11:2 11:4

**York** 47:23

**yourself** 6:11
  30:19 30:21
  55:8 58:1
  58:4 65:21

